## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ASIA GAINES, for herself and as next friend of her minor child, "JC," | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 19-cv-00775 |
| v. | ) ) | Judge Elaine E. Bucklo |
| THE CHICAGO BOARD OF EDUCATION; KRISTEN A. HAYNES; and JUANITA TYLER, | ) ) ) | Magistrate Judge Finnegan |
| Defendants. | ) ) ) | **Jury Demand** |

### PLAINTIFF'S RESPONSES TO DEFENDANTS' MOTIONS IN *LIMINE*

December 8, 2023

*Plaintiff's counsel*
Al Hofeld, Jr.
Zachary J. Hofeld
LAW OFFICES OF AL HOFELD, JR., LLC
53 West Jackson Boulevard, Suite #432
Chicago, Illinois 60604
(773) 241-5844
Fax - 312-988-0057
al@alhofeldlaw.com
zach@alhofeldlaw.com

### *Gaines* Plaintiff's Exhibit List
### (for Plaintiff's MILs and Plaintiff's Responses to Defendants' MILs)

**A.**  Transcription of the combined body-worn camera footage of CPD Officers Layne, Hochhauser, and Corvera (Plaintiff 435-451)

**B.**  Transcript (part 1) and video (part 2) of the deposition of Jo'Maury Champ (Filed Under Seal)

**C.**  CPD Case Supplementary Report by Officer Casanova (Plaintiff 380-397) (Filed Under Seal)

**D.**  CPS Investigative Report by Latasha Finley (redacted) with attachments A-K (BOE 3374-3443)

**E.**  Transcript of the criminal trial of Kristen Haynes and Juanita Tyler from October 9, 2020

**F.**  Transcript of the deposition of Dr. Jane McNaught

**G.**  Transcript of the deposition of Deisy Anaya

**H.**  Transcript of the deposition of Asia Gaines

**I.**  Transcript of the deposition of Joseph Champ

**J.**  Defendants' Responses to Mandatory Initial Discovery Requests from Kristen Haynes and Chicago Board of Education

**K.**  Transcript of the deposition of Juanita Tyler Volumes I and II

**L.**  CPD Criminal History Reports of Asia Gaines and Joseph Champ (Filed Under Seal)

**M.**  Expert Report and CV of Dr. Steven Berkowitz(Filed Under Seal)

**N.**  Transcript of the Deposition of Kristen Haynes

**O.**  CPS Misconduct Reports of Jo'Maury Champ in chronological order (BOE 80-87, BOE 741-754, BOE 98-135, BOE 7166-7214, BOE 72-79) (Filed Under Seal)

**P.**  Expert Report, First Set of Scales, and CV of Dr. Jane McNaught (Filed Under Seal)

**Q.**   Rebuttal of Dr. Jane McNaught's Opinions by Dr. Steven Berkowitz (Filed Under Seal)

**R.**   Second Set of Scales by Dr. Jane McNaught (Filed Under Seal)

**S.**   Juanita Tyler's Cook County Criminal Records (PLAINTIFF 1059-1138)

**T.**   Juanita Tyler's Lake County Criminal Records (PLAINTIFF 1139-1207)

**U.**   Transcript of CBS News Juanita Tyler Interview

**V.**   Transcripts of Defendant Tyler's and Defendant Haynes' Criminal Trial

**W.**   Transcripts of Defendant Board's Dismissal Proceeding Against Defendant Haynes (Filed Under Seal) (BOE 7238-7273, 7923-8088, 8142-8210, 8089-8097, 8211-8236)

**X.**   Defendant Board's Post-Hearing Brief from Defendant Haynes' Dismissal Hearing (Filed Under Seal) (BOE 8098-8141)

**Y.**   Deposition Transcript of Nakyya Champ (Filed Under Seal)

**Z.**   Deposition Transcript of Dr. Steven Berkowitz Vol. I (Filed Under Seal)

**AA.**  Deposition Transcript of Dr. Steven Berkowitz Vol. II (Filed Under Seal)

**BB.**  Deposition Transcript of Beatrice Starks

**CC.**  Deposition Transcript of Sylvia Hodge Vol. I

**DD.**  Defendant Board's Dismissal Charges and Specifications Against Defendant Haynes and Suspension Records (Filed Under Seal) (BOE 460-474, 517)

**EE.**  Facebook Message Defendant Haynes and Ray Tyler (PLAINTIFF 32)

**FF.**  Plaintiff's Mandatory Initial Discovery Responses

**GG.**  Defendant Board's Responses to Plaintiff's First Set of Discovery Requests to All Defendants

**HH.**  Emails from Shariaye Wilson to Al Hofeld, Jr. and Zachary J. Hofeld

Plaintiff Asia Gaines, on behalf of her minor son JC, through undersigned counsel, respectfully submits the following responses to defendants' motions in *limine*:

## OVERVIEW

Defendants' motions in *limine* hide from this Court much of testimony and facts it needs to make informed rulings on defendants' motions. Though wrapped in tidy packages plentiful with *general* statements of evidence law, defendants' motions ignore the evidence of record and, often, fundamentally misrepresent it.

In broad strokes, the facts that the Court needs to understand defendants' motions in *limine* are as follows. On September 20, 2018, the minor plaintiff JC was a 9-year-old, fourth grader at Tilton elementary School. His homeroom teacher was defendant Kristen Haynes, with whom JC had a trusting relationship. At the time and since kindergarten (the parties expert witnesses all agree), JC had undiagnosed ADHD and had been mildly disruptive in Haynes' class in the days before September 20. On September 18 and 19, Ms. Haynes spoke to JC's mother (in person) and father (over the phone (and possibly in person as well)), respectively, about JC's behavior; Haynes also asked JC's father to come to school (for the first or second time) the following day, September 20, to meet in person, but due to his late shift work schedule at Walmart he did not make it in. On the evening of September 19, Haynes messaged and/or phoned two distant relatives on JC's on his father's side, including defendant Tyler, a great aunt of JC's who was not authorized in school records to have contact with JC and whom JC had either never met or met once as a toddler and had no recollection of, and a great uncle of JC's. In her messages/calls, Haynes told both of them that she was trying to get in touch with their sibling, another great aunt of JC's, "Mona," whom, she wrote, JC is "scared of." The next morning before the start of school, September 20, Haynes told the school security guard that she

2

was expecting Tyler and that, when she arrives, to send her directly upstairs to her classroom (instead of directing her to the school office, *per* Tilton policy, where the office would have checked whether was an authorized contact for JC). In this way, Tyler entered Tilton and went directly up to meet Haynes at her classroom, Room 204.

Next, plaintiff alleges that, on September 20, Haynes provided two, adult size belts to Tyler, belts that she stored in her classroom closet and with which she had repeatedly threatened the students in her class, calling them by the names "Mr. Brown" and "Mr. Black" and that claiming she had permission from some of their parents to use it on them or allow their parents to come to school and use them.

At age 9 in the fall of 2018, JC was short and skinny. (https://www.cbsnews.com/chicago/news/george-tilton-elementary-school-student-beaten-belt/) (last checked 11/17/23). He was approximately 4'5" and 66 pounds; Haynes estimated he was 4'3" on 9/20/18. (Haynes dep.). When JC and his sister NC tried to enter the classroom that morning, both Haynes and Tyler were standing at the classroom door. They allowed NC to pass them and enter the classroom. As JC followed behind NC through the doorway, Tyler, who JC later referred to only as "the lady" because he did not recognize her or know who she was, restrained him by grabbing the loop of his backpack, which was on his back. JC asked, "What did I do?" In response, Haynes said, "You know what you did." JC and Haynes repeated this back-and-forth. After JC asked the same question a third time, Tyler slapped him twice. Haynes did not intervene. When JC asked once more, Haynes responded, "Are you trying to call me a liar?" When JC tried to pull away from Tyler who was now holding his left wrist, Haynes grabbed his right wrist, and together Haynes and Tyler dragged JC backwards down the hallway to a second-floor boys' bathroom. Haynes then unlocked the bathroom door with her keys that

were hanging around her neck, held the door open for Tyler and JC, and Tyler and JC entered the bathroom.  Haynes then returned to her classroom.

Inside the bathroom, Tyler pushed JC into a corner and told him to take off his bookbag and pants.  When JC refused to take off his pants, Tyler hit him repeatedly with both belts (layered on top of each other) over his clothes on his shoulder, back, butt, and legs as he stood in the corner. Tyler paused twice during the beating to again demand that JC take down his pants and each time, when JC refused, she resumed beating him with the belts. During the "whooping" or beating, JC screamed, cried and called out.  His sister (and at least some other students), seated in the classroom, heard JC and started to get up when Haynes told her to sit back down; Haynes ignored JC's cries.  In the bathroom, when Tyler ordered JC for the third time to take down his pants, he screamed, "I want my Mama," and Tyler replied, "I am your Mama!" and continued hitting him with the belts.  When she stopped beating him, Tyler said, "Respect Ms. Haynes; we grew up together."  Tyler then took JC by the wrist back to Haynes' classroom, hitting him with the belts on his butt once more on the way back to the classroom in response to Haynes saying that JC was smirking.  Many of the students in Haynes' classroom laughed when JC entered the room.  Tyler pushed JC towards his seat, returned the belts to Haynes, and left the school.  JC and his sister told his aunt what happened to him when she picked them up from school that day, as soon as they got in the car.

Plaintiff alleges that he sustained abrasions to his left shoulder, right thigh and neck, redness on his back, legs and buttocks, pain and soreness, difficulty sitting, and, subsequently, school bullying, Post-Traumatic Stress Syndrome (PTSD), exacerbated ADHD, Major Depressive Disorder, and Anxiety-Disorder.

4

Defendants' defense is to completely deny all allegations. [1]

On and following September 20, 2018, numerous investigators interviewed JC, Haynes, and/or Tyler and other numerous other witnesses about the events of that morning. They include: Chicago police, Tilton's principal, emergency medical and mental health providers, a DCFS investigator, a CPS investigator, testimony at Haynes' and Tyler's criminal trial, testimony in Chicago Board of Education's dismissal proceeding before the Illinois State Board of Education, depositions in this case, and interviews by expert witnesses. As relevant background, plaintiff attaches: a transcription of same of the body worn camera video of JC's first recorded account, which was given to patrol officers during in evening of September 20, 2018 (Plaintiff's MIL Exhibit A[2]); the transcript and video JC's deposition in this case (Group Exhibit B); the final investigative report completed by detectives on October 29, 2018 (Exhibit C); and the CPS investigator's report from February 4, 2019 (Exhibit D). Plaintiff will show that Haynes and Tyler's statements have changed over time and contradict each other on key points while JC's retelling of the incident has been consistent.

---

[1] For her conduct in the incident, defendant Tyler was convicted of misdemeanor criminal battery in *People v. Tyler*, 18 DV 80766 (Cir. Ct. Cook Cty.), and the Illinois Appellate affirmed. *People v. Tyler*, 1-21-0450, 2023 IL AP (1st) 210450-U. Defendant Haynes was found not guilty of child endangerment during the same trial. However, for her alleged conduct in the incident, defendant Chicago Board of Education initiated a dismissal proceeding against defendant Haynes before the Illinois State Board of Education, which is still pending and awaiting a decision by the hearing officer.

[2] Plaintiff uses a single lettering system to refer to all of her exhibits, both her exhibits to her MILs and her exhibits to her responses to defendants' MILs. Plaintiff's exhibits are referred to simply as "Exhibit A," "Group Exhibit B," and so on.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 1

### Introduction

Defendants ask the Court to bar any "evidence of Defendant Juanita Tyler's criminal record," arguing that it is inadmissible under Federal Rules of Evidence ("FRE") 401, 404(b), 609, and 403. Dkt 312 at 1-8. But Defendants' entire motion rests on an absurd idea: that Tyler gets a criminal do-over—a second chance to litigate whether she repeatedly struck JC with belts in a bathroom at JC's school on September 20, 2018, despite having already been convicted of doing just that. *People v. Tyler*, 2023 IL App (1st) 210450-U, ¶ 1-3. Needless to say, she does not. For all the reasons set forth in Plaintiff's Motion *In Limine* ("MIL") No. 1, Tyler is precluded from denying battering J.C. with Haynes' belts in the Tilton bathroom at trial in this case, because she has already been convicted beyond any reasonable doubt of doing just that. *People v. Tyler*, 2023 IL App (1st) 210450-U. As a consequence, Plaintiff should not have to introduce evidence of past instances in which Tyler physically assaulted and battered family and friends in order to prove her battery, assault, and IIED claims against Tyler here. The proper course instead is for the parties to stipulate to the fact that Tyler was convicted beyond any reasonable doubt of beating J.C. in the bathroom with belts and lost her appeal. Alternatively, if Defendants will not agree to such stipulation, the Court can and should take judicial notice of the same.

Equally problematic, Defendants act as though the only evidence of prior acts were Tyler's criminal records at Plaintiffs' Proposed Exhibits 43, 44, 45, and 46. It is not. Most fundamentally, Defendants ignore the fact that, when questioned at deposition about the facts *underlying her prior arrests*, Tyler repeatedly invoked her Fifth Amendment privilege against

6

self-incrimination. While Tyler was free to do so, here in the civil context her decision carries an important consequence: the jury may draw an adverse inference from Tyler's decision to take the Fifth and assume her answers would have been unfavorable. Given this, Tyler's repeated invocation of the Fifth Amendment—for example, when asked whether she battered her mother, husband, and other acquaintances during multiple, specific instances throughout the 1990s and 2000—are highly probative. If Tyler denies having battered J.C. with Haynes' belts in the Tilton washroom by reason that she does not believe in hitting a child, is not capable of hitting a child, and does not believe in hitting someone first, Plaintiff may properly introduce the foregoing evidence under Rule 404(b)(2) for the non-propensity purposes of showing that Tyler in fact believed in hitting children, was capable of hitting children, and did believe in hitting others first. The Court should deny Defendants' motion in its entirety.

To place these issues in proper context, Plaintiff begins by summarizing the relevant record evidence.

## Relevant Facts

In August 1992, Defendant Tyler was arrested and charged with endangering the life of a child. Ex. S at Plaintiff 1063-64, 1065-68. Plaintiff sought to discover the facts and circumstances of that arrest at Tyler's deposition in this case, but Tyler refused to answer any questions, repeatedly invoking her Fifth Amendment right against self-incrimination, testifying in relevant part:

Q. Who was the alleged victim? Do you remember?
A. I told you, I plead the Fifth. See, you're not listening to me.
Q. No, the way it works is I still ask you the questions, and if you're going to plead the Fifth, you can tell me that.
A. Okay.
MS. MCBRIDE [Tyler's counsel]: He can ask you, and you can choose to not.
THE WITNESS: I can plead the Fifth.
BY MR. HOFELD:

7

> Q. Okay. What was the age of the alleged victim, Ms. Tyler?
> A. I plead the Fifth.
> Q. Was the alleged victim in your care when it was alleged that you endangered him or her?
> A. I plead the Fifth.
> . . . .
> Q. Did you -- What did you do to endanger the life of the child?
> A. I plead the Fifth.
> Q. Did you hit the child?
> A. I plead the Fifth.
> Q. Did you touch the child in any way?
> A. I plead the Fifth.

Ex. K, Tyler Dep at 279:24-281:15.

In April 1998, Defendant Tyler was arrested and charged with domestic battery, in violation of "720 ILCS 5/12-3(A)." Ex. S at Plaintiff 1063. The Chicago Police Department Arrest Report pertaining to the incident states that Tyler was "placed in custody after being identified by the victim [Brenda Williams] as the one who slapped her as they were entering Collins H.S."[3] *Id.* at Plaintiff 1090; *see also id.* at Plaintiff 1088-89. Plaintiff sought discovery into the facts and circumstances of Tyler's arrest at her deposition, but Tyler refused to answer any of Plaintiff's questions, repeatedly asserting her Fifth Amendment privilege:

> Q. . . . . [C]an you tell me what happened that got you arrested?
> A. That's not your business, and I plead the Fifth.
> Q. Okay. So can you tell me what the specific allegation against you was?
> A. And I plead the Fifth again.
> Q. Let me -- That's fine, but let me finish the question, all right? Can you tell me what the specific allegation against you was?
> A. I plead the Fifth.
> Q. Okay. And can you tell me any of the facts that led to that charge?
> A. No, sir.
> Q. Why not?
> A. 'Cause I plead the Fifth.
> Q. Okay. Did you---in the incident for which you were arrested in April of 1998, did you slap a woman by the name of Brenda Williams as she was entering Collins High School?
> A. I plead the Fifth.

---

[3] Both this CPD Arrest Reports and those referenced below may be admitted at trial pursuant to the hearsay exceptions for either business records (*see* Rule 803(6)) or public records (*see* Rule 803(8)).

> Q. Was Brenda Williams a minor?
> A. I plead the Fifth.
> Q. Was she only 16 years old?
> A. Was she?
> Q. I'm asking you.
> A. I plead the Fifth.
> Q. What were you doing at—Why were you at Collins High School?
> A. I plead the Fifth.
> Q. Was Brenda Williams related to you?
> A. I plead the Fifth.
> Q. Is Brenda Williams the name of the alleged victim?
> A. I plead the Fifth.
> . . . .
> Q. Ms. Tyler, did you hit Brenda Williams?
> A. I plead the Fifth.
> Q. Did you touch her?
> A. I plead the Fifth.

Ex. K at 283:2-284:22.

In August 2002, Defendant Tyler was arrested and charged with battery, in violation of

"720 ILCS 5/12-3-A-1." Ex. S at Plaintiff 1063. According to the Chicago Police Department

Arrest Report filed in connection with Tyler's arrest, a woman by the name of Linda Armstead

submitted a signed criminal complaint for battery stating that Tyler, during a verbal altercation,

began to strike her about the body and face with her hands." *Id.* at Plaintiff 1083; *see also id.* at

Plaintiff 1085-86. Plaintiff sought to discover the facts and circumstances surrounding the arrest

at Tyler's deposition. However, Tyler refused to answer any of Plaintiff's questions, asserting the

Fifth:

> Q. . . . . [C]an you tell me what the specific allegations were against you?
> A. No.
> Q. Why not?
> A. 'Cause I plead the Fifth?
> Q. Okay
> The police report and criminal complaint indicate that during a verbal argument,
> you began to strike the victim about the body and face with your hands. Is that what
> happened?
> A. I plead the Fifth.
> Q. Did you at any time strike the alleged victim?

A. I plead the Fifth.
Q. Did you make any physical contact with the alleged victim?
A. And I plead the Fifth once again.
Q. Who was the alleged victim?
A. None of your business.
Q. That's not -- That's not --
A. I plead the Fifth.
Q. Okay. Was the alleged victim Linda Armstead?
A. I plead the Fifth.
Q. Do you know what her age was?
A. I plead the Fifth.
Q. Was Ms. Armstead any relation to you, Ms. Tyler?
A. I plead the Fifth, sir.

Ex. K at 286:2-2:287:6.

On April 5, 2005, Defendant Tyler was arrested and charged with domestic battery, in violation of "720 ILCS 5/12-3.2-A-1." Ex. S at Plaintiff 1062, 1070-74. According to the Chicago Police Department Arrest Report filed in connection with Tyler's arrest, a witness named Latonya McNutt submitted a signed complaint for domestic battery stating that Tyler "threw the victim"—identified as a 1-year-old infant named Cameron Tyler—"in to a chair in a rough manner while at the Mt. Sinai Hospital," "causing the baby to scream out in pain[.]" *Id.* at Plaintiff 1097-1101. Following an investigation, a Chicago Police Detective named Andrea LaBelle submitted a sworn criminal complaint to the Circuit Court of Cook County, alleging Tyler had:

> committed the offense[s] of ~~domestic battery~~ reckless conduct in that she, without legal justification, ~~knowingly and intentionally~~ recklessly caused bodily harm or endangered bodily safety of Cameron Tyler, a family member, in that she did pick Cameron Tyler up and "slam" Cameron Tyler into a chair, causing him to hit his head on the armrest. Defendant [Tyler] further put Cameron on the floor, shouted obscenities at him and kicked "towards" Cameron.[4]

---

[4] The stricken language appears to reflect the fact that Tyler ultimately pled to the reduced charge of reckless conduct.

10

*Id.* at Plaintiff 1115. Later that month, Tyler pled guilty and was sentenced to 12 months supervision.[5] *Id.* at Plaintiff 1073-74, 1116.

Around the same time, the plaintiff in this case filed a petition on behalf of Cameron Tyler with the Illinois Circuit Court of Cook County, seeking an order of protection against Tyler for a one-year duration. *Id.* at Plaintiff 1118-22. The court granted the petition. *Id.* at Plaintiff 1102, 1104, 1111-14.

On information and belief, on yet another date, Defendant Tyler was arrested and charged with domestic battery for beating her husband, and subsequently pled guilty to the charge. On or about December 5, 2018, in a consensual interview on a public sidewalk in Chicago, Tyler voluntarily admitted to a CBS 2 Chicago reporter named Dave Savini that she had "knock[ed] the fuck out my husband." Ex. U, Recording of Tyler's CBS Interview, at 06:30-06:38; Ex. K, Tyler Dep at 209:13-210:21 (admitting interview occurred 12/5/18).[6] At deposition in this case, Plaintiff sought to uncover the facts and circumstances related to Tyler's guilty plea. But Tyler refused to answer any question on Fifth Amendment grounds, testifying in relevant part:

> Q. In going over the cases that we've -- In going over the arrests and charges that we have covered today, did we at all discuss the battery charge involving your husband?
> A. I plead the Fifth.
> Q. Okay. Meredith, I'm just going to say I think she's overusing the Fifth. I think it's potentially fraud to not even acknowledge that there's another --
> A. Because the past is not your business.
> Q. Excuse me. Excuse me. There's not another charge out there or another case. I think that's --
> MS. MCBRIDE [Tyler's counsel]: You asked her questions about the allegations regarding her husband that you are describing. Last time she pleaded the Fifth in response to those. I think we've gone over that enough.
> BY MR. HOFELD:

---

[5] Though Tyler initially took the Fifth at deposition when asked about the incident, she changed course and answered questions on advice of counsel in light of her guilty plea. Ex. K at 288:23-290:9.

[6] *See also* Plaintiff's Response to Defendants' MIL 4 (refuting Defendants' mischaracterizations of the interview and properly summarizing nature and substance of interview).

Q. Well, for the record, I think it's coming close to concealment, and I'm going to ask you a couple more questions, since you're not even going to acknowledge there was ever an arrest or a charge or a case or anything.

MS. MCBRIDE: If you recall whether or not there was a case, you may answer that question.

BY MR. HOFELD:

Q. Was -- First of all, were you arrested for battery against your ex-husband?

A. No, sir.

Q. Okay.

A. It wasn't against him.

Q. Okay. Were you charged—Did you ever have a charge of battery where your husband or ex-husband was the victim?

A. No, he wasn't the victim.

Q. Okay. Did you ever have a court case that involved your ex-husband?

A. Yes, I did.

Q. Okay. And where was that case?

A. It was in Lake County.

Q. All right. And what was the -- Was that a criminal case or a civil case?

A. I don't remember.

Q. What was the allegation against you in that case?

A. And I plead the Fifth.

. . . .

Ex. K at 300:23-302:22.

In total, Tyler pled the Fifth 52 times at her deposition. *See* Ex. K at 208:21; 209:8,12;

279:10, 16, 19; 280:2, 10, 14, 18; 281:5, 8, 11, 13, 15, 17; 283:5, 8, 12, 17, 22, 24; 284:4, 7, 9,

12, 14, 17, 20, 22; 285:1, 4; 286:1, 6, 12, 15, 18, 22; 287:1, 3, 6, 9, 12, 14, 16; 289:13; 300:19,

22; 301:3; 302:22; 306:5.

On September 28, 2018—eight days after the incident in this case—Defendant Tyler was

arrested and charged with domestic battery for intentionally causing bodily harm to J.C. by

striking him with belts. Ex. S at Plaintiff 1061, 1075-80; *People v. Tyler*, 2023 IL App (1st)

210450-U; 720 ILCS 5/12-3.2(a)(1). Tyler demanded a bench trial. Ex. S at Plaintiff 1075-80.

Following discovery, *id.*, Tyler's case was tried before Judge Laura Bertucci-Smith of the Illinois

Circuit Court of Cook County over the span of four days—February 19, 2020, February 20,

2020, October 8, 2020, and October 9, 2020—during which the court heard testimony from ten

12

witnesses—Joseph Champ, Plaintiff Asia Gaines, Beatrice Starks, Latasha Finley, N.C., J.C., Chicago police detective Alice Casanova, DCFS investigator Deisy Anaya, Lavita Buckner, and Charlene Haynes—in addition to openings and closings. *See* Ex. V, Transcript of Tyler's Entire Criminal Trial. Tyler was represented at the trial. *Id.* Her counsel had the opportunity to cross examine every witness who testified. *Id.* The court received numerous documents into evidence. *Id.*; *cf. Tyler*, 2023 IL App (1st) 210450-U, ¶¶ 4-30 (summarizing trial). Following closing arguments, the court found Tyler guilty of domestic battery of J.C. *Tyler*, 2023 IL App (1st) 210450-U, ¶ 30. In doing so, the court explicitly found that Tyler beat J.C. with belts in a washroom at Tilton Elementary School on September 20, 2018. *Id.* at ¶ 37 ("the trial court accepted J.C.'s clear testimony that defendant, whom he identified at trial, struck him repeatedly with a belt in the washroom at his school on the morning of September 20, 2018"). The court sentenced Tyler to one year of conditional discharge and required her to register as a violent offender against youth. *Id.* at ¶ 31. Tyler filed a posttrial motion challenging the sufficiency of the evidence against her, which was denied. *Id.*

Tyler then appealed her conviction to the Illinois Appellate Court, arguing that the evidence at the criminal trial was insufficient to prove her guilty beyond a reasonable doubt of domestic battery. *Tyler*, 2023 IL App (1st) 210450-U, ¶¶ 2, 32. At the time of the April 10, 2023 dispositive motion deadline in the instant action (Dkt. 244), Tyler's appeal had been fully briefed with the parties awaiting the court's ruling. On August 1, 2023—four months *after* the dispositive motion deadline in this action—the Illinois Appellate Court issued a written order pursuant to Illinois Supreme Court Rule 23(b) affirming Tyler's criminal conviction for domestic battery of J.C. In the 41-paragraph order, the court f[ou]nd [that] the evidence that [Tyler] committed domestic battery against J.C. was not so unreasonable, improbable, or unsatisfactory

13

that reasonable doubt of her guilt remains," pointing to numerous strands of evidence corroborating the fact that Tyler "struck [J.C.] repeatedly with a belt in the washroom at his school on the morning of September 20, 2018." *Id.* at ¶¶ 37-40.

Finally, at Tyler's deposition in this suit, she repeatedly denied facts which Illinois courts have already adjudicated and affirmed, repeatedly appealing to her self-described good character, motivations, and belief system. *See, e.g.*, Ex. K, Tyler Dep at 143:3-9 (testifying Haynes did not give her belts on 9/20/18 "[b]ecause *I don't believe in doing corporal punishment to kids*"), 151:14-152:14 (denying telling police Haynes gave her belts, explaining: "*I don't believe in corporal punishment*. So I'm not going to even ask for no belts or nothing like that because *I don't believe in hitting little kids* because *I didn't never whoop my own*"), 167:17-168:2 (denying telling Haynes she was going to scare JC, questioning, rhetorically, "[w]hat I like scaring a kid for? . . . . *I don't want no kids to be scared of me*. I don't want to have that image with no kid."), 205:1-9 (testifying she *would only strike someone if she was struck first*), 211:2-3 ("*I don't hit no kids at no school*. I don't believe in corporal punishment.").

**Argument**

This Court should deny Defendants' MIL 1 for two broad reasons.  First, it is moot. Second, it wholly ignores the myriad ways in which the evidence at issue may become admissible at trial.

**I.    Defendants Ignore the Preclusive Effect of Tyler's Criminal Conviction for the Underlying Incident, Which Renders Defendants' Motion Moot**

As discussed, the Illinois Circuit Court of Cook County has already adjudicated the issue whether Defendant Tyler used belts received from Defendant Haynes to beat J.C. "repeatedly" in a bathroom at J.C.'s school on September 20, 2018, finding her guilty beyond a reasonable doubt. That conviction has been upheld on appeal. *Tyler*, 2023 IL App (1st) 210450-U.

Defendants now ask this Court for extraordinary relief: to exclude any evidence of Tyler's conviction. Defendants argue—without citation to any authority—that Tyler's conviction is inadmissible because it is not relevant (under FRE 401), is not relevant for a non-propensity purpose (under FRE 404(b)), and may "cause unfair prejudice" (under FRE 403) "by leading the jury to convict her"—here in this civil suit—"based on her prior criminal history." Defendants' request should be rejected in its entirety.

As a threshold matter, Defendants' entire motion flows from an absurd, fatally flawed premise: that the issue whether Tyler repeatedly struck JC with belts received from Haynes in the Tilton bathroom in September 2018 has *not* been decided for purposes of this case. In other words, Defendants assume Tyler gets second chance to litigate the issue—even though she has already had a full and fair opportunity to do so in her criminal proceeding, actually litigated the issue in her criminal proceeding in a full trial on the merits, has already been found guilty beyond any reasonable doubt, and also has lost her appeal. *Tyler*, 2023 IL App (1st) 210450-U (summarizing Tyler's criminal proceeding and trial and affirming her conviction and sentence). Needless to say, that presumption has no basis in law. The Seventh Circuit has long held that the doctrine of issue preclusion (or "collateral estoppel") "applie[s] in civil trials to issues previously determined in a criminal conviction." *Appley v. West*, 832 F.2d 1021, 1025-26 (7th Cir. 1987). For good reason: the doctrine promotes the underlying policy "that 'one fair opportunity to litigate an issue is enough.'" *Appley v. West*, 832 F.2d 1021, 1025 (7th Cir. 1987) (quoting *Bowen v. United States,* 570 F.2d 1311, 1322 (7th Cir. 1978)). For all of the reasons detailed in Plaintiff's MIL 1, all elements for issue preclusion to apply are met here. *See* Dkt. 323 at 1-8. Consequently, Defendant Tyler is precluded from attempting to relitigate the issue whether she repeatedly beat J.C. with Haynes' belts in the Tilton bathroom at trial. *Id.* (citing *Czajkowski v.*

15

*City of Chi.*, 810 F. Supp. 1428 (N.D. Ill. 1992) (defendant police officer's precluded from disputing whether he battered plaintiff in civil suit given prior conviction for battering plaintiff); *Smith v. Sheahan*, 959 F. Supp. 841 (N.D. Ill. 1997) (defendant precluded from denying battering plaintiff given prior conviction for doing just that); *Erie Insurance Co. v. Gibbs*, 2023 IL App (3d) 220143 (2023) (insured precluded from relitigating issue as to whether he intentionally pushed hospital employee in civil suit given insured conviction for the battery); *Benedick v. Mohr*, 233 Ill. App. 3d 903 (5th Dist. 1992) (giving Illinois criminal conviction preclusive effect in subsequent state tort action); *In re Complaint of American River Transp Co*., 712 F. Supp. 2d 735 (N.D. Ill. 2010) (driver of speedboat that collided with barge precluded from relitigating issue whether he was intoxicated given his prior guilty plea to operating watercraft under influence); *Kluppelberg v. Burge*, 276 F. Supp. 3d 773 (N.D. Ill. 2017) (granting plaintiff's "motion to apply collateral estoppel to the City of Chicago's argument contesting its liability under *Monell* by arguing it did not have a policy of concealing material exculpatory and/or impeachment evidence contained in so-called 'street files' in the late 1980s")); *see also Appley v. West*, 832 F.2d 1021, 1026 (7th Cir. 1987) ("When Mr. West pleaded guilty to the two counts of mail fraud, he effectively pleaded guilty to all of the material facts alleged in the indictment on those two counts."); *Nathan v. Tenna Corp.,* 560 F.2d 761, 763 (7th Cir. 1977).

Tyler's request to hide her conviction from the jury defies law and logic. As for the law, such an outcome simply cannot be squared with the well-settled caselaw just cited. Tellingly, Defendants cite no authority to the contrary. Dkt. 312 at 5. And Defendants' request fails as a matter of logic. It creates the possibility that Tyler could be found guilty *beyond any reasonable doubt* of battering J.C. in one proceeding yet not guilty of battering J.C. where the underlying conduct was the same. Such an outcome would fly in the face of basic rule-of-law principles

16

such as, among other things, the equal application of the law. *See Smith v. Sheahan*, 959 F. Supp. 841, 846 (N.D. Ill. 1997) ("the criminal offense of battery closely tracks the tort of battery"— "[a] person . . . cannot commit the crime of battery without also committing the tort of battery"). Further, such an outcome would be inconceivable here, where Tyler fully litigated the issue in the criminal proceeding but has barely litigated the issue here. Indeed, she did not file an answer Plaintiff's complaint until September, 2023, four years after the complaint was filed. She never responded to written discovery, deposition notices, or subpoenas for deposition. She only appeared for her deposition after Judge Lee got the U.S. Marshals to forcibly bring her to the courthouse, red her the riot act, and eventually appointed temporary counsel.

The proper course is for the parties to stipulate to the fact of Tyler's conviction beyond a reasonable doubt of beating J.C. with Haynes' belts in the Tilton bathroom. If Defendants refuse to so stipulate, then Plaintiff respectfully asks the Court to take judicial notice of the same.

**II.     Tyler's Invocation of the Fifth Amendment When Asked Whether She Battered Various Family and Friends as well as Her Guilty Pleas to Battering Her 1-Year-Old Grandson and Husband Will Be Amissible If Tyler Denies Battering J.C. On the Ground that She Would *Never* and Could *Never* Strike a Child or that She Does Not Believe in Hitting Someone First**

Plaintiff would not anticipate any need to introduce, here, evidence of Tyler's past acts of physical violence towards others especially children *prior to* September 2018 if it were not for the fact that, as detailed above, Tyler repeatedly denied beating J.C. with Haynes' belts at her deposition on the basis that she would *never* hit a kid, has *never* hit a kid, does not *believe* in hitting kids, and does not *believe* in corporal punishment. *Supra*. Consequently, if Tyler is permitted to offer such testimony at trial—or impermissibly injects it herself—Plaintiff may properly introduce the following evidence under FRE 404(b)(2) for the permissible, non-propensity purposes of showing that *Tyler* was *capable* of beating kids, believed that hitting kids was okay, and believed in striking others first:

17

- Tyler's invocation of the Fifth Amendment when asked if she endangered the life of a child by hitting him/her in August 1992;
- Tyler's invocation of the Fifth Amendment when asked if she hit Brenda Williams (her mother) at Collins High School in April 1998;
- Tyler's invocation of the Fifth Amendment when asked if she hit Linda Armstead about the body and face with her hands in August 2002;
- Tyler's 2005 guilty plea to battering her 1-year old grandson Cameron Tyler;
- Tyler's guilty plea to battering her husband; and
- Tyler's December 2018 statement to CBS reporter Dave Savini that she "went up to Waukegan" and "knocked the fuck out my husband."

*Supra.* Because the admissibility of this evidence cannot be decided yet, Defendants' motion should be denied.

Reading Defendants' argument to the contrary, one would think that Plaintiff intends to simply introduce Tyler's criminal record, waive it in front of the jury, and ask the jury to convict her of IIED, assault, and battery of J.C. But that is hardly the case. While true that a party's prior arrests not resulting in convictions generally are inadmissible, *see, e.g.*, *Anderson v. Sternes*, 243 F.3d 1049, 1054 (7th Cir. 2001), Tyler's invocation of the Fifth Amendment is a different matter. Indeed, in civil cases like this, the law expressly allows juries to draw adverse inferences about specific questions where the witness invokes her constitutional right against self-incrimination instead of answering. This is a very basic legal principle. *E.g.*, *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Hillman v. City of Chicago*, 834 F.3d 787, 792 (7th Cir. 2016) (collecting Seventh Circuit authority to the same effect); *see also Harris v. City of Chicago*, 266 F.3d 750 (7th Cir. 2001) (finding reversible error where trial court refused to permit impeachment of a witness with his prior Fifth Amendment assertions).

Given this adverse inference, Tyler's invocation of the Fifth would be extremely relevant when asked about the allegations underlying her previous arrests—but not the arrests themselves.

Indeed, Tyler's invocation means that she has a legitimate fear that giving truthful testimony about the allegations of battery against her mother, husband, 1-year-old grandson, and other acquaintances would subject her to potential criminal liability. *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 6630-64 (7th Cir.2011) ("To be privileged by the Fifth Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have *some* tendency to subject the person being asked the question to criminal liability."); *Martin–Trigona v. Gouletas,* 634 F.2d 354, 360 (7th Cir. 1980) ("Some nexus between the risk of criminal conviction and the information requested must exist."). it is for this reason that courts routinely require a party intending to invoke the Fifth in a civil case to take the stand and do so in response to questions. Indeed, it would be improper to hide from the jury the fact that the witness has invoked her Fifth Amendment right. *See Harris v. City of Chicago*, 266 F.3d 750, 755 (7th Cir. 2001) (abuse of discretion to bar evidence of prior invocation of Fifth Amendment right by defendant who later waived the right and testified at trial).

Furthermore, while Tyler does have the right to remain silent, that does not mean that she should benefit unduly from doing so. *See United States v. Rylander,* 460 U.S. 752, 758 (1983) (rejecting attempt to "convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword"). Put differently, Plaintiff should not be penalized (any more than she already was in terms of being denied discovery) by Tyler's decision to protect her constitutional rights rather than answer questions about her alleged batteries of family and friends.

Therefore, if Tyler opens the door by denying the capacity or belief necessary to strike a child or to hit a person first, Plaintiff should not be denied the right to introduce relevant

19

evidence showing that Tyler possesses that capability and belief just because Tyler apparently believes that truthful answers about what she did back in 1992, 1998, 2002, and 2005 might subject her to criminal liability. Special accommodations on that basis is hardly warranted. *Cf. Graystone Nash, Inc.,* 25 F.3d at 191 ("In a civil trial, a party's invocation of the privilege may be proper, but it does not take place in a vacuum; the rights of the other litigant are entitled to consideration as well."); *Doe ex rel. Rudy-Glanzer v. Glanzer,* 232 F.3d 1258, 1264 (9th Cir. 2000) (in a civil proceeding, where "the parties are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding"). To the extent that there is any deficiency in this FRE 404(b)(2) evidence, that deficiency should be held against Tyler—not Plaintiff—because Tyler's invocation of the Fifth effectively denied Plaintiffs the opportunity to fully develop FRE 404(b) evidence. Defendants' motion should be denied. *See also United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir. 1985) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403.").

For all of the foregoing reasons, the Court should deny Defendants' MIL 1.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE 2

In their motion in limine 2, Defendants first move to bar any introduction of the former testimony of J.C., N.C., Michael Mahone, R.J., K.B., S.C., K.K.B., or J.L. But Defendants' argument fails. Plaintiff first addresses Defendants' motion with respect to Michael Mahone, R.J., K.B., S.C., K.K.B., or J.L. Plaintiff then address the motion with respect to J.C. and N.C.

## LEGAL STANDARD

Though the Federal Rules of Evidence generally prohibit admission of hearsay, FED. R. EVID. 801(c) (hearsay definition), 802 (hearsay rule); *United States v. Salerno*, 505 U.S. 317, 320 (1992), there are exemptions and exceptions. *See generally* FED. R. EVID. 801(d), 803, 804. Relevant here is the hearsay exception establish by Federal Rule of Evidence 804(b)(1), which allows a court to admit the "former testimony" of an "unavailable" witness. FED. R. EVID. 804(b)(1); *Salerno*, 505 U.S. at 318; *United States v. Reed*, 227 F.3d 763, 766 (7th Cir. 2000). For this exception to apply, Plaintiff broadly must show, first, that the witness is "unavailable" within the meaning of Rule 804(a) (which identifies five types of unavailability), and, second, that the unavailable witness's prior testimony is "former testimony" within the meaning of Rule 804(b)(1)—that is, that it "(A) was given as a witness at a trial, *hearing, or lawful deposition*, whether given during the current proceeding or a different one; and (B) is now *offered against a party who* had—or, in a civil case, whose *predecessor in interest* had—an *opportunity* and *similar mot*ive to develop it by direct, cross-, or redirect examination." FED. R. EVID. 804(b)(1) (emphasis added).

**I.      If Michael Mahone, R.J., K.B., S.C., K.K.B., or J.L. Prove Unavailable to Testify at Trial, the Testimony They Gave at Haynes' Dismissal Hearing Will Be Admissible For Its Truth**

With no trial date on the calendar, and based solely on the observation that Plaintiff designated the dismissal hearing testimony of Michael Mahone, R.J., K.B., S.C., K.K.B., and J.L., Defendants ask this Court to bar admission of these witnesses' prior testimony, arguing it is inadmissible hearsay because: (1) Plaintiff "has not shown" that these witnesses are "unavailable" under Rule 804(a); and (2) even if she had, their prior testimony is not "former testimony" under Rule 804(b)(1). Defendants' argument is meritless without and should be denied for three reasons.

The following brief background supplies the context necessary to properly evaluate whether Rule 804(b)(1) applies here:

- In its opening statement on the first day of Haynes' dismissal hearing before ISBE hearing officer Carne, Defendant Board stated in pertinent part:

  We are here today to ask that you recommend the dismissal of Kristen Haynes . . . for what we consider one of the most worst and most egregious cases of teacher misconduct that we've had to prosecute. . . .

  . . . [T]he preponderance of the evidence we will present you will demonstrate that it's more likely than not that *Ms. Haynes acted cruelly, immorally, and negligently* _when she put J.C. in serious harm by going out of her way to contact a distant family member to come to Tilton to discipline J.C., handing her belts, and leading them to a small enclosed bathroom where they could be alone._ Her actions, unfortunately, were despicable for anyone, let alone with a public educator entrusted with creating a safe learning environment for children on a daily basis.

  We ask that you . . . recommend the Board terminate her employment. In our post-hearing brief, we will argue that *Ms. Haynes's conduct* is irremediable per se because it _caused physical and psychological harm to J.C._, among other reasons. Her actions are also irremediable per se because . . . ."). (Ex. W., Transcript of Haynes' Entire Dismissal Hearing, at 8:7-12, 14:11-15:20.)

- As its first witness, Defendant Board called Mahone, who testified he was the founder/owner of Arc Light Investigative Services, which specializes in employee misconduct investigations on behalf of Defendant Board.[7] *Id.* at 19:9-17. Defendant Board's law department retained Arc Light to conduct an investigation into the employee misconduct allegations against Defendant Haynes. *Id.* 19:14-17; Ex. X, Board's Post-Hearing Brief, at BOE 8118. It was the regular business practice of both Arc Light and Defendant Board to prepare reports following such investigations. Ex. W, 20:22-21:5. The CPS / Arc Light Investigative Report regarding the investigation of Defendant Haynes' alleged misconduct was created shortly after the incident occurred. *Id.* 22:18-24.

- Defendant Haynes' counsel cross-examined Mahone, attacking the admissibility of the CPS / Arc Light Investigative Report.[8] Following a lengthy exchange of objections and arguments

---

[7] Because Defendant Board construed Mahone's testimony regarding "CPS" as testimony regarding Defendant Board, *compare, e.g.*, Ex. XXX, Dismissal Hearing Transcript, at 20:22-21:1 (Mahone affirming Arc Light investigative reports "are routinely made and transmitted to *CPS* as a regular part of Arc Light's business" (emphasis added)), *with* Ex. XXX, Board's Post-Hearing Brief, at BOE 8118 (Defendant Board citing this testimony in asserting Mahone "testified that it was the regular business practice of both ArcLight and *the Board* to prepare reports following investigations"), Plaintiff does the same here.

[8] Defendant Haynes' counsel also objected repeatedly throughout Defendant Board's direction examination of Mahone, attacking the admissibility of the CPS / Arc Light Investigative Report. Ex. W at 18:1-47:17.

22

between Defendant Haynes' counsel and Defendant Board's counsel, hearing officer Carne admitted the CPS / Arc Light Investigative Report into evidence based on Mahone's testimony. *Id.* 25:15-46:6 (esp. pp. 41-46).[9]

- Defendant Board also called five of J.C.'s classmates who also were in Haynes' 4th-grade class: "R.J.," "K.B.," "S.C.," "K.K.B.," and "J.L." Ex. W. Each of these students gave powerful testimony that explicitly and directly refuted Defendant Haynes' testimony that she only kept the two belts in her closet for kids whose pants were sagging, *id.* 417:4-418:3, and that the belts were used only to assist students with dress code violations, *id.* 417:4-418:3. Indeed, R.J., K.B., S.C., K.K.B., and J.L. testified that they they knew Haynes kept two belts in a small closet in the front of her classroom to discipline them *Id.* at 226:21-23; 230:4-5; 255:3-10; 417:4-418:3; 208:2-14; 240:2-9; 241:18-20; 255:3-10; 295:2-10. One belt was brown and one was black. *Id.* at 418:7-17. They had names: Mr./Mrs. Brown and Mr./Mrs. Black. *Id.* at 256:1-7; 274:23-275:2; 418:18-24; 500:7-12. The belts were adult-sized, not child-sized. *Id.* at 207:12-20; 418:7-17. Nearly all of these students recalled Haynes telling them that she could get permission from their parents to discipline them with the belts if they misbehaved. *Id.* at 203:16-20; 204:11-14 (K.B.); 227:5-11 (S.C.); 240:10-18 (K.K.B.); 256:1-7 (J.L.). These students also offered firsthand accounts of their observations on September 20, 2021 that corroborate J.C.'s allegations against Tyler. *See, e.g.,* Ex. X at BOE 8108 (indicating Defendant Board acknowledged as much in its post-hearing brief, writing that "other students recall seeing J.C.'s 'auntie' (Tyler) at school on September 20, 2018. R.J. recalled that when the 'auntie' got to the classroom, she talked with J.C. outside the classroom and smacked his head with her hand. R.J. remembers it being a hard hit because he could hear it." (citing Ex. W at 58:17-58:23 (R.J.), 229:14-21 (S.C.)., 59:2-11, 59:2-11, 71:1-23)).
- Defendant Haynes' counsel cross-examine these witnesses, seeking to minimize the negative impact (on Haynes) of the students' testimony and elicit favorable testimony to suggest Haynes was not involved or minimally involved in orchestrating Tyler's beating of J.C.

Defendants motion should be denied for three reasons. First, Defendants improperly turn the MIL standard on its head, suggesting without authority that the burden is Plaintiff's to prove unavailability now. While it is true that it would be Plaintiff's burden to prove unavailability *at trial, United States v. Reed*, 227 F.3d 763, 766 (7th Cir. 2000), nothing requires she do so now. The plain language of rule 804(a)(5) makes that clear: "A declarant is considered to be unavailable as a witness if the declarant is absent *from the trial or hearing . . .*" So do Seventh Circuit precedents. *See, e.g., United States v. Reed*, 227 F.3d 763, 767 (7th Cir. 2000) ("'The

---

[9] After the dismissal hearing, Defendant Board further argued, in its 41-page post-hearing brief, that the CPS / Arc Light Investigative Report should be admitted into evidence in its under either the business records exception to the rule against hearsay (Rule 803(6)) or the public records exception to the hearsay rule (Rule 803(8)).[9] Ex. X at BOE 8116-19.

ultimate question is whether the witness is unavailable despite good-faith efforts undertaken **_prior to trial_** to locate and present that witness.'" (quoting *Ohio v. Roberts*, 448 U.S. 56, 74 (1980))). While Plaintiff in theory could prove unavailability now if she were invoking Rule 804(a)(4) (i.e., unavailability due to death), Plaintiff is not invoking that rule but rather 804(a)(5).

Second, Plaintiff's purpose in designating the dismissal hearing of Mahone, R.J., K.B., S.C., K.K.B., and J.L. was not to affirmatively assert that they *will* be unavailable—because their availability is presently unknown—but rather to flag that Plaintiff has good reason to think that one or more of these witnesses may ultimately prove unavailable at trial. Specifically, it is Plaintiff's understanding that Mahone no longer lives in Illinois, having moved to Arkansas. In addition, while Plaintiff the phone number and address of R.J. and K.B.'s parents/guardians as a result of this Court grant in part of Plaintiff's motion to compel Defendant Board to produce this information, Dkt. 136, S.C., Plaintiff has been unsuccessful in her attempts to establish contact with R.J. and K.B. Plaintiff has retained a private investigator to confirm that the address and phone numbers remain current. But it is as of yet unclear whether Plaintiff will achieve cooperation and/or whether these witnesses will comply with her *subpoena, which she cannot issue until a trial date has been set*. As for S.C., K.K.B., and J.L., Plaintiff has sought to learn their *full* names and current addresses and phone numbers in a variety of ways, including by again asking Defendant Board for that information for the sole purpose of directing a trial subpoena, as well as through a private investigator. But Defendant Board refused Plaintiff's request, and Plaintiffs' other efforts have proved fruitless so far. In short, Plaintiff is actively working to procure the live testimony of these witnesses at trial, but for the reasons just

24

discussed, Plaintiff has reason to think one—or more—of these witnesses may prove unavailable as a witness at trial.

If one or more of these witnesses proves unavailable at trial despite Plaintiff's good-faith effort to procure their live testimony, there can be no question that Plaintiff will likely be able to show that the witness is "unavailable" within the meaning of Rule 804(a)(5)(1). As the Seventh Circuit has long emphasized, "the rule is not that the [proponent of the prior testimony] must do everything it can to get a witness to testify," but rather "only that it make a *reasonable, good faith effort* to get the witness into court." *United States v. Reed*, 227 F.3d 763, 767 (7th Cir. 2000) (emphasis). It is a question of reasonableness. "'The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.'" *Id.* (quoting *Ohio v. Roberts*, 448 U.S. 56, 74 (1980)). The efforts Plaintiff has already made, combined with those she is currently making and will continue to make in the future, will be more than sufficient to establish her "good faith" effort to locate and present these witnesses.

Willfully ignoring the fact that unavailability cannot yet be decided, Defendants suggest that Mahone, R.J., K.B., S.C., K.K.B., and J.L. could not possibly be unavailable to testify at trial given that each was "willing and able to testify" at Haynes' dismissal hearing. Dkt. 313 at 4. But Defendants mislead the Court. To the extent Mahone testified, that was prior to his move to Arkansas and, more fundamentally, his testimony at the hearing was via Zoom. (If Mahone could testify at trial via Zoom, Plaintiff would be less concerned about possible unavailability). And the fact that the kids testified at the hearing reflects the fact that they were compelled to do so by Defendant Board, who had their full names, addresses, and phone numbers (they were in

Defendant Board's schools, after all). Plaintiff lacks such complete information, and Defendant Board refuses to assist Plaintiff in obtaining it.

Third, if Mahone, R.J., K.B., S.C., K.K.B., or J.L. do, in fact, prove unavailable to testify at trial, their testimony at Haynes' dismissal hearing would be "former testimony" admissible for its truth under 803(b)(1), because Haynes' dismissal hearing unquestionably is among the enumerated proceedings covered by the plain language of 804(b)(1)(A) (i.e., "hearing"), and because Plaintiff would be offering the testimony against *Haynes*, who undeniably had an *opportunity* and *similar moti*ve to develop it by direct, cross-, or redirect examination at her dismissal—and indeed took that opportunity, cross-examining each of these witnesses. *See* Ex. XXX. *See also United States v. Reed,* 27 F.3d 763 (7th Cir. 2000) (holding that testimony of codefendant who testified in first trial but refused to testify in retrial was admissible under former testimony exception to hearsay rule); *United States v. Pizarro*, 717 F.2d 336, 350 (7th Cir. 1983) (explaining that, under the former testimony exception to the hearsay rule, the admissibility of previously cross-examined testimony does not turn on a subsequent court's view of the unavailable declarant's reliability); *see also* § 804:1 Rule 804(b)(1): former testimony, 7 HANDBOOK OF FED. EVID. § 804:1 (8th ed.) ("The exception for former testimony involves the admission of testimony taken under oath and subject to cross-examination.").

In an attempt to evade the conclusion that the dismissal hearing testimony would qualify as "former testimony" under 803(b)(1), Defendants argue in cursory fashion that the dismissal hearing testimony does not satisfy Rule 804(b)(1)(B) for two reasons. First, "because *Tyler* did not have a predecessor in interest at the hearing who had 'an opportunity and similar motive to develop [the testimony] by direct, cross-, or redirect examination.'" Dkt. 313 at 6 (emphasis added). But that argument is wrongheaded. For starters, it ignores the preclusive effect of Tyler's

26

criminal conviction here: Tyler cannot relitigate whether she beat J.C. with belts repeatedly in the Tilton washroom; she can only contest (a) whether that conduct was "extreme or outrageous" (with respect to Plaintiff's IIED claim) and (b) whether that conduct caused J.C.'s damages (with respect to Plaintiff's assault, battery, and IIED claims). *See* Pl's MIL 1; Pl's Resp. to Defs' MIL 1. Regardless, even if Tyler were not estopped from relitigating the issues decided at her criminal trial, Defendants ignore the plain language of 804(b)(1)(B): Plaintiff would not be "offer[ing]" the designated dismissal hearing testimony "against" Tyler—none of the students, for example, were present in the bathroom. Rather, Plaintiff would be offering the testimony against Defendant Haynes, who indisputably had the opportunity and motive to cross examine the witnesses at her dismissal hearing: there, as here, she was defending herself against allegations that she orchestrated J.C.'s beating. Finally, to the extent that any *line* testimony could be offered against Tyler, she *did* have a predecessor in interest—Defendant Haynes—who had the opportunity and similar motive to cross examine the witnesses. After all, Haynes and Tyler were co-conspirators.

In a final, three-sentence argument on this issue, Defendants contend that the dismissal hearing testimony could not satisfy Rule 804(b)(1)(B) because "*none* of parties had a similar motive and opportunity to develop the testimony at the administrative hearing," pointing to the fact that, there, Defendant Board was on the opposite side of the "v" from Defendant Haynes, whereas, here, they are on the same side. Dkt. 313 at 6-7. But Defendants distort the Rule 803(b)(1)(B). The question is not whether everyone in this case had a predecessor in interest with an identical motive, the question is only whether the party against whom the testimony is offered had a predecessor who had the chance and motive to examine the witness. Here, again, that is

27

Defendant Haynes, undeniably had meets those requirements. This testimony is not being offered against Defendant Board. The Court should deny Defendants' motion.

Defendants also argue that plaintiff should be barred from calling the child witnesses KB, KKB, JL and RJ at trial *in any form* (including through designation) because plaintiff did not formally disclose them in her MIDPs. (Exhibit FF). Premised on a fundamental misrepresentation of developments during discovery, defendants argument is wrong.[10]

Analogous to the MIDP, Fed. R. Civ. Pro. 26 requires a party to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses…, identifying the subjects of the information." Fed. R. Civ. P. 26(a)(1)(A). Rule 26 also requires a party to "supplement" its disclosures if it "learns" that the information disclosed is "incomplete" *and* "if the additional [] [] information *has not otherwise been made known to the other parties during the discovery process or in writing*." Fed. R. Civ. P. 26(e)(1) (emphasis added). To ensure compliance with these rules, Rule 37 provides that "[i]f a party fails to… identify a witness as required by Rule 26(a) or (e), then the party is not allowed to use that information or witness to supply evidence… at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 26(c)(1). Whether noncompliance with Rule 26(a) or (e) is substantially justified or harmless is left to the district court's broad discretion. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011).[11]

---

[10] Plaintiff's proposed designations of KB, KKB, JL and RJ are only in the event that these witnesses are unavailable for trial due to plaintiff being unable to locate or serve them or in the event of their failure to respond to trial subpoenas.

[11] "[T]he Seventh Circuit has indicated that the following factors should guide the district court's discretion [in determining whether noncompliance was substantially justified or harmless] : (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in

In this case, plaintiff was never in possession of information regarding these witnesses that she could have disclosed, and she never had a duty to supplement because these witnesses and their likely testimony was subsequently "*made known to the other parties during the discovery process or in writing*." Fed. R. Civ. P. 26(e)(1) (emphasis added). First, it was defendants – specifically, the Board and Haynes – who possessed yet failed to disclose any of the child witnesses, even though MIDP strictly required them to disclose witnesses with information that *the opposing party* (i.e., plaintiff) may use to prove his case. (Defendants' MIDPs, Exhibit). Because these witnesses were/are all CPS students and minors whose identifying and contact information was protected by law, plaintiff simply did not have the ability to disclose them and, for the same reasons, was unable to discover them, ascertain their knowledge, or interview them. However, defendant Board had all of this information but did not disclose it. After plaintiff raised the issue with the Board that these witnesses were missing from its MIDPS and the Board still refused to disclose them, plaintiff moved to compel. (Dkt. #111, 131, 135). The Court granted plaintiff's motion in part, ordering the Board to disclose the names and contact information of two child witnesses. The Board then produced this information to all parties (except for Tyler, who was not participating).

Second, these witnesses were "*made known to the other parties during the discovery process or in writing*" because CPS' investigation and CPD Detective Casanova's investigation both included interviews with child witnesses who were students in Haynes' classroom on 9/20/18.  (Exhibits C and D). Their reports were produced in discovery to all parties by the Board (Finley's investigative report) and/or subpoenaed by plaintiff and the Board (Casanova's

---

not disclosing the evidence at an earlier date." *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, No. 12 C 3233, 2016 WL 7034074, at *5 (N.D. Ill. Dec. 2, 2016) (citing *David v. Caterpillar, Inc.*, 324 F.3d 857, 857 (7thth Cir. 2003)).

29

case report) and produced to all parties. Each report contained summaries of their interviews with the child witnesses (identified only by their initials). (Exhibits C and D). This is how all parties' attorneys first became aware of the child witnesses. In addition, plaintiff took the depositions of both investigator Finley and Detective Casanova, and both of their investigative reports were used as exhibits at their depositions. Therefore, it is crystal clear that all parties were repeatedly made well-aware of the existence of the child witnesses and their likely testimony.[12]

Because all parties had already exchanged during discovery all available information about the child witnesses (except for the information plaintiff sought to compel from the Board), there was never a need or duty for plaintiff to formally disclose or supplement these witnesses through amended MIDPs. In the alternative, any such failure by plaintiff was substantially justified or harmless because all parties already had the information. Therefore, it was no surprise to defendants when these witnesses appeared on plaintiff's will- and may-call lists, there is no prejudice to cure, no disruption to the trial, and no bad faith in plaintiff not disclosing information that all parties already had.

## II. Second, J.C. and N.C.'s Deposition Testimony May Be Admissible at Trial For its Truth

Plaintiff JC is not only a minor who was 9 years-old on 9/20/18, but he is the child victim of a crime committed by one or both defendants. Tyler was convicted of battering JC in the boys' bathroom at Tilton Elementary School. Haynes was charged with battery and endangerment but not convicted. Defendants' "motion in limine" 2 to exclude JC's and NC's video deposition

---

[12] Defendant Board had and has much more. Not only did defendant Board have the full names and contact information for the student witnesses and their parents in the CPS system, but defendant Board interviewed, prepared and presented several of the children as witnesses during its prosecution of Haynes' dismissal proceeding. (Exhibit ).

designations is a motion to compel them to testify in person at trial even though they are likely to be unavailable for legal and factual reasons set forth below. Defendants' motion should be denied.

In the FPTO, plaintiff seeks to designate for trial the video deposition testimony of JC and his sister from this case in light of their likely unavailability to testify live at trial because 1) they are minors 2) JC has severe PTSD from the 9/20/18 incident (diagnosed by multiple treating clinicians, not only plaintiff's expert), the likelihood for his re-traumatization and decompensation when asked about the incident is very significant, and NC suffers traumatic distress when discussing the incident; and 3) because JC and NC have already been interviewed or testified regarding the incident (and thus re-traumatized) over 15 times since 2018, including 10 times by defendants alone. (FPTO, at 22-25). JC and NC should not have to endure the trauma again when defendants have already had an opportunity to cross-examine them, defendants' right to cross-examine a minor victim in a civil trial is not an unqualified, and JC and NC have nothing new to add to their video deposition testimony.[13]  Plaintiff asks the Court to allow plaintiff to show their video deposition testimony to the jury in the event the Court deems them unavailable for trial. In the alternative, plaintiff asks for specific procedural safeguards to protect JC and NC from defense counsel when they testify at trial.

This Court previously protected JC and NC at their depositions and contemplated that their video depositions may be used at trial. During discovery and after a meet-and-confer

---

[13] Defendants' statement that plaintiff first informed defendants that JC and NC may be unavailable to testify at trial just hours before the FPTO deadline is a materially false statement. Plaintiff included *all* her proposed designations for JC, NC, and other child witnesses in the very first draft of the FPTO she sent to defendants on October 27, 2023. The parties then discussed the issue at their very first meet-and-confer on November 8, 2023 and did not reach agreement. The terms and conditions of child testimony have been an ongoing issue of litigation in this case for 3 years. (Dkt. ##111, 143, 144, 146-150).

31

process with the defense, plaintiff previously moved for, and this Court previously ordered, numerous procedural safeguards for JC and his sister's mental health during their depositions in this case. (Dkt. ## 143, 144, 146-150). At that time, following argument from counsel and based on Seventh Circuit authorities, the Court entered an Order that: 1) limited each child's (JC's and NC's) depositions to 3 hours and 15 minutes and allotted plaintiff 2 hours for direct examination, defendants 1 hour for cross-examination, and plaintiff 15 minutes for re-direct examination; 2) allowed plaintiff to examine the witnesses first: 3) limited the defense to having two attorneys present (only one of whom examined the witnesses); 4) limited the defense's ability to ask leading questions of the child witnesses; 5) allowed the children's mother to be present even though she is also a witness; 6) allowed each witness to take as many breaks as needed; and 7) required the depositions to occurred under the Court's personal supervision in the courtroom. (Dkt. #150, at 1-2). Finally, the Court ordered that the depositions be videorecorded.  (Id. at 2). Plaintiff had requested (and case law recommended) that the deposition be videotaped in the event the minor plaintiffs were unable to testify at trial. (Dkt. ## 143, 144, 146-150).

On June 30, 2021, JC and NC were deposed in this case. At that time, Plaintiff's counsel did a short but complete direct examination of each witness, given their status as traumatized minors. Defendants cross-examined JC and did not use up their allotted time. Defendants did not cross-examine NC at all.  (Exhibits B and Y).

JC was 9 years-old on the 9/20/18 incident date. His sister NC, who was in Haynes' classroom with him, is one-year older than JC. JC has severe PTSD stemming from the incident. Plaintiff's medical expert, a board-certified pediatric psychiatrist who specializes in and directs a clinic treating traumatic distress in children, diagnosed JC with severe PTSD, (exacerbated) ADHD, depression and anxiety as the result of defendants' beating. (Berkowitz report at 19-22,

Exhibit M). Several of JC's medical treaters also diagnosed him with PTSD (or a variant thereof) and ADHD, including Garfield Park Behavioral Hospital.  (Id. at 10-13).  *Defendants'* expert opined that JC currently has CPTSD, *caused in part by the 9/20/18 incident*, ADHD, and anxiety (cause disputed) and that JC also had PTSD from the incident at least until early 2020.  (Exhibit P).

In particular, as a result of the incident JC suffered sleep disturbance, nightmares, anxiety, crying, enuresis, anhedonia, afraid to enter bathrooms, and, according to reports and scale responses, and he is currently suffering insomnia, nightmares, hypervigilance, enuresis, anxiety, anger, flashbacks, avoidance, lack of interest, lack of trust of people in authority, fear of attending school, etc.  (Berkowitz dep. I, at 71:3-17, Exhibit Z).  JC had no prior sleep, anxiety or bedwetting issues. "There was little question that he had PTSD," "chronic PTSD," and JC "was clearly…more symptomatic with his ADHD than most of the kids I have worked with…." (Dr. B dep I, 62:12-21; 52:21-53:5; 78:17-23). JC's prognosis is "guarded" to "poor." (Berkowitz report at 23, Exhibit M).

As a result of his symptoms, JC has great difficulty talking about the incident and, when is reminded of and/or talks about it, his feelings and symptoms of traumatic distress become trigged, physically aroused, and he experiences re-trauma.  He is extremely reluctant and avoidant when asked to talk about the incident. (Berkowitz Report at 13, 15, Exhibit M). When forced to recount the incident, he becomes upset and has nightmares and intrusive thoughts. (Id.). As he talks, he becomes increasingly agitated and fidgety. (Id.). In his own words, when he tells what happened: "the devil takes over." (Id.). In typical fashion for kids with PTSD, he becomes increasingly aroused or hyper-aroused with anxiety, including physical symptoms. (Berkowitz dep. I, at 54:17-55:3). Although JC steeled himself for his video deposition, but there are several

pregnant pauses in which he puts his head down, needs a break, and/or is silent because – it is obvious - he is struggling. (Exhibit B).

In addition, JC's ADHD makes him easily become frustrated, impulsive, and often answering before the question is completed. (Exhibit M, Berkowitz report at 17). His PTSD compounds and magnifies his ADHD symptoms. (See Id. generally). When JC's anxiety stress becomes overwhelming, as is likely during prolonged adversarial cross-examination, he may decompensate. Under those circumstances and anxiety and stress, leading questions will likely confuse him. When JC becomes confused or afraid, he will be more vulnerable to responding with assent because Children like to please adults, especially adults in authority, including lawyers in suits. They do not want to seem disobedient or impolite.

JC's sister, NC, also has significant trauma from the incident and needs this protection. Though she has not been formally evaluated, she, too, has great emotional difficulty talking about the incident. For instance, as demonstrated to Magistrate Finnegan, she cried in the middle of her testimony at the criminal trial, was offered tissue and water, and had to be given time in which to "compose" herself. (Dkt. # 148, Exhibit A). In addition, her video deposition testimony also contains several pauses in which it is evident that she was struggling to maintain composure and focus. (Exhibit Y).

"… [C]ourts have long recognized the need to protect the physical and psychological well-being of child abuse victims in judicial proceedings, and a variety of measures have been used to ameliorate the harsh consequences associated with child abuse cases." *Aylward v. Bamberg*, 1999 U. S. App. LEXIS 15168, at *13-14 (7th Cir. 1999). In criminal cases, the Court is mandated to fashion restrictions on defendants' examinations of child victim-witnesses. 18 U.S.C. § 3509. Whether or not 18 U.S.C. § 3509 is triggered here, courts routinely act to protect

the child witnesses who testify. *U.S. v. Protho, 41 F.4th 812, 825-827 (7th Cir. 2022); Aylward v. Bamberg*, 1999 U. S. App. LEXIS 15168 at *13-14 (7th Cir. 1999)(collecting cases)*; Arassi v. Weber-Stephen Prods.* LLC, 2014 U.S. Dist. LEXIS 49032 (E. D. Wis., April 9, 2014); *Doe v. Henry*, 2011 Ill. App. Unpub. LEXIS 66, at *4-5, 15 (3d Dist. 2011); *Bucher v. Richardson Hosp. Auth.*, 160 F. R. D. 88, 95 (N. D. Tx. Dec. 13 1994); *Spigarolo v. Meachum*, 934 F. 2d 19, 21 (2d Cir. 1991); *Arcans v. Superior Court*, 774 P.2d 837, 839 (Ariz. Ct. App. 1989). "These cases strike an appropriate balance between the need to provide a supportive environment for the child witness and the defendant's right to a fair trial." *Aylward*, 1999 U. S. App. LEXIS 15168 at *14. It would be irregular and likely contrary to law if the Court here did not act to impose reasonable restrictions to protect JC and NC.

The Court is allowed to restrict defendants' right to confront and cross-examine a child victim witness, especially in a civil case. "In all *criminal* prosecutions, the accused shall enjoy the right… to be confronted with the witnesses against him…." (Sixth Amendment, U. S. Constitution)(emphasis added). However, even in criminal trials, the right to face-to-face confrontation is not absolute. *Maryland v. Craig*, 497 U.S. 836 (1990); *Ohio v. Roberts*, 448 U. S. 56, 64 (1980); *Mattox v. United States*, 156 U. S. 237, 243 (1895); *Papapetropoulous v. Milwaukee Transport Services, Inc*., 795 F. 2d 591, 598-600 and note 11 (7th Cir. 1986). The Supreme Court has held that society's interest in protecting an infant or child witness from unnecessary trauma outweighs the defendant's right to confront the witnesses against him. *Maryland v. Craig*, 497 U. S. 836, 843, 855 (1990).

Moreover, it is widely that recognized leading questions from an adverse party to a child can be highly suggestive and can corrupt a child's testimony:

> In general, open-ended questions tend to elicit longer and richer responses than
> closed-ended questions, though close-ended questions are sometimes necessary

35

when children are reticent (Lamb, et al., 2008). A potential problem of close-ended questions is that they increase the likelihood of children acquiescing to (rather than producing) inaccurate information. One study found that a particular type open-ended question, namely "Wh-" questions such as "what happened?" or "why did you feel that way" is likely to elicit more accurate information as well as greater details about the event in question compared to close-ended questions (Lamb, et al., 2008). This is exactly the type of information that is germane to a coherent narrative.

*Questioning Child Witnesses*, Nicholas Scurich, Ph.D., Departments of Psychology & Social Behavior and Criminology, Law & Society at the University of California – Irvine, January 31, 2013 (http://www.thejuryexpert.com/2013/01/questioning-child-witnesses/). An adversary's use of leading questions on children is an obvious effort to suggest, intimidate, shape, limit or otherwise manipulate the child's telling of what happened.

At their age, with their limited education and mental impairments, JC and NC are highly vulnerable to suggestion, manipulation and intimidation by the defense during what would be an inherently adversarial and prolonged cross-examination. In addition to having to see Tyler and Haynes face-to-face, at trial JC and NC will face at least seven (7) defense attorneys, judging from the number who worked on defendants' drafts of the FPTO, defendants' motions in limine, and defendants' responses to plaintiff's motions in limine.

In these circumstances, courts regularly prohibit leading questions to children from adverse parties. *Idaho v. Wright*, 497 U. S. at 813; *Harris*, 698 F. 3d at 642. "Ordinarily," the Court allows leading questions on cross-examination. Fed. R. Ev. 611(c). However, *the advisory committee notes to Fed. R. Civ. Pro. 611 specifically state that child witnesses are one of the exceptions to the general rule:* "Within this tradition, however, *numerous exceptions have achieved recognition:... the child witness*...." (1987 Advisory Committee notes on Subdivision (c) of Fed. R. Ev. 611)(emphasis added). The inability to ask leading questions is a procedural safeguard that the court can use to protect child witnesses. *Idaho v. Wright*, 497 U. S. 805, 813

(1990); *Harris v. Thompson*, 698 F. 3d 609, 642 (7th Cir. 2012). The right to ask leading questions is not absolute and is subject to the discretion of the district court. *United States v. Hall*, 165 F. 3d 1095, 1117 (7th Cir. 1999). Further, the Court controls the mode and order of examining witnesses so as to "make those procedures effective for determining the truth" and "protect witnesses from harassment." (Fed. R. Ev. 611(a)). "[T]he examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence…." (Fed. R. Civ. Pro, 30(c)(1)).

At the same time, leading questions to child witnesses *during direct examination* are "entirely proper" because they help elicit difficult testimony and aid the court in its search for truth, and a lack of leading questions may be "inappropriate or unnecessary to a determination of whether a given statement is sufficiently trustworthy." *United States v. Boyles*, 57 F. 3d 535, 547 (7th Cir. 1994); *Doe v. United States*, 976 F. 2d 1071, 1080 (7th Cir. 1992); *Doe v. United States*, 976 F. 2d 1071, 1080 (7th Cir. 1992). In other words, on direct examination leading questions may be necessary to develop the witness' testimony in cases where the witness is a child. *United States v. Archdale*, 229 F. 3d 861, 865-866 (9th Cir. 2000); Fed. R. Ev. 611(a). These decisions are an exception to Fed. R. Civ. Pro. 611's general rule that leading questions should not be asked on direct. This exception is built into the language of the rule itself (i.e., "except as necessary to develop the witness's testimony").

The defendants have already examined or interviewed JC 5 times and NC 4 times. Defendants deposed both NC and JC in this case and cross-examined both of them during Haynes and Tyler's criminal trial. (Exhibits B, Y, and V). In addition, the Board, through CPS investigator Finley, interviewed both JC and NC during her investigation. (Exhibit D). The Board and Haynes also examined both JC and NC during Haynes' dismissal proceeding. (Exhibit

W). In addition, defendants' expert McNaught interviewed JC for an entire day. (Exhibit P). In addition, JC was interviewed another approximately 15 times and NC another 2 times by other examiners. (E.g., Exhibits A, C, G). JC was interviewed twice by two different sets of police officers. (Id.). He was also interviewed by Tilton's Principal Hodge. (Plaintiff's proposed exhibit 1, FPTO, Exhibit A). Both JC and NC were interviewed by DCFS investigator Anaya. (Exhibit G). JC has also been interviewed regarding the incident by multiple medical treaters, according to records. (Berkowitz expert report, Exhibit M). Moreover, plaintiff's counsel and plaintiff's expert naturally found it necessary to interview JC and NC more than once. In light of the high number of times JC and NC have been interviewed by defendants and others, *defendants' own medical expert testified*:

> *I have never seen a child who has been interviewed so much about an incident. And I've worked with many children who have been traumatized, and I have never seen a child interviewed so frequently by people. It's really distressing.*

(McNaught dep. trans., 110:7-13, Exhibit F)(emphasis added).[14]

Given that JC and NC are minors, that they are in fragile mental health and highly suggestible, given the number of times that JC and NC have already been thoroughly examined and/or interviewed by the defense, the number of times they have been re-traumatized through recounting the events, the fact that defendants already had the opportunity to cross-examine both of them at their depositions in this case, and the fact that, after so many examinations and interviews, JC and NC have no new information and nothing new to say, the Court should find

---

[14] Defendants argue JC is available to testify at trial because he gave a single, friendly reporter an interview JC about his experience in the presence of his mother, father, and his attorney in the safety and comfort of his home. (https://www.cbsnews.com/chicago/news/george-tilton-elementary-school-student-beaten-belt/ and https://www.cbsnews.com/chicago/news/lawsuit-filed-child-beating-case-cps-student/) (last checked 12/7/23).This is a false equivalency. At trial defendants would subject JC to rigorous, adversarial and prolonged cross-examination through leading questions.

that JC and NC are unavailable testify at trial and allow plaintiff simply to show the jury the video of their direct and cross-examinations in lieu of their live testimony. It would simply re-traumatize JC and NC further to be forced to testify yet again, and it would be needlessly cumulative for them to do so when plaintiff and defendants have already examined them thoroughly on video in this case.

Tyler complains she has not had the opportunity to examine plaintiff. (Motion at 5). That is untrue: Tyler had the opportunity to examine plaintiff but sat on the sidelines, as she has done throughout the case: she failed to show up for JC's and NC's depositions and all other depositions in this case and failed to make any efforts to retain counsel. Although Tyler was timely served twice with summons and the original complaint in 2019 and received plaintiff's written discovery requests and notices for her deposition, Tyler simply never filed an answer, answered discovery, or responded in any way to deposition notices or subpoenas. (Dkt. # 106). Eventually, this Court held Tyler in contempt and issued a writ of body attachment that was executed by the U.S. Marshals, and Tyler was brought from her apartment before the Court. (Dkt. ## 108, 109, 113, 115, 120 (body attachment), 121 (contempt order), 126, and 127). Eventually, almost a year after the Court appointed counsel for her, Tyler was made available for deposition in 2023 and answered the complaint on September 20, 2023. (Exhibit K; Dkt. # 306). Moreover, Tyler cross-examined both JC and NC at her criminal trial. (Exhibit V). Granting defendants' motion to exclude video testimony so that Tyler could cross-examine JC and NC at trial would be to reward her – and any party - who chooses to simply sit on the sidelines during discovery. Alternatively, as argued above Tyler had a predecessor in interest in the form of Haynes who has examined JC and NC on multiple occasions, including during their depositions in this case.

In the event that the Court requires plaintiffs to testify a trial again at trial, then, in the alternative, plaintiff requests that the Court institute the following procedural safeguards in order to protect JC and NC's fragile mental health and the integrity of their testimony:

- Limit JC testimony to 2.5 hours, with 90 minutes allotted to plaintiff, and limit NC's testimony 1 hour, with 40 minutes allotted to plaintiff;

- Allow only 1 defense attorney to examine JC and NC on behalf of the defense;

- Neither Tyler nor Haynes may attend in person in the same room;

- Neither the defense nor plaintiff may ask JC or NC leading questions, except preliminary questions to direct attention[15];

- Allow JC to testify in chambers or the Court's conference room, which would be less imposing and more intimate than a large courtroom;

- Limit number of people present, including attorneys, to the smallest number possible; and

- Allow the children's mother or other close relative of their choosing to be present.

Defendants in several similar cases in which defendants' excessive force caused the child plaintiffs to suffer from PTSD were recently prohibited from asking leading questions of the minor plaintiffs. *Tate v. City of Chicago*, 2020 WL 5800817, *2 (N.D. Ill. Sept. 29, 2020) ("[N]either party is permitted to ask leading questions), as affirmed/modified by 2020 U. S. Dist. LEXIS 46434, at *4 (N.D. Ill. March 11, 2021); and *Mendez v. City of Chicago*, 2020 WL 3510692, at *4 (N. D. Ill. June 29, 2020) ("The court finds that Defendants should be prohibited from asking leading questions… [T]he inability to ask leading questions is a procedural safeguard that can be used to protect child witnesses").

---

[15] Defendants previously *agreed* not to ask JC or NC leading questions at their depositions. (Dkt. #144 at 3).

In opposing plaintiff's deposition designations, defendants are proposing a *carte blanche,* adversarial examination through leading questions of two, mentally traumatized children. Defendants indicate no willingness to accept any restrictions on their examinations whatsoever. When defendants sought to depose JC and NC without any restrictions, this Court did not allow it. The Court should not allow it now either.

A *carte blanche* cross examination of JC and NC is not warranted by either the law or facts, and it has more than just a mere potential to oppress the child witnesses and cause them undue burden, unfair prejudice and mental harm. Defendants fail to cite any authority at all for their proposal to examine JC and NC *carte blanche* and without restriction. They do cite no medical evidence; indeed, *defendants' medical evidence supports plaintiff's advocacy of restrictions.* They cite no authority for an unfettered right to cross-examine in a civil case. In the end, they provide no explanation or reasons why they need to cross-examine JC and NC yet again. Moreover, defendants' motion has not pointed to any earlier statements by JC or NC that are impeaching or inconsistent with their deposition testimony.

Defendants also argue that plaintiff should be barred from calling the child witnesses KB, KKB, JL and RJ at trial *in any form* (including through designation) because plaintiff did not formally disclose them in her MIDPs. Defendants' argument is premised on a fundamental misrepresentation of developments during discovery.[16]

Analogous to the MIDP, Fed. R. Civ. Pro. 26 requires a party to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses…, identifying the

---

[16] Plaintiff's proposed designations of KB, KKB, JL and RJ are only in the event that these witnesses are unavailable for trial due to plaintiff being unable to locate or serve them or in the event of their failure to respond to trial subpoenas.

subjects of the information." Fed. R. Civ. P. 26(a)(1)(A). Rule 26 also requires a party to

"supplement" its disclosures if it "learns" that the information disclosed is "incomplete" *and* "if

the additional [] [] information *has not otherwise been made known to the other parties during*

*the discovery process or in writing*." Fed. R. Civ. P. 26(e)(1) (emphasis added). To ensure

compliance with these rules, Rule 37 provides that "[i]f a party fails to… identify a witness as

required by Rule 26(a) or (e), then the party is not allowed to use that information or witness to

supply evidence… at a trial, unless the failure was substantially justified or is harmless." Fed. R.

Civ. P. 26(c)(1). Whether noncompliance with Rule 26(a) or (e) is substantially justified or

harmless is left to the district court's broad discretion. *Dynegy Mktg. & Trade v. Multiut Corp.*,

648 F.3d 506, 514 (7th Cir. 2011).[17]

      In this case, plaintiff was never in possession of information regarding these witnesses

that she could have disclosed, and she never had a duty to supplement because these witnesses

and their likely testimony was subsequently "*made known to the other parties during the*

*discovery process or in writing*." Fed. R. Civ. P. 26(e)(1) (emphasis added). First, it was

defendants – specifically, the Board and Haynes – who possessed yet failed to disclose any of the

child witnesses, even though MIDP strictly required them to disclose witnesses with information

that *the opposing party* (i.e., plaintiff) may use to prove his case. (Defendants' MIDPs, Exhibit).

Because these witnesses were/are all CPS students and minors whose identifying and contact

information was protected by law, plaintiff simply did not have the ability to disclose them and,

---

[17] "[T]he Seventh Circuit has indicated that the following factors should guide the district court's discretion [in determining whether noncompliance was substantially justified or harmless] : (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, No. 12 C 3233, 2016 WL 7034074, at *5 (N.D. Ill. Dec. 2, 2016) (citing *David v. Caterpillar, Inc.*, 324 F.3d 857, 857 (7thth Cir. 2003)).

for the same reasons, was unable to discover them, ascertain their knowledge, or interview them. However, defendant Board had all of this information but did not disclose it. After plaintiff raised the issue with the Board that these witnesses were missing from its MIDPS and the Board still refused to disclose them, plaintiff moved to compel. (Dkt. #111, 131, 135). The Court granted plaintiff's motion in part, ordering the Board to disclose the names and contact information of two child witnesses. The Board then produced this information to all parties (except for Tyler, who was not participating).

Second, these witnesses were "*made known to the other parties during the discovery process or in writing*" because CPS' investigation and CPD Detective Casanova's investigation both included interviews with child witnesses who were students in Haynes' classroom on 9/20/18.  (Exhibits C and D). Their reports were produced in discovery to all parties by the Board (Finley's investigative report) and/or subpoenaed by plaintiff and the Board (Casanova's case report) and produced to all parties. Each report contained summaries of their interviews with the child witnesses (identified only by their initials). (Exhibits C and D). This is how all parties' attorneys first became aware of the child witnesses. In addition, plaintiff took the depositions of both investigator Finley and Detective Casanova, and both of their investigative reports were used as exhibits at their depositions. Therefore, it is crystal clear that all parties were repeatedly made well-aware of the existence of the child witnesses and their likely testimony.[18]

---

[18] Defendant Board had and has much more. Not only did defendant Board have the full names and contact information for the student witnesses and their parents in the CPS system, but defendant Board interviewed, prepared and presented several of the children as witnesses during its prosecution of Haynes' dismissal proceeding.  (Exhibit W).

Because all parties had already exchanged during discovery all available information about the child witnesses (except for the information plaintiff sought to compel from the Board), there was never a need or duty for plaintiff to formally disclose or supplement these witnesses through amended MIDPs. In the alternative, any such failure by plaintiff was substantially justified or harmless because all parties already had the information. Therefore, it was no surprise to defendants when these witnesses appeared on plaintiff's will- and may-call lists, there is no prejudice to cure, no disruption to the trial, and no bad faith in plaintiff not disclosing information that all parties already had.

On the contrary, the ball has always been and remains in the Board's court. Except for two students, the Board has refused to identify the full names of the students identified only by initials or provide their contact information for the vast majority of student witnesses and their parents so that plaintiff may call them at trial. The Board continues to withhold their identities, which causes plaintiff to rely on the former testimony exception or to move the Court to order the Board to provide the names and contact information so that plaintiffs are able subpoena them to testify in person at trial. During the parties FPTO, plaintiff requested this information from the Board again, and the Board refused to provide it. (FPTO, plaintiff's witness lists, at 10-11, 18-19).

## Conclusion

For all of the foregoing reasons, the Court should deny Defendants' MIL 2.

## **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE 3**

### **Introduction**

Defendants' motion in limine #3 lumps together and conflates three separate issues: 1) whether Defendant Board of Education of the City of Chicago ("defendant Board" or "the Board") should remain in the case caption, jury instructions and verdict form; 2) whether scores of plaintiff's proposed exhibits and witnesses regarding Board policies, the Board's dismissal charges against defendant Haynes, and other Board records should be barred; and 3) whether a special interrogatory is necessary regarding whether defendant Haynes was acting within the scope of her employment with the Board. (Motion at 2-3). When each issue is understood and analyzed independently, it becomes clear that defendants' motion must be denied.

### **Removing the Board from the Caption, Jury Instructions, and/or Verdict Form Would be Erroneous as the Board is a Current Party Defendant and Doing So Would Only Confuse and Mislead the Jury and Unfairly Prejudice Plaintiff**

First, in the procedural circumstances of this case, removing defendant Board from the caption, jury instructions and verdict form would be contrary to case authority in this District. Defendants' only express argument for removing all references to the Board is that all of plaintiff's claims against the Board have been dismissed. (Motion at 1). That is not an accurate statement. Further, to the extent the Board makes an implicit argument that all references should be removed because plaintiff no longer has any *direct* liability claims against the Board, case law makes clear this is not sufficient legal reason to do so. (Motion at 2).

The Board is a current defendant in this case. Plaintiff's amended complaint contains two counts against the Board, *respondeat superior* (count 9) and indemnification (count 10). (Dkt. 23, at 30-31). This Court previously denied the Board's motion to dismiss plaintiff's *respondeat superior* count in a memorandum opinion. *Gaines v. Chicago Board of Education*,

2020 WL 1182767, *4-5 (N.D.Ill. March 12, 2020). The Court held that Haynes' alleged conduct in arranging for and participating in JC's beating was plausibly within the scope of her employment because Haynes' actions were tied to her lawful school objective of maintaining discipline of her students. Id. at 4. Notably, the court pointed out that, in the Board's reply in support of its motion to dismiss, the Board did not contest plaintiff's allegation that Haynes was "authorized, indeed commanded, to maintain discipline of her students." Id. at *5; dkt. 55 at 10. Rather, the Board's sole argument for dismissal was that the particular form of discipline that Haynes administered was outside the scope of her employment. The Court disagreed that this argument required dismissal, noting that scope of employment extends to "methods, even though quite improper ones, of carrying out the objective of the employment." Id. (*quoting Coleman v. Smith*, 814 F. 2d 1142, 1149 (7th Cir. 1987)). The Court did not address plaintiff's indemnification count against the Board in its motion to dismiss ruling, so that count stood. 2020 WL 1182767, at *4-5. Therefore, plaintiff's operative complaint currently contains a *respondeat superior* claim and an indemnification claim against the defendant Board.

Because plaintiff has pending *respondeat superior* and indemnification claims against the Board, the Board is a current party defendant, and excluding its name from the caption, jury instructions and verdict form are not warranted. *Jones v. City of Chicago*, 14-cv-4023, 2017 WL 413617, *6 (N.D.Ill. Jan. 31, 2017)(denying defendant City's motion in limine to remove it from the case caption and verdict form because "the City is still a defendant in this case under a *respondeat superior* theory for malicious prosecution as well as for [plaintiff's] indemnification claim"); *Bruce v. City of Chicago*, 09 C 4837, 2011 WL 3471074, *3-4 (N.D.Ill. July 29, 2011)(denying City's motion in limine to "strike the City of Chicago from the caption because Plaintiff has asserted a state law claim for *respondeat superior* against the City. The City is a

46

party to the case and should remain in the case caption"); *Wilbon v. Plovanich*, 12 C 1132, 2016 WL 890671, *3 (N.D.Ill. March 9, 2016) ("The indemnification claim against the City is still part of this lawsuit.  For that reason, the City of Chicago will remain named on the caption, jury instructions, and verdict forms"); *Tolliver v. Gonzalez*, 10 C 1879, 2011 WL 5169428 (N.D.Ill. Oct. 31, 2011) (denying City's motion to bar/strike the City of Chicago's name from the case caption).  To remove all mention of the Board from the caption, jury instructions, and verdict would be tantamount to dismissing it as a party defendant from the lawsuit.  That would be improper.

The only case that defendants cite in support of their argument that defendant Board should be removed from the caption, jury instructions and verdict form is *Martin v. City of Chicago*, No. 15 C 4576, 2017 WL 2908770, at *9 (N.D.Ill. July 7, 2017). However, in *Martin*, unlike here, the plaintiff: *agreed*, in the parties' proposed jury instructions, that the City was not a party to the lawsuit and that the defendants were being sued only as individuals; *waived* any objection to removing the City as a defendant in his response to defendants' motion in *limine* by failing to provide any reason or cite any authority for his objection; and did not have a *respondeat superior* claim. Moreover, in *Martin* the municipal defendant argued that its inclusion in the caption, jury instructions and verdict form may confuse the jury and improperly signal that "deep pockets" were available to pay any judgment.  At *2. Here, defendants failed to make this argument and, therefore, it has been waived.

Apparently as support for their argument that all references to defendant Board should be removed, defendants assert that the jury will have no role is resolving plaintiff's *respondeat* superior and indemnification claims.  (Motion at 2).  This is completely wrong.  It is wrong, first, for the obvious reason that the jury will decide the factual issue of whether Haynes was acting

within the scope of her employment when she arranged for and participated in JC's beating.

Scope of employment is almost always an issue for the jury. "An unbroken line of precedents holds that summary judgment is generally inappropriate when scope of employment is at issue." *Rodman v. CSX Intermodal, Inc.*, 405 Ill. App. 3d 332 (1st Dist. 2010); *Bagent*, 224 Ill. 2d at 165; *Reeze*, 2013 IL App (3d) 120981 ¶ 27. Judgment as a matter of law is appropriate only if the Court finds no reasonable person could conclude from the evidence that Defendant Caza was acting within the scope of his employment with Defendant Tenco Excavating, Inc. *Reeze*, 2013 IL App (3d) 120981 ¶ 27. Moreover, the jury will decide the scope of employment issue regardless of whether it is presented with defendants' special interrogatory or not. These two issues are not linked: even assuming the answers defendants' special interrogatory, this is not a reason to remove the Board from the jury instructions, verdict form, and caption. While defendants nominally acknowledge that scope of employment is a jury issue, they promptly ignore the significance of removing all trace of the employer from the jury instructions. (Motion at 2).

Moreover, because scope of employment is a jury issue, it would confuse the jury to be asked to decide whether Haynes was acting within the scope of her employment with an employer who is never mentioned in the caption, jury instructions, or on the verdict form. If defendant Board were completely absent from the jury instructions' definition of scope of employment, jurors would not have enough context for understanding or making sense of why they are called upon to decide whether Haynes was acting within the scope of her employment. In particular, with no mention of defendant Board 1) in the definition of "scope of employment" and the explanations of the parties' roles and the jury's options provided in plaintiff's instruction 32, and 2) at the end of each instruction for each state law claim (which recurs as a reminder in

48

plaintiff's proposed instructions), the jury instructions would be unclear and confusing. (See plaintiff's proposed instructions 32, 34, 35, 36, 37, 39, 40 agreed instruction 33, and defendant's proposed instructions 35, 37, 40). Juror confusion would only unfairly prejudice the plaintiff and unfairly benefit defendant Board.

Removing defendant Board from the caption, jury instructions, and verdict form would unfairly prejudice plaintiff for a second reason. The defendants have not moved to bar evidence of defendant Board's duty to indemnify its teacher defendant Haynes for a compensatory damages award and, consequently, have waived that argument, so plaintiff should now properly be allowed to introduce such evidence.[19] *Tolliver v. Gonzalez*, 10 C 1879, 2011 WL 5169428, at *3 (Since there generally is no public awareness of a municipality's duty to indemnify its employees, in the absence of evidence of indemnification there is a danger that the jury, aware of the modest income of teachers and unaware of any duty to indemnify, will lowball any damage award to plaintiff). If defendant Board were removed from the caption, jury instructions, and verdict form now, then, when plaintiff introduces evidence of the Board's duty to indemnify Haynes, the jury would be confused by the incongruous information: it would hear that the Board is not a defendant in the case but that the Board will pay plaintiff's judgment against Haynes if she is found liable. Put differently, there is no reason to bar mention of defendant Board to the jury at this point because plaintiff will be allowed to introduce evidence of its duty

---

[19] In the alternative, in the event plaintiff is not permitted to introduce evidence of the Board's duty to indemnify first, then, if defendant Haynes, who benefits from the right of indemnification by defendant Board, "opens the door" by testifying or arguing that 1) her financial circumstances render her personally unable to pay damages or 2) she personally will have to pay punitive damages out of her pocket, then at that point plaintiff has the right to admit evidence of the Board's obligation to indemnify Haynes for any compensatory damages award. *Bruce v. City of Chicago*, 2011 WL 3471074, at *3; *Wilbon v. Plovanich*, 2016 WL 890671, at *3, *citing Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998).

to indemnify Haynes, and the Board has already stated affirmatively that it will make good on that obligation. (Motion at 2).

More generally, the defendants have not argued in their motion in limine #3 that keeping the references to the Board in the caption, jury instructions and verdict form is not probative of defendant Haynes' liability, would somehow unfairly prejudice defendants, or would confuse or mislead the jury. (Motion at 3)(arguing only that admission into evidence of the Board's policies would unfairly prejudice the defendants or confuse or mislead the jury). For example, defendants do not argue that keeping these references to the Board would signal to the jury that "deep pockets" are available to pay any judgment. As noted, defendants do not argue that evidence of the Board' indemnification obligation is irrelevant, unfairly prejudicial, or confusing to the jury. Therefore, all such arguments have been waived.

### Defendant Board's Policies and Witnesses are Directly Relevant to Plaintiff's Individual Claims Against Defendant Haynes in Multiple Ways

Next, in a single, broad-brush stroke, defendants ask the Court to bar all evidence of defendant Board's policies, its dismissal charges and proceeding against defendant Haynes, and other Board records totaling 30 of plaintiff's proposed exhibits, as well as 20 of plaintiff's witnesses. (Motion at 3, including note 2). This request is vague, overly broad and draconian and should be denied on this ground alone. *Wilbon v. Plovanich*, No. 12 C 1132, 2016 WL 890671, at *9 (N.D.Ill. March 9, 2016)("The court agrees that Defendants' request to bar any reference to all police department rules, policies, and general orders is overly broad" and "Defendants' motion in limine… is denied…"), *report and recommendation adopted*, No. 12 C 1132, 2016 WL 3922906 (N.D.Ill. July 21, 2016). Moreover, defendants' arguments for barring the admission of policies are undeveloped and, thus, waived. *M.G. Skinner & Assoc. Ins. Agency,*

*Inc., v. Norman-Spencer Agency, Inc*., 845 F. 3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority").

To the extent defendants' argument has not been waived, defendants' blanket assertion that all of the materials "have no bearing on the factual issues the jury will decide" is false and misleading. (Motion at 3). First, to be clear, plaintiff will not be presenting any evidence to prove dismissed claims, including plaintiff's dismissed *Monell* claim, and will not be presenting any evidence that is relevant *solely* to any of plaintiff's dismissed claim(s). (Motion at 3). However, despite its title, the body of defendants' motion completely ignores the fact that many of the Board's policies and other records are *relevant to plaintiff's individual claims against defendant Haynes*. Defendants' argument that they are relevant only to plaintiff's dismissed *Monell* claim is pretextual; throughout their motions in *limine*, defendants seek to exclude school policies and witness testimony that are relevant to plaintiff's individual claims against Haynes that, if not admitted, would severely prejudice plaintiff. In fact, each of plaintiff's 30 exhibits and 20 intended witnesses to which defendants object on this basis are relevant to plaintiff's individual claims. Plaintiff's responses to defendants' motions in limine 2 and 5-7 address Board policies, records and testimony beyond those that plaintiff addresses here.

Here, as one example, some of the Board's policies are directly relevant to plaintiff's *respondeat superior* and indemnification claims against the Board for Haynes' liability under plaintiff's state law claims. To prove that Haynes was acting within the scope of her employment when she arranged and participated in JC's beating, plaintiff must show that her conduct was "of a kind she is employed to perform or reasonably could be said to have contemplated as part of her employment" and that her conduct was "motivated, at least in part, by a purpose to serve the employer." (Agreed instruction 33, FPTO, Exhibit E, at 49). In this case, plaintiff alleges and

51

will prove that Haynes' steps in arranging for and participating in Tyler's beating of JC were

taken in response to JC's recent disruptive behavior in Haynes' classroom. To demonstrate that

classroom discipline was the "kind of conduct" Haynes was required by the Board to perform,

plaintiff will need to introduce evidence of the Board's policy charging teachers with

responsibility for classroom discipline:

> **Sec. 6-13. Duties of Classroom Teachers.** Teachers shall take charge of the
> divisions or classes assigned to them by the principal. They shall be held responsible
> for the instruction, progress and discipline of their classes….

(Rule of the Board of Education, FPTO, Exhibit A, plaintiff's proposed Exhibit 87). Similarly,

plaintiff will need to introduce evidence and/or elicit testimony regarding the specific

disciplinary measures available to teachers under Board policy, such as loss of privileges,

parent/teacher conferences, in school suspension, and out of school suspension. (Tilton Student

Parent Handbook, FPTO, Exhibit A, plaintiff's proposed Exhibit 85). Thus, evidence of the

Board's policies requiring teachers to discipline students is directly relevant to plaintiff's

allegation that Haynes acted within the scope of her employment and to proving the Board's

vicarious liability for her conduct.  Such evidence should not be barred.

Further, as an example of a policy relevant to plaintiff's substantive claims against the

Board for Haynes' liability under state law, the Board has a long-standing written policy

prohibiting its employees from using corporal punishment as a method of discipling students:

> **Sec. 6-21. Corporal Punishment Prohibited.** No employee of the Board of
> Education may inflict corporal punishment of any upon persons attending the public
> schools of the city of Chicago.

(Plaintiff's Exhibit 87, BOE 911). This Board policy is directly relevant to multiple of plaintiff's

state law claims and federal claims against Haynes. It is relevant for all the reasons plaintiff

addresses with case law in response to defendants' MIL #6.

First, it is relevant as circumstantial evidence of plaintiff's civil conspiracy claim against Haynes. A conspiracy is almost always established through circumstantial evidence and inferences drawn from evidence. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134 (1999). The Board's unqualified prohibition on corporal punishment is relevant because it explains Haynes' motive or purpose for entering into an agreement with Tyler for *Tyler* to come to school to discipline JC for misbehavior in *Haynes*' classroom. Haynes was well-aware that she personally was not allowed to inflict corporal punishment on a student, (Haynes dep. 222:3-17), so she entered into an agreement for someone else to do it. Thus, the Board's policy and Haynes' knowledge of the policy is relevant evidence of conspiracy between Haynes and Tyler for Tyler to discipline or "whoop" JC with belts.

Second, the Board's corporal punishment policy is relevant, circumstantial evidence of plaintiff's claims against Haynes for aiding and abetting Tyler's assault, battery, and the intentional infliction of emotional distress against JC. The strict, written policy and Haynes' awareness of it provide circumstantial evidence of Haynes' motive or intent in planning and arranging for *Tyler* to come to school and use Haynes' belts to beat JC for his misbehavior in *Haynes'* classroom. Haynes knew she was not allowed to physically hurt JC. But when she was unable to get JC's parents to curb his classroom behavior immediately - including unsuccessfully suggesting to JC's mother Asia Gaines at a parent/teacher meeting two days before the incident that she could use her (Haynes') belts to "whoop" JC - Haynes then circumvented the Board's policy by arranging for and helping *Tyler* come to school to beat JC for his classroom misbehavior.  (Asia Gaines dep. 73:8-77:24; 80:16-82:4; 150:15-152:15, Exhibit)("Ms. K. Haynes told me told me if I ever want to whoop him, she have something for me to whoop him. She then opened [her classroom closet] door, she showed me a black and a brown belt that's

hanging up. She then closed the door back."). This was classic corporal punishment in a school, except that the teacher cleverly used someone else to inflict the blows.

Third, the Board's policy prohibiting corporal punishment is relevant in another way to plaintiff's aiding and abetting claim as well as to plaintiff's claim that Haynes directly inflicted serious emotional distress on JC. The Board's absolute prohibition against corporal punishment is evidence of the community standards for "extreme and outrageous conduct" by a teacher in Haynes' circumstances. What constitutes "extreme and outrageous conduct" is a community standard, and it will be up to the jury to determine if Haynes' conduct was extreme and outrageous. The policies adopted by the defendant Board reflect the standards of the educational community in Chicago of parents, teachers, staff and administrators. The fact that the Board adopted such an unqualified prohibition on corporal punishment - meaning that it is not warranted under any circumstances - is evidence that the Board "regarded" corporal punishment "as intolerable in a civilized community" and "beyond all possible bounds of decency." This community standard is a relevant benchmark for the jury's decision on whether Haynes' conduct in facilitating and participating in JC's in-school beating was extreme and outrageous. Here, when a teacher, ignoring such a clear policy, arranges to have a misbehaving 9-year-old child beaten in a school bathroom during school hours by a strange adult without the knowledge or authorization of the child's parents, then the Board's policy is relevant evidence that the teacher's actions were extreme and outrageous.

Fourth, the Board's policies and Haynes' violation of those policies are also relevant to plaintiff's state law claims for punitive damages. The fact that Haynes knowingly violated a crystal-clear policy, of which she was well aware, by undertaking a course of conduct in which she arranged for and/or participated in JC's beating is relevant evidence that her conduct was

54

intentional or willful and wanton. (Plaintiff's proposed jury instruction 46; IPI 35.01, FPTO, Exhibit E, at 74). The fact that Haynes knowingly violated or sought to circumvent the Board's corporal punishment policy also goes to the reprehensibility of her conduct, a factor that the jury considers when deliberating on punitive damages. (Id.). More pointedly, the fact that Haynes understood the Board's policy but decided to circumvent it by having someone else carry out the actual beating is evidence that she attempted to conceal her misconduct, another punitive damages factor. (Id.). Finally, the fact that Haynes violated not just one but *several* Board policies during her course of conduct culminating in the beating JC is additional, relevant evidence of both her intent and the reprehensibility of her conduct. (See plaintiff's response to motion in limine #6 below).

Multiple other Board policies, including but not limited to those addressed in plaintiff's response to defendants' motion in limine 6, are relevant for similar reasons. Finally, defendants' blanket, undeveloped argument that the Board's policies and Haynes' violations of same are not relevant in any way to plaintiff's § 1983 claims is wrong as a matter of law, as also set forth in response to motion in limine 6.

### Defendants' Proposed Special Interrogatory is Not Necessary or Inaccurate

Finally, defendants' proposed special interrogatory is simply unnecessary. (FPTO, Exhibit E, at 99). Even if some special interrogatory were necessary, defendants' is phrased in a manner that is vague, confusing, inaccurate and incomplete, and highly prejudicial to plaintiff. First of all, it completely omits plaintiff's aiding and abetting claim against Haynes, which is paired with, and must be decided with, each of plaintiff's state law claims. Next, defendants' draft erroneously asks the jury to answer the interrogatory only if it finds on *all* of plaintiff's state law claims ("Claims 3, 4, 5, and 6") rather than if/when it finds for plaintiff on one or more

of plaintiff's state law claims (i.e., "Claims 3, 4, 5, *or* 6"). Defendants ignore that a different set of Haynes' acts, some of which Haynes performed at different times, underlies each of plaintiff's state law claims. Further, the language "to the extent you find defendant Kristen Haynes liable" is confusing because it incorrectly introduces the idea of degrees of liability when the jury instructions only asked the jury to decide, for each count, whether she is liable or not. Finally, "at the time occurrence" is vague, undefined and does not refer to the legally relevant time, which is more apt to be "the time of the alleged wrongful act or acts."

For at least the reasons stated above, defendants' motion in limine 3 should be denied.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 4

### Introduction

The Court should deny Defendants' motion to exclude *all* statements made by Defendant Tyler in a consensual interview that she gave to a CBS reporter.

### Background

In a gross mischaracterization of the interview, Defendants Motion *In Limine* No. 4 asserts that Defendant Tyler was "ambushed," portraying the entire interview as an nonconsensual assault on Tyler. But the video recording of the interview objectively contradicts Defendants' characterizations. Far from being "ambushed," Tyler was politely approached by CBS 2 Chicago investigative reporter Dave Savini, who softly introduced himself, stating "Ms. Tyler—Juanita—I'm Dave Savini from CBS News." Ex. U, Recording of Tyler's CBS Interview, at 00:00-00:05. Savini then took a step back, putting his back against the wall of the nearby building, allowing Tyler the opportunity to walk past him if she wished not to participate. *Id.* at 00:02-00:06. Seemingly curious, Tyler stopped and squarely faced Savini. *Id.* at 00:04-

00:06. Savini then stated "we want to talk to you about the allegations involving [J.C.]. Do you have anything to say about that?" *Id.* at 00:06-00:12. At that, although Tyler initially took a handful of steps past Savini (proceeding away from him), she nevertheless stopped, turned back, squarely faced Savini again, and voluntarily began answering his questions. *Id.* at 00:09-00:20. Approximately 48 seconds into the interview, Savini—not Tyler—began to walk down the sidewalk (seemingly so the camera could see both his and Tyler's faces rather than seeing only his and not Tyler's). *Id.* at 00:40-48 (Tyler's back to camera while answering question); *id.* at 00:49-00:55 (Savini successfully reorients both Tyler, himself, and the camera so that the camera can see both of their faces as they walked together down the street). Consistent with the consensualness of the interview, Tyler walked alongside—not away from—Savini as the two proceeded along the sidewalk, with Savini asking questions and Tyler answering them. *Id.* at 00:56-07:14.

Tyler voluntarily answered Savini's questions for more than 7 minutes. *Id.* at 00:00-07:14. At no time during those 7 minutes did Tyler ever say anything to suggest that her participation in the interview was no longer voluntary. At all times she was free to walk away or otherwise decline to answer any one of Savini's questions. In fact, it was not until approximately 7 minutes and 13 seconds into the interview that Tyler did anything to indicate that her participation was no longer consensual: for the first time, Tyler turned, pointed to the camera, and stated "get me off that camera." *Id.* at 07:12-07:14. The interview ended 56 seconds later. *Id.* at 07:13-08:09.

## Legal Standard

This Court may grant a motion *in limine* to exclude evidence before trial "*only* when the movant shows that the evidence is inadmissible on *all* potential grounds." *Betts v. City of Chi.*,

57

784 F. Supp. 2d 1020, 1023 (N.D. Ill. 2011) (emphasis added). To be admissible, evidence must be relevant. FED. R. EVID. 402. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable. FED. R. EVID. 801. Rule 403 provides that the Court "may exclude relevant evidence if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403 (emphasis added).

### Argument

First, Defendants' motion is moot. For all of the reasons set forth in Plaintiffs' MIL 1 and Plaintiff's response to Defendants' MIL 1, the undisputed fact that Tyler was convicted of domestic battery for beating J.C. repeatedly with belts in the Tilton bathroom necessarily precludes her from attempting to relitigate that issue at trial in this case. In other words, , the issue has already been decided, meaning Plaintiff need not prove Tyler's misconduct anew at trial in this case and rather need only prove that Tyler's conduct *caused* J.C.'s damages. If Plaintiffs' MIIL 1 is properly granted, Plaintiff would concede that the probative value of portions of Tyler's CBS interview would decrease dramatically.

If Plaintiff *were* required to prove that Defendant Tyler beat J.C. with belts in a Tilton bathroom, several of Tyler's statements from the CBS interview are plainly admissible. For example, at trial Plaintiff expects that Tyler will deny, as she did at her deposition, that J.C. was ever inside the Tilton bathroom with her or that *he was standing near the bathroom door while she was inside*. *See, e.g.*, Ex. K, Tyler Dep at 130:24-133:13, 134:19-135:1. But that is not the story she told Mr. Savini three years early in late 2018. Ex. U, at 04:44-04:49 (telling Savini that J.C. was "standing right there," by the bathroom door, while she was inside the bathroom); (story air date 2/6/19, https://www.cbsnews.com/chicago/news/george-tilton-elementary-school-

student-beaten-belt/) (*last checked 12/8/23*). That is a critical admission—it places *both* Tyler

and J.C. inside or at the bathroom entrance—the site of the alleged beating—together at the same

time. At the same time, Tyler's statement has tremendous impeachment value, especially here,

where her statements to CBS were made three years ago, shortly after the incident.

     Also, Plaintiff expects Tyler to testify, as she did at her deposition, to making countless

statements to J.C. in the hallway about a wide range of subject matters, including, but in no way

limited to, telling him "'you cannot act like that in school,'" "'you have to be good because your

mama got heart trouble,'" "'you don't want Mona to come up here and beat you,'" "'if anybody

hits you with a belt you need to tell on them,'" and "if you be good in school I would give you

five dollars a day." Ex. K, at 125:11-12, 125:13-14, 125:17-18, 125:24-126:1. But that is not

what she told Dave Savini following the incident. She told him that all she said to J.C. was that

he needed to "act right" and would pay him $5 per week if he behaved. Ex. U, at 5:11-5:20. In

this respect, the CBS interview is highly probative of Tyler's truthfulness.

     As another example, at trial Plaintiff expects Tyler to repeatedly deny beating J.C. with

belts in the bathroom by appealing explicitly to her non-belief in corporal punishment and her

non-belief in hitting someone first. *See, e.g.*, Ex. K, Tyler Dep I at 143:3-9 ("I don't believe in

doing corporal punishment"), 151:14-152:14 ("I don't believe in corporal punishment"), 205:1-9

(testifying she *would only strike someone if she was struck first*). If Tyler so testifies at trial, then

Plaintiff is entitled to introduce Tyler's admission to Dave Savini that she took a train to

Waukegan and "knocked the fuck out her husband" (when her husband had not hit her first). Ex.

U at 06:30-06:37. In addition, for all the reasons set forth in Plaintiffs' response to Defendants'

MIL 1, Tyler's statement is also admissible "other acts" evidence pursuant to Rule 404(b).

In sum, on balance, if Plaintiff must re-prove the facts essential to Tyler's criminal conviction, it is clear that Tyler's interview statements to CBS reporter Dave Savini have tremendous probative value to Plaintiff's case—i.e., in proving the underlying conduct (by placing Tyler and J.C. at or near the bathroom together), in countless respects for impeachment, and for probative, Rule 404(b) evidence—especially when considering that the statements were made shortly after the incident. In short, the probative value of Tyler's statements to CBS is substantial. Defendants' entire argument to the contrary wholly ignores the substantial probative value of Tyler's statements to Plaintiff's case. Any prejudice, if it exists, is not unfair. And it certainly does not outweigh—let alone substantially outweigh—the probative value of the evidence.

For all of the foregoing reasons, the Court should deny Defendants' MIL 4.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE 5

### Introduction

Defendants seek to exclude most or all of Dr. Berkowitz's opinions. (Defendants' motion in *limine* #5 ("motion")). Dr. Berkowitz ("Dr. B") conducted psychiatric examinations of JC and concluded that, as a result defendants' beating, JC suffers from Post-Traumatic Stress Disorder (PTSD), exacerbated and severe Attention Deficit and Hyperactive Disorder ("ADHD"), Major Depressive Disorder, and an anxiety disorder. He also rendered opinions as to JC's prognosis, treatment recommendations for JC's PTSD and exacerbated ADHD, and identified the approximate cost per unit of the types of treatment JC needs in the future. (Report at 22-23, Group Exhibit M). All of Dr. B's opinions that defendants seek to exclude are relevant, reliable, and helpful to the jury, and Dr. B is well-qualified to give them, as detailed below. His

opinions are set forth in his initial report, rebuttal report and his two depositions. (Rebuttal report attached as Exhibit Q).

Defendants' motion in limine 5 is really a statement of defendants' disagreement with plaintiff's experts' opinions dressed up as an attack on methodology when the proper place for such arguments is cross-examination and jury argument. *McKeon v. City of Morris*, 2016 U. S. Dist. LEXIS 131126, at 7-8 (N. D. Ill. Sept. 26, 2016). District courts have broad discretion in determining the admissibility of expert testimony. *See GE v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012). With regard to the reliability of an expert's methodology, courts consider factors such as whether the methodology can and has been tested, whether it has been subject to peer review, whether it has a known or potential rate of error, and whether it is generally accepted among the relevant community. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Daubert*, 509 U.S. at 593-94). Within this framework, even "shaky expert testimony may be admissible, assailable by its opponents through cross-examination," and criticisms of the testimony's quality speak not to admissibility but to the weight that the testimony should be accorded by the trier of fact. *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (quoting *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)). "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 943 (N. D. Ill. 2006).

### Dr. B is Qualified to Render His Diagnoses and Other Opinions in this Case

Dr. B is well-qualified to render his opinions in this case based on his knowledge, skill, experience, training and education. (Berkowitz CV, Group Exhibit M). Dr. B is board-certified in both Psychiatry and Child and Adolescent Psychiatry and has decades of experience assessing

and treating PTSD and related disorders in children and adolescents in urban environments. (Id.). He currently directs the Stress, Trauma & Adversity Research and Treatment (START) Center at the University of Colorado medical campus where he is also a Professor in Psychiatry. (Id.). Dr. B did his internship, residency and post-residency fellowship at Yale University. (Id.). He was subsequently a Professor in Child and Adolescent Psychiatry at Yale for 18 years where he also held numerous leadership posts, including as director of Yale's Child and Adolescent Forensic Programs and Yale's Child Violent Trauma Center. (Id.). He worked on the staff of and supervised fellows at the Yale Child Study Center for 15 years. (Id.). He was also professor of clinical psychiatry at the University of Pennsylvania medical school for 9 years and was Director of the Penn Center for youth and Family Traumatic Stress Recovery. (Id.). He has been a consultant to the U.S. Department of Justice and numerous other government agencies and has headed publicly appointed task forces. (Id.). He has published extensive, peer-reviewed, books, book chapters and journal articles on identifying and treating PTSD and traumatic stress symptoms in children, adolescents, and families in urban communities. (Id.; Report at 25-27). He has also published regarding the treatment of substance abuse in children and adolescents, on the relationship between traumatic stress and anti-social behavior in children and adolescents, and on the relationship between income/economic class and mental health conditions. (Id.). He has developed innovative treatment models for treating child and family traumatic distress. (Id.). Dr. B has also worked extensively with public schools to create accommodations for students with various learning disabilities, including ADHD, and has participated in the development of numerous 504 and Individualized Educational Plans. (Report at 1). He has worked with "in the hundreds" of students who were in the process of being evaluated for an IEP or 504 Plan and has attended numerous IEP and 504 meetings at schools. (Dr. B dep I, 213:5-23).

**Dr. B's Diagnoses of PTSD, Exacerbated/Severe ADHD, Depression and Anxiety in JC as the Result of Defendants' Beating are Reliable and Helpful to the Jury**

First, Dr. B's diagnoses of JC's diagnoses resulting from defendants' beating are relevant, reliable, and helpful to the jury. Defendants make only brief, cursory and undeveloped arguments, at end of their motion, that Dr. B's PTSD, ADHD, depression, and anxiety diagnoses are unreliable, conclusory, without evidentiary support, and speculative. (Motion at 11-12). They even assert that these diagnoses are "irrelevant" to plaintiff's damages case and that Dr. B is unqualified to make them. (Id.).

Dr. B's opinions regarding JC's diagnoses and symptoms resulting from the incident are obviously relevant evidence of JC's damages under all of plaintiff's claims. Defendants dispute that JC has any significant psychiatric damages stemming from the incident. Defendants provide no reasons why Dr. B's opinions are "irrelevant."

Dr. B's life's work demonstrates that he is well-qualified to diagnose psychiatric disorders in children and adolescents and that he is superlatively qualified to diagnose PTSD and traumatic stress in children. (Berkowitz CV, Group Exhibit M). In addition, as an experienced, clinical psychiatrist, Dr. B is qualified to diagnose depression, anxiety, substance abuse, suicide ideation, and learning disabilities, including ADHD. (Id.). Dr. B has also worked extensively with schools to create accommodations for children with ADHD and other learning disabilities.

Dr. B's findings that JC suffers from PTSD, ADHD, depression and anxiety as the result of defendants' beating are based on scientifically reliable methodology and voluminous evidence. To arrive at his diagnoses and other opinions in this case, as set forth in his reports and deposition testimony Dr. B did the following: 1) conducted three separate interviews of JC and his mother (both together and separately), including one in-person interview in Chicago and two interviews *via* Zoom videoconference; 2) administered and scored standardized scales for

63

child PTSD, Depression, and Anxiety; 3) reviewed all available medical and mental health records for JC from before and after the incident date; 4) reviewed all of JC's school records; 5) reviewed all of the deposition testimony in this case, including the testimony of medical and/or mental health professionals who evaluated and/or treated JC; 6) and reviewed JC's multiple accounts of the underlying incident and the reports of those who investigated the incident. (Berkowitz report at 2-4, 19, Group Exhibit M). From these materials, Dr. B. obtained a comprehensive psychosocial, medical, psychiatric, developmental, and academic life-history for JC for the periods before as well as after the 9/20/18 incident. (Id. at 2-13, 19; Berkowitz rebuttal at 1, 10, Exhibit Q). Dr. B then administered and scored the standardized scales for child PTSD, child anxiety, child depression, and child psychosis, and listed the responses in his report and tendered all completed scales to defendants. (Report at 14-19, Group Exhibit M; Dr. B dep I, 106:12-18, 108:7, Exhibit Z). As a result of this comprehensive information and the application of his three-plus decades of education, training, skill, knowledge and experience as a child psychiatrist, Dr. B discussed his formulation of his diagnoses and related opinions, his treatment recommendations and prognosis. (Berkowitz report at 19-23). This is the standard methodology for forensic psychiatric evaluations that is generally accepted among the relevant community of Dr. B's peers. *Smith v. Ford Motor Co.*, 215 F.3d at 719 (citing *Daubert*, 509 U.S. at 593-94). Dr. B's two reports and two depositions lay out his comprehensive, forensic approach, his reasoning, and discuss the bases for all of his opinions. (Group Exhibit M and Exhibit Q).

Defendants' three assertions as to Dr. B's "lack of knowledge" regarding JC's PTSD are misrepresentations. (Motion at 11). First, Dr. B's reports and deposition testimony detail the specific, PTSD-related symptoms that, he found, JC has suffered sleep disturbance, nightmares,

64

anxiety, crying, and enuresis and, according to reports and scale responses, is currently suffering new insomnia, nightmares, hypervigilance, new enuresis, anxiety, anger, flashbacks, avoidance, lack of interest, lack of trust of people in authority, does not want to go to school, etc.  (Report at 10-11, 22; Dr. B dep I, 54:5-56:23; 72:5-22; 75:17-23; 79:18-80:5; 111:24-113:1; 168:13-169:9). JC had no prior sleep or anxiety issues.  (Dr. B dep I, 70:5-20, 151:1-6).  "There was little question that he had PTSD," "chronic PTSD," and JC "was clearly…more symptomatic with his ADHD than most of the kids I have worked with…."  (Dr. B dep I, 62:12-21; 52:21-53:5; 78:17-23, Exhibit Z).

Second, contrary to defendants' misrepresentation, Dr. B *did* opine on the probabilities of JC's recovery from PTSD and ADHD:  his symptoms can be managed if he receives proper treatment but that, the longer he goes without PTSD treatment, the less effective treatment will be and that, if does not receive treatment – which, he opines, is likely given JC's family's barriers to access - his overall prognosis is poor.  (Motion at 11; Report at 23, Group Exhibit M). Dr. B was clear that JC requires life-long treatment for his severe ADHD.  (Id.).  Dr. B estimated that JC will need medication management for 18 months and psychotherapy for several years. (Id.).

Third, defendants' argument that Dr. Berkowitz "failed to consider" other "traumatic" events in JC's as "potential causes of JC's PTSD" life is a falsehood.  (At 11; Dr. B dep II, 53:23-54:2)("Q. Did you… consider other potential sources… beyond… the alleged beating?  A. Yes.").  Dr. B considered them indeed and found that they did not meet DSM-5 criterion A for PTSD, i.e., exposure to a life-threatening event; put simply, JC had no trauma history prior to 9/20/18 or Dr. B's evaluation.  (Report at 4-5, 15, Group Exhibit M; Dr. B dep I, 113:24-114:2; 192:1-5, Exhibit Z) (both JC and his mother "denied exposure to traumatic events prior to the

beating at school"). For example, JC said he was never in danger from his Godmother's house fire, and no one was hurt. (Rebuttal at 4, Exhibit Q; Dr. B dep II, 18:9-20:16, Exhibit AA). Moreover, JC was not in the car for his mother's car accident, and she was not injured. (Id.). Defendants' argument that Dr. Berkowitz did not take JC's distant, older brother's street murder into account is an especially dishonest argument. (At 11). Defendants know that this tragic event occurred *after* Dr. B met with and diagnosed JC; at the time Dr. B. completed the scales with JC, JC's sole traumatic event was the school beating (i.e., his brother had not yet been killed). (Id.; Dr. B dep I, 114:10-11, Exhibit Z; 187:24-188:7; Dr. B dep II, 16:10, Exhibit AA). Dr. B agrees that JC's trauma from his event was clinically significant, but timing made it a non-factor in his diagnosis based on the 9/20/18 incident.

Next, defendants argue that Dr. B's opinion that JC's pre-existing ADHD symptoms were dramatically exacerbated as the result of the 9/20/18 incident is "speculative" and contradictory. (Motion at 12). This, too, is a profound distortion. As a preliminary note, defendants do not dispute that JC had ADHD both before and after the 9/20/18 incident; *defendants' own expert agrees*. (Dr. B dep I, 82:19-84:16, Exhibit Z). However, what Dr. B *actually* says is that JC's ADHD *symptomatology* – both the frequency and intensity of his ADHD *symptoms* – became severe following the 9/20/18 incident due to JC's PTSD. (Dr. B dep I, 66:17-67:10; 168:13-169:9)(JC's ADHD was "much worse" after the 9/20/18 incident). His opinion is based on, among other sources, his review and comparison of JC's pre-incident and post-incident medical and mental health records, *including Tilton's own records in the form of JC's behavioral incident reports; according to Tilton's own records, JC had 10 incidents of disruptive behavior between first and fourth grade while he had over 30 between fourth and sixth grades.* (Plaintiff's motion in *limine* 10, at 33, 38-39). In part, Dr. B's opinion is based on the testimony of Brian Apollo,

the Tilton school psychologist, who testified JC's post-incident behavior was much worse; he was angrier, harder to deescalate, cursed frequently, and did not trust his teachers. (Berkowitz report at 8, Group Exhibit M; Dr. B dep I, 98:8-99:14, Exhibit Z). Dr. B's opinion is also based on the well-known connection between PTSD and ADHD – namely, that PTSD-induced brain changes and symptoms make ADHD symptoms worse - a connection that Dr. B sites authority for both in his report and his testimony. (Berkowitz report at 10, 13, 20, 23, and 24, Footnote 3; Dr. B dep I, 124:11-21, Exhibit Z)(citing articles on the NCTSN.org and Chadd.org websites). Dr. B even developed a guide for the treatment of both PTSD and ADHD. (Dr. B dep I, 111:16-24). People with ADHD have special difficulty processing traumatic exposures. (Report at 20, 23). Finally, Dr. B did not perform "DSM-5 testing" for exacerbation of ADHD because *no such test exists*, because multiple providers had already diagnosed JC with ADHD after 9/20/18 and Dr. B saw no reason to doubt this diagnosis, because JC's school records and testimony (school psychologist Brian Apollo, for example) pointed to a clear worsening in frequency and severity of JC's ADHD symptoms post-incident, and because Dr. B personally observed the severity of JC's ADHD during his three meetings with him. (Motion at 12; Berkowitz report at 10, 11, 14, 19; Dr. B dep I, 86:21-87:4).

Related, defendants argue that Dr. B's opinion that ADHD medications would have been effective in controlling JC's ADHD symptoms is "conclusory" and "speculative." (Motion at 13). This is another fabrication. While defendants offer no authority for their argument that ADHD medications would not have been effective, Dr. B's opinion is based on medical science and his experience treating patients with ADHD. (Id.). Dr. B cited and discussed the MTA study and testified as follows:

> Q. You say: he would have had much better control over his behaviors…. Is that not speculation?

A.  No.  It's based on the treatment efficacy that we know of for stimulants and other medications and some therapies… [I]t's based on what we know about treatment response for appropriate and effective treatment.  So, kids will improve… [H]e would have improved and… he likely would have had a 504….

Q.  Is it possible that had JoMaury received the medication or the treatment that you had outlined in your report, that he still would have had the issues that he was currently dealing with [on the incident date]?

A.  Not to the degree, no.

A psychiatrist with decades of experience prescribing medications, including ADHD

medications, Dr. Berkowitz understands which ADHD medications are effective in which doses

and how to adjust the dosages to the optimal level at which disruptive behaviors can be

minimized.  In full context, Dr. B's opinion is that, had JC's ADHD been both identified at

school and properly treated with medications, "he would have had much better control over his

behaviors," and, because "he would not have been as much of a problem in the classroom," it is

unlikely that Haynes would have engaged Tyler to beat him. (Berkowitz report at 10, 19, Group

Exhibit M).  Finally, contrary to defendants' misrepresentation, Dr. B has never opined that JC's

school had "a responsibility to provide medication for students with ADHD."  (At 13). Dr. B

never said this.

Next, defendants' argument that Dr. Berkowitz's depression and anxiety diagnoses of JC

are "speculative" merely because no other provider previously diagnosed them is undermined by

*defendants' own expert, who diagnosed JC with anxiety*.  (Motion at 13; plaintiff's motion in

*limine* 14, at 52). Dr. B's diagnoses of JC with mild depression and an anxiety disorder are not

speculative: they are based on JC's and is mother's objective scores on the child depression

(CES-DC) and child anxiety (SCARED) standardized scales that Dr. Berkowitz administered.

(Report at 14, 15-17). Dr. B also explained that JC's depression and anxiety are most likely related to his PTSD. (Berkowitz report at 22, Group Exhibit M).

Next, defendants' argument that Dr. B's opinions regarding child rearing in urban, African American communities is "speculative" because he is not an expert on African American race and culture is contrary to all evidence. Looking at his CV, it is clear from Dr. B's professional positions, research and publications, and awards over the last 30 years that he has always worked with mostly African American children and families – for example, at the Yale Child Study Center in New Haven for 15 years, then at a Community Mental Health Center in Philadelphia for approximately 9 years, and in public health throughout his career. (Report at 25-27, Group Exhibit M). He has spent "most of my career working in… urban environments with… disenfranchised folks" and "Black kids" and understands the cultural dynamic of multiple adult caregivers. (Dr. B dep I, 100:21-23; 192:9-10; Dr. B dep II, 33:13-34:4, 40:17-41:6, and 60:21-61:3). Defendants' suggestion that he has no basis or authority for his opinions is willfully false. (Motion at 12).

Moreover, Dr. B's opinions that 1) PTSD (as well as ADHD) are positively correlated with increased risks of suicide, substance abuse, major depression and major anxiety and 2) JC is, therefore, statistically at greater risk of these complications are directly relevant to Dr. B's opinions regarding JC's prognosis (of "guarded" or "poor") and the extent of JC's psychological damages from defendants' beating. (Report at 21, Group Exhibit M; Dr. B dep I, 111:4-8, Exhibit Z)("In fact, substance use disorders and depression are the most common posttraumatic issues facing traumatized individuals"). Dr. B's opinions in this regard are based on well-established, objective research, not personal speculation. (Motion at 12-13; Report at 21). In fact, there are hundreds of scientific research articles about these correlations.

https://www.nctsn.org/sites/default/files/resources/making_the_connection_trauma_substance_a

buse.pdf (PTSD and substance abuse); https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3051362/

(PTSD and substance abuse); https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7314975/ (PTSD

and substance abuse); https://www.sciencedirect.com/science/article/pii/S0145213414000350

(PTSD and depression and anxiety);

https://www.sciencedirect.com/science/article/pii/S0165032722007182; (PTSD and Depression

and anxiety); https://www.sciencedirect.com/science/article/pii/S0145213414000350 (PTSD and

Depression and anxiety). Dr. B himself has published on this correlation. (CV at 17, Group

Exhibit D). To be clear and despite defendants' misstatement, it is not Dr. B's opinion - and he

never says - that JC will commit suicide, abuse substances, and/or have major depression and/or

anxiety; rather, Dr. B responsibly states that he is at greater behavioral and statistical risk of

these complications than he would be if he did not have PTSD from defendants' beating. As

defendants note, Dr. B states that JC does not currently abuse substances. (At 13). But Dr. B has

already diagnosed JC with PTSD-related depression and anxiety, and defendants' expert agrees

that JC has an anxiety diagnosis. (Dr. B dep I, 111:4-13, Exhibit Z). Finally, defendants'

argument that Dr. Berkowitz's statement that JC's verbalized wish for suicide should have been

taken seriously is somehow "improper" is inaccurate and, in any event, not a valid basis for

excluding it. (At 12; Report at 6, and 24, notes 1 and 2). As a psychiatrist, Dr. B is certainly an

experienced authority on appropriate clinical responses to suicidal ideation.

### Dr. Berkowitz's Opinions Regarding His School's Failure to Identify and Accommodate JC's ADHD, JC's Lack of Access to Treatment for Traumatic Distress, and JC's Religious Expression Are Relevant to JC's Individual Claims Against Defendants, Are Reliable, and are Helpful to the Jury

Defendant's motion in *limine* #5 primarily attacks Dr. B's opinions regarding 1) JC's

school's failure to identify and accommodate his learning disability prior to 9/20/18; 2) JC's lack

of access to treatment for traumatic distress; and 3) Dr. B's interpretation of JC's religious expressions.  (At 4-11).

As explained below, all three opinions are relevant solely to plaintiff's individual claims against defendants, not to any dismissed *Monell* claim.  Defendants' argument that Dr. B's opinions about the school's actions and inactions regarding JC are relevant only to plaintiff's dismissed *Monell* claim is misleading and pretextual.  (At 4, 6).  Defendants want to exclude them for other reasons.  (Id.). Defendants' constant refrain that "Whatever happened… at Tilton Elementary prior to September 20, 2018 is of no relevance whatsoever" is not their real position. (E.g., at 6, 7, 7-8, 8).

Defendants themselves seek to admit evidence of *all* of JC's behavioral incidents prior to the 9/20/18 incident: they seek to admit his 10 school incident reports from kindergarten, first, second, and third grade. (Defense Exhibits 507-517, FPTO Exhibit B).  They argue that JC's misbehavior in prior years is relevant to, for example, whether Haynes' seizure/excessive force against JC on 9/20/18 was reasonable in light of "all of the surrounding circumstances." (Defendants' proposed jury instruction 26, FTPO Exhibit E).  Defendants define "all of the surrounding circumstances" broadly to include *all of JC's behavior in prior school years*.  (Id.) ("you may consider… the attitude and past behavior of the student… the relationship between the need for the use of force and the amount of force used" and "you must make this decision based on what Kristen Haynes knew at the time….").  Though Haynes was not JC's homeroom teacher prior to the 2018-2019 school year, she testified that in prior years she had had JC in her classroom for in-school detentions and was aware of his disruptive behavior.  (Haynes dep. 29:3-21, Exhibit N).

71

As argued in plaintiff's motion in *limine* 10, the Court should bar all evidence of JC's behavioral incidents and disciplinary history occurring prior to the 2018-2019 school year as not relevant, and plaintiff incorporates that motion here. Plaintiff's position is that only JC's behavior during the month of September, 2018 before the 9/20/18 incident is relevant to Haynes' conduct in arranging for Tyler to beat JC and/or to Haynes' conduct in seizing and using excessive force against JC. This scope of time comports with the substantive of law. "[A] teacher or administrator who seizes a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the *circumstances then existing and apparent*… [I]n seeking to maintain order and discipline, a teacher or administrator is… constrained to taking reasonable action to achieve those goals." *Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014-1015 (7th Cir. 1995)(emphasis added); *Wordlow v. Chicago Bd. of Educ.*, 2018 U.S. Dist. LEXIS 199701, *22-24 (N. Dist. Ill. 2018); *Medina v. Izquierdo*, 594 F. Supp., 3d 1045, 1053 (N.D.Ill. 2022). Thus, the Fourth Amendment inquiry is focused on whether the seizure and/or force used was objectively reasonable "*under the circumstances then existing and apparent*." Id. This inquiry focuses on the student's *current* behavior that the teacher seeks to discipline and, perhaps, on the student's recent behavior leading to the student's current behavior. Defendant Chicago Board of Education's policy on school discipline confirms this temporal scope for a teacher's disciplinary action. Schools:

> may use *reasonable* force *as needed* to *maintain safety for the other students, school personnel or persons* or *for the purpose of self-defense* or the *defense of property*, shall provide that a teacher *may remove a student* from the classroom *for disruptive behavior*, and shall include provisions which provide due process to students. The policy shall not include slapping, paddling or prolonged maintenance of students in physically painful positions *nor shall it include the intentional infliction of bodily harm*.

105 ILCS 5/24-24 (emphasis added). This scope for the meaning of "circumstances then existing and apparent" – which focuses on the student's *current* behavior that the teacher seeks to discipline - is reflected in plaintiff's proposed jury instruction 26.  (FPTO, Exhibit E at 34). JC's behavioral incidents from school years prior to the 2018-2019 school year are not relevant to the jury's determination of whether Haynes' discipline of JC on 9/20/18 was needed in order to maintain the safety of others, for the purpose of self-defense or the defense of property.  (Id.).  Only JC's behavior on 9/20/18 and during the days leading up to on 9/20/18 are relevant to the jury's decision whether Haynes acted reasonably on 9/20/18.

However, in the alternative, in the event defendants are allowed to admit evidence of JC's behavior from prior school years, then, to avoid serious, unfair prejudice to plaintiff, plaintiff should be allowed to introduce opinion evidence that explains the reasons why that JC's ADHD-related behavior in school persisted unaddressed for years leading up to the 9/20/18 incident. At this juncture and in this evidentiary context, plaintiff would seek to admit Dr. B's expert opinions. Based on his review, Dr. B's opinion is that JC showed "textbook" and "classic ADHD behaviors" since kindergarten and that, "despite the fact that his ADHD-type symptoms were clearly interfering with his education and possibly other students' educations" and that JC was academically a poor-to-average student, no one at the school (including defendant Haynes and witnesses Charlene Haynes and school psychologist Brian Apollo) identified the issue, notified JC's parents that he may have learning disability, referred JC for an assessment or initiated a 504 Plan or IEP that would have provided academic accommodations.  (Berkowitz report at 5-6, 7, 8, 9-10, 19 Group Exhibit D; Dr. B dep I, 83:8-10, 101:14-15, Exhibit

Z)("[T]here is minimal documentation indicating that Ms. Gaines was fully or adequately

informed about any medical need" and "JC was the poster child for ADHD… given his

severity… it was very clear"). Dr. B's opinion is that the testimony from school officials

such as defendant Haynes "displays a lack of understanding of the causes of JC's

difficulties prior to the fourth grade…." (Id. at 6). Although he disruptive prior to

9/20/18, he was not physically aggressive and struggled to do his schoolwork.  (Id. at 10).

Further, Dr. B's opinion is that, had JC's ADHD been identified at school and properly

treated with educational accommodations and medications, the result would have been

that JC "would have had much better control over his behaviors," and "he would not have

been as much of a problem in the classroom."  (Report at 10, Group Exhibit D; Dr. B dep

I, 198:5-13). Dr. B.'s opinion is, in that case – if the school had not ignored JC's need for

assessment and accommodations for ADHD - that it is unlikely that Haynes would have

engaged Tyler to beat JC. (Report at 10, 19).  However, in light of what happened, "the

school's neglect… resulted in the physical beating [JC] received during school," so that

"it is clear that the school first failed JC and then, subsequently, traumatized and

damaged him in large degree due to its failures."  (Id. at 6, 10).[20]

Defendants intentionally misrepresent Dr. B's opinions to make them sound

outlandish.  (At 4-5).  Dr. B has *not* opined that Tilton should have "*provided treatment*

---

[20] If the Court barred evidence of JC's behavioral incidents in school years prior to September, 2018,
plaintiff would still seek to introduce expert opinion testimony regarding JC's behaviors during
September, 2018 *only* - specifically, that during September, 2018, JC had undiagnosed ADHD, that his
behaviors *during September, 2018*, were symptomatic of ADHD, that no one at school had intervened to
notify his parents at any time that he may have a learning disability, refer him for an evaluation or initiate
a 504 Plan or IEP, etc. (Plaintiff would also seek to elicit testimony from defendant Haynes, C. Haynes,
Brian Appollo and other witnesses that they did not previously take these steps).  The temporal scope
would be limited to September, 2018, and the general past.

for JC's ADHD" or that it had "a duty to find *outside medical treatment* for Gaines to

obtain for JC" (emphasis added).  (At 4-5, 6).  Dr. B never opined that "schools have the

responsibility of *treating* their student's ADHD." (Id.). These statements are nowhere to

be found in Dr. B's reports or testimony. Together, these distortions falsely suggestion

that Dr. B's opinion is that the school was *a medical provider* that should have directly

*treated* JC's ADHD. (Id.). In fact, Dr. B's opinions are modest and factual: all he says is

that the public school failed to identify that JC had a potential learning disability, failed to

notify his mother that he may have disability and should be evaluated, and failed to refer

him for an evaluation and/or initiate a 504 Plan and/or IEP for academic

accommodations.  Dr. B points out that a medical diagnosis was not even necessary in

order for the school to initiate a 504 Plan or IEP for JC.  (Dr. B dep I 91:13-92:4, Exhibit

Z).  Finally, it is clear that, when Dr. B opines that it is unlikely the beating would have

occurred if the school had earlier provided JC with accommodations for his ADHD, he

does not express his opinion as a fact or certainty; he carefully states or qualifies in terms

of probability that the beating would not have occurred.  (Report at 10, 19, Group Exhibit

D).

> Dr. B has the education, training, knowledge, skill, and experience, necessary to render

these opinions. Defendants simply ignore his qualifications to give them.  They argue that Dr. B

"has no experience working at a school" and, thus, "lacks the foundation" to opine on a school's

duties when it comes to behaviors that are interfering with a student's ability to learn.  (Motion at

5).  On the contrary, throughout his career Dr. B has worked extensively with public schools in

New Haven, Philadelphia, and Denver to create accommodations for students with various

learning disabilities, including ADHD, and has participated in the development of numerous 504

75

Plans and IEPs. (Report at 1, <u>Group Exhibit D</u>; Dr. B dep I, 122:6-123:19, <u>Exhibit Z</u>). He has worked with "hundreds" of students who had or were in the process of being evaluated for an IEP or 504 Plan and attended numerous IEP and 504 meetings at schools. (Dr. B dep I, 213:5-23).

Dr. Berkowitz's opinions are also reliable. Defendants' assertion that they are based on "no methodology" is a falsehood. As his reports and testimony indicate, Dr. B's opinions are based on his careful review of all of JC's school records, including JC's incident reports, as well as on his review of the testimony of school officials like defendant Haynes, C. Haynes, Brian Apollo, Tilton's school psychologist, all of whom admit (as Dr. B notes in his report) that they did not initiate the process for a 504 Plan or IEP, refer JC for an evaluation or suggest to his mother that JC had a learning disability for which he needed to be evaluated. Thus, Dr. B's opinions are based on his review of defendants' own records and testimony. There is no methodological where an expert's opinions are based on *experience*, not science. *In re Opana ER Antitrust Litig.,* No. MDL No. 2580, 2021 U.S. Dist. LEXIS 105342, at *20-21 (N.D. Ill. June 4, 2021). Moreover, defendants' argument that Dr. B's opinions are unscientific because Dr. B, a non-lawyer, could not, *impromptu* during his deposition, recall the *citations* and names of the federal statutes that govern public schools' well-known duty to create 504 Plans and/or IEPs for students with learning disabilities is ridiculous. (Motion at 6; Dr. B dep I, 122:6-123:19; 211:23-213:14, <u>Exhibit Z</u>)("I've read the statute" and "it happens all the time" that schools "identify issues, suggest interventions and treatment" and "make referrals"). Defendants' argument is a "gotcha" technicality; Dr. B described a 504 Plan and an IEP are, and defendants, in their footnote 2, *admit* that Berkowitz's statements regarding the statutes governing 504 and IEP Plans are *correct.* (Dr. B dep I, 91:7-92:4; Motion at 5). Dr. B's experience and specialized knowledge in

this area can help the trier of fact understand the evidence or determine a fact in issue. Finally, it is generally well known, can be accurately and readily determined from the statutes themselves, is not subject to reasonable dispute that public schools have a duty to provide educational accommodations for a student's learning disability in the form of a 504 Plan or an IEP. *See, e.g*., https://www2.ed.gov/about/offices/list/ocr/504faq.html (last checked 11/29/23). In the absence of defendants' agreement to a stipulation that such a duty existed, then the Court may simply take judicial notice of 1) the names and citations of these two statutes and 2) that they impose a duty on public schools to provide educational accommodations for a student's learning disability in the form of a 504 Plan or an IEP, and the Court can instruct the jury accordingly. Plaintiff respectfully requests that the Court take judicial notice of a public school's duty to provide appropriate educational accommodations for students with learning disabilities, pursuant to Fed. R. Ev. 201.

Without the admission of Dr. B's opinions regarding the school's failure leading to the 9/20/18 incident, plaintiff would be severely, unfairly prejudiced. Fed. R. Ev. 403. Defendants want the jury to believe that JC's disruptive behavior in prior grades was the result of *individual* choice (i.e., he's just a aggressive, mean or bad kid) and that the reason his behavior persisted is that his family failed to take action to address it. Dr. B's opinions make it clear - based on school records, school officials' testimony, his medical knowledge of ADHD, and his knowledge of the way the 504 Plan and IEP processes generally work - that this was not the case. If JC's behavior in kindergarten through third grade is relevant to Haynes' conduct on 9/20/18, then, in all fairness, so are the medical and institutional reasons for JC's behavior. Admitting JC's prior behavioral incidents without also admitting the evidence that explains their persistence over years would cause

plaintiff severe, unfair prejudice.  Thus, if defendants are allowed to admit evidence of

JC's behavior, then Dr. Berkowitz's opinions are highly relevant, not unfairly prejudicial

to defendants, and helpful to the jury in its understanding of why JC was being disruptive

and why nothing was done about his behavior.  Finally, the fact that the school officials'

failure to act violated school or District duty policy is not unfairly prejudicial to

defendants at all: on the contrary, this fact is directly relevant in view of defendants' own

insistence that the jury hear and take into account "the past behavior of the student" when

deciding whether Haynes' conduct on 9/20/18 was reasonable. (Motion at 7).  If the jury

hears evidence of JC's past ADHD behaviors before September, 2018, then the jury

should also hear evidence of the school's failure to address that behavior by

accommodating the learning disability/disorder causing it.

### Dr. B's Opinions Regarding the Unavailability of Treatment in Chicago for Indigent Children with PTSD is Admissible

Dr. B's opinions regarding the unavailability of treatment for indigent children with

PTSD and ADHD in Chicago are relevant in multiple ways to proving JC's psychological

damages. First, they underlie and are relevant to Dr.'s opinion of JC's prognosis as "guarded" to

"poor."  (Berkowitz report at 23, Group Exhibit D). According to Dr. B, JC's prognosis is

guarded or poor precisely because, to date, JC has been unable to date to obtain treatment for

PTSD due "great difficulty accessing same" and because, based on its likely continued

unavailability in the future, he is unlikely to be able to obtain it then as well.  (Id).  Without

treatment for his PTSD, JC is at much greater risk for depression, suicide, substance abuse,

incarceration, and worse physical health.  (Report at 21, 23)("he is at great risk for

institutionalization… of a developing a substance abuse disorder and being incarcerated").  Thus,

while effective treatment is crucial, JC is unlikely to get it.  (Dr. B dep I, 209:13-20, Exhibit Z).

78

Dr. B based his opinion of the unavailability of PTSD treatment for indigent children in Chicago on the medical records and deposition testimony he reviewed, including the testimony of Sue Patton, APN, of Garfield Park Behavioral Hospital who treated JC during both of his partial hospitalizations following the 9/20/18 incident, and JC's mother, who took JC to multiple counseling providers before, during, after the COVID shutdown. (Report at 11, second and fifth paragraphs, at 13, first paragraph; Group Exhibit D; Dr. B dep I, 209:22-210:21; 217:13-21, Exhibit Z).

In addition, Dr. B's opinions that treatment for traumatic distress is unavailable in Chicago are relevant to the cost estimates that Dr. B assigns to the course of private psychotherapy and medication management that he recommends for JC. (Report at 23, Group Exhibit D). That is to say, the cost of private treatment – and, therefore, Dr. B's estimates of the unit cost of private treatments - is relevant precisely because public sector treatment is unavailable JC and his family. Dr. B.'s cost estimates will almost certainly be helpful to the jury when it considers the amount of damages it awards to JC. The jury may want to award more than enough for JC's family to be able to afford the cost of private PTSD and ADHD treatment.

Third, Dr. B's opinions are relevant to rebutting the defense's argument that JC's family, not any lack of treatment resources, is to blame for JC's untreated ADHD and PTSD. Defendants argue their expert Dr. McNaught opines that the fact that JC has not had consistent treatment for ADHD or any treatment for PTSD is solely the fault of his mother Asia Gaines. Defendants argue that they (the defendants) "have nothing to do with the availability of mental health services" for JC, a low-income student in Chicago, but the fact is defendants take their plaintiff, including his economic circumstances, as they find him. (Motion at 7-8). JC's given status as a low-income student means he was and is more susceptible to prolonged injury or a worse

prognosis due to the unavailability of treatment for people like him. Defendants agreed to the pattern "eggshell plaintiff" jury instruction. (Agreed Jury Instruction 43, p. 67, FPTO Exhibit E).

Defendants misstate Dr.'s opinions regarding the unavailability of treatment. Contrary to defendants' mischaracterization, Dr. B does not offer an opinion on the big, broad subject of "access to mental health services in Chicago." (Report at 7, 8, Group Exhibit D). His opinion is far more limited, narrow, and specific - that public sector treatment for indigent children with PTSD and/or ADHD is unavailable in Chicago. (Id.).

Dr. B is qualified to give these opinions, and his opinions are reliable. As noted, Dr. B relied on: JC's treaters, including Sue Patton; JC's mother who tried to get treatment for JC from multiple providers; and Dr. B's informal research talking to multiple colleagues in Chicago who treat traumatic distress in the private sector. (Dr. B dep I, 175:7-12; 217:13-21, Exhibit Z). Defendants' assertion that there is "no meaningful or scientific support" for Dr. B's opinion is empty rhetoric because they simply ignore these factual bases for his opinion. (Motion at 8-9). Thus, defendants' argument that he "lacks any foundation to opine on access to mental health treatment services in Chicago" falsely presupposes a requirement that his opinion must be based on *Dr.'s personal knowledge*. (Id.). It need not be. Fed. R. Ev. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of… [I]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Moreover, for the same reasons, Dr. B's opinions are not "conclusory"; they are based on statements by witnesses who *are* mental health providers in Chicago with personal knowledge as well as on Ms. Gaines'

experience in going to multiple different providers who are listed in Dr. B's report. (Report at 10-13, Group Exhibit D).

Dr. B's opinions will help the jury understand the reasons why JC's prognosis for recovery from PTSD and ADHD is guarded or poor as well as the reasons why it is unfortunately likely that JC will suffer the effects of, and possibly other complications from, PTSD for years to come. These opinions have a core relevance to plaintiff's damages case. They will also help the jury understand why private treatment is necessary for JC – indeed, why private treatment is likely only way JC can recover - and Dr. B's cost estimates for private treatment will provide helpful guidance for the jury's decision regarding the amount of damages to award JC.

**JC's Statements About Religious Belief and Church Attendance and Dr. B's Explanation of His Statements Are Admissible**

JC's statements that refer to his religious belief or church attendance and Dr. B's pithy comment about those statements are directly relevant to JC's damages: among other reasons, they show how defendants' conduct affected or changed both JC's inner, emotional/spiritual life and his outward activities. While JC attended church on a regular, weekly basis before 9/20/18, as a result of the incident he lost his desire to attend church and, in fact, stopped attending or only attended sporadically thereafter.

As a threshold matter, it is not even clear which specific "opinion(s)" of Dr. B's defendants seek to bar or what the basis for barring them is. (Motion at 10). Three of the five "opinions" that defendants refer to are not opinions at all but facts that JC and his mother reported about himself to Dr. B: JC reported that "the devil takes over" when he is made to talk about the incident; that he attended church weekly before the incident; and that he no longer wanted to attend church after the incident. (Berkowitz report at 13, 15, Group Exhibit D). Since these are statements that JC and his mother made and have nothing to do with Dr. B's opinions,

there is no reason to bar them.[21]  They are how JC felt and acted in the wake of the incident.

(Dr. B dep I, 54:5-56:3, Exhibit Z). The only "opinions" that Dr. B expressed regarding these

statements are his explanations JC's expression "when the devil takes over" is a phrase uniquely

used by religious people and that JC's loss of his desire to attend church is a trauma response.

(Id.).

Defendants argue that Dr. B "lacks the foundation" in knowledge, skill, experience

training and education to understand or opine on JC's religious references or church attendance.

The argument is without merit.  Dr. B is a trained psychiatrist.  Psychiatrists understand the role

that belief, including religious belief, plays in individuals inner or emotional lives. An

experienced psychiatrist, Dr. B is certainly qualified to opine on the meaning of JC's religious

belief and language.  Finally, as an expert in PTSD, Dr. B is qualified to identify a trauma

response when he sees one.

Further, Dr. B's opinions are reliable. Defendants argue Dr. B does not say "where or

how he formed the opinions about JC's religion or lack thereof" and that, therefore, the Court is

unable to examine his methodology for arriving at these opinions, which are merely based on

speculation.  (Response at 10). Again, there is not much "opinion" here.  Dr. B interviewed JC

and his mother who made the statements attributed to them above. Dr. B simply noted that JC's

loss of his desire to attend church was a response to the trauma he experienced on 9/20/18 and

included a brief gloss that "that's when the devil takes over" was JC's way, as a religious person,

of saying that he feels very bad things when he has to recount the incident.  Here again, Dr. B's

---

[21] Indeed, it is clear from defendants' motion, page 10, that defendants are really asking the Court to bar or suppress JC's *own* statement that "the devil takes over" when he is made to recount the incident.  This would be improper as JC is allowed to describe the changes in himself in whatever language he expresses himself.

opinions are properly based on *experience. In re Opana ER Antitrust Litig.,* No. MDL No. 2580, 2021 U.S. Dist. LEXIS 105342, at *20-21 (N.D. Ill. June 4, 2021). Moreover, defendants never indicate what "methods" he should have followed or reference authorities indicating the proper methods. *DePaepe v. Gen. Motors Corp.*, 141 F. 3d 715, 720 (7th Cir. 1998). Defendants' empty clamor about "methodology" is a pretense for their disagreement with Dr. B's opinions.

JC's and his mother's statements above and Dr. B's opinions regarding them are directly relevant to proving plaintiff's damages. They will assist jurors in understanding the impact that defendants' beating had on JC's inner or emotional life and his regular daily or weekly activities, including his ability to enjoy them. Defendants ignores this point. In particular, without explanation from a psychiatric expert jurors may not understand that JC's loss of desire to attend church after 9/20/18 was a *trauma* response rather than being due to some other, innocuous change. Finally, defendants' argument about how the jury may "misinterpret" JC's statement "that's when the devil takes over" is nebulous and undeveloped, but what it is clear is that Dr. B's gloss on JC's statement is helpful to jurors who may not understand the religious reference; Dr. B's comment clarifies JC's meaning.

JC was/is a religious person who regularly attending church before his beating. Given how central religion and church were/are to JC's emotional life, the fact that he lost his desire to attend and refused to attend any further is a very significant and highly relevant fact about his psychological damages. JC would be seriously, unfairly prejudiced if he and/or Dr. B were barred from testifying about this deleterious change in his inner life and pre-9/20/18 activity.

For the reasons set forth above, the Court should deny defendants' motion in *limine* #5.

83

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE #6

### Introduction

During her alleged course of conduct in arranging and participating in Tyler's beating of JC, Haynes violated multiple policies of defendant Board, including but not limited to the school security policy that defendants identify in their motion in limine #6. Haynes' violations of multiple Board policies are relevant and admissible in several ways to plaintiff's state and federal law claims, including JC's claim for punitive damages. For these and other reasons that follow, defendants' motion in limine #6 must be denied.

### Haynes Violated Multiple Board Policies

Defendants' motion in limine #6 is highly misleading regarding the facts and circumstances in which Haynes violated Tilton's building or school security policy. (Motion at 5). To show see that policy is relevant to Haynes' conduct and plaintiff's claims, it is important, first, for the Court to understand Haynes actions in the circumstances in which she operated.

Tilton's school security policy has two aspects.

School Security Policy, Part 1. First, Haynes violated the Board's implicit policy that only a student's authorized guardian or other authorized adult is permitted to have contact with the student in school.  This implicit policy is the underlying reason for the rule set forth in Tilton's Staff Handbook under "Building Security":

> All visitors, including parents, must obtain a pass in the main office.  If you see a
> visitor without a pass, immediately direct him/her to the main-office.

(Exhibit A to Defendants' motion in limine #6, at 11 (BOE 651)). Ms. Starks, the school security guard who allowed Ms. Tyler into the building, testified as follows:

Q. …[I]s part of the purpose in sending the visitor to the office to ensure that they're an authorized contact for the student?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. Ok. And as I think you've already said, passes are given out at the office. Right?
A. Right. Yeah.
Q. Did you ever give passes out the security desk or no?
A. No, I'm not allowed to.

(Starks dep. trans. 32:11-23; see also 42:18-23, Exhibit B). Starks' security desk was just inside the main entrance to the school. The security protocol was to have visitors sign in, ask them who they are there to see, and then send them directly to the main office across from her desk. (Starks dep. trans. 39:18-41:23). Tilton's Principal Hodge testified that "all people are to be reported to the office before they go up and the office can verify who is in the computer as a guardian." (Hodge dep. trans. I at 73:3-6, Exhibit CC). The office then gives out a pass to authorized visitors. (Id. at 197:13-199:99). The only place passes were given out was at the office. (Id.).

In summarizing the building security rule quoted above, the Board simply ignores the reason why all visitors are required to obtain a pass in the main office: to ensure that the visitor is authorized in school records to have contact with the student *before* the visitor receives a pass and moves through the school to have contact with student(s). (Motion at 2). Defendants say plaintiff mischaracterizes this policy, creating a *faux* violation where there was none. In fact, it is *defendants* who mischaracterize and downplay the fundamental and critcal importance of this rule for student safety in order to conceal just how serious Haynes' breaches were. (Motion at 2, 6). Every parent knows how central a school's security protocol is to protecting children from contact with potentially dangerous adults who are not authorized to have contact with them. Because plaintiff's description of the implicit policy behind the rule is accurate, introducing the

building security policy into evidence will not confuse or mislead the jury. (Motion at 2). While defendants belittle Haynes' policy violations as "mere administrative violations" of "an internal staff handbook" which "did not break the law," it is evident that this Board policy was fundamental to keeping students like JC safe.[22] (Motion at 2, 4, 6).

The facts relevant to Haynes' violation of the first aspect of Tilton's school security policy are as follows:

- During the first week of school, Haynes talked with JC's mother in person. (Haynes dep. 56:19-58:4, Exhibit N ). Two days before the 9/20/18 incident, on September 18, Ms. Haynes had an in-person conference with JC's mother at school and discussed JC's behavior in her classroom. (Id. 66:3-73:22). JC's father was on speakerphone during this meeting, and she spoke with him, too. (Id. 69:15-70:5). Ms. Haynes asked him if he could come to school the next morning, September 19, but due to his late-night work schedule at Walmart, he did not come. (Id., 69:15-70:5, 75:18-76:4). On September 19, Haynes had JC call his father from the phone in her classroom and tell him she wanted to get on the phone and talk to him, but JC finished talking to him before Haynes could get on the phone. (Id. 79:15-81:5).

- Throughout JC's attendance at Tilton, JC's mother Asia Gaines was the only contact for him in Tilton's records. (Principal Hodge dep. trans. I, 174:10-12, Exhibit CC). On 9/20/18, Ms. Gaines, JC's father Joseph Champ, and possibly JC's maternal grandmother Cynthia Stokes and his maternal aunt Tiara Taylor were the only authorized contacts for JC. (Id. 171:4-173:21). Tyler was *not* an authorized guardian for JC on 9/20/18 (or at any time). (Id. 164:11-21).

- After Haynes had spoken with both JC's mother and father on September 18 and 19, during the evening on September 19, Haynes personally messaged over Facebook and phoned two distant relatives on JC's father's side, including defendant Juanita Tyler, a great aunt of JC's whom JC had either never met or had met once as a toddler and had no recollection of. (Exhibit EE). In her message and phone call, Haynes indicated she was trying to get in touch with Mona Tyler, another great aunt of JC's, whom, Haynes wrote, JC is "scared of." (Id.). When

---

[22] The specific policies described above, as well as those addressed in plaintiff's response to defendants' motion in limine #3, are not exclusive or exhaustive of those that Haynes violated. Defendant Board charged Haynes with multiple, other policy violations in its bill of dismissal charges and specifications. (Exhibit DD, at BOE 471-474). Plaintiff may seek to admit these and/or other Board or Tilton policies that are relevant and admissible on plaintiff's claims against Haynes. Defendants have not moved to bar any other specific policies.

Haynes reached and spoke with Juanita Tyler, they agreed Tyler would come up to the school the next morning. (Tyler dep., <u>Exhibit K</u>).

Thus, even though, during the two (2) weeks since school had begun, Haynes had met twice in person with JC's mother, had spoken to his father on the telephone at least once, knew who JC's authorized contacts were, and Tyler had never been an authorized school contact for JC, nevertheless Haynes found, contacted and arranged for Tyler to come up to the school on 9/20/18 to discipline JC.

<u>School Security Policy, Part 2</u>. Haynes also violated the policy's rule requiring all visitors entering the school to obtain a pass from the main office before being allowed into the school. (<u>Exhibit A</u> to Defendants' motion in limine #6, at 11 (BOE 651)). Haynes violated this policy as follows:

- On 9/20/18, when Haynes entered the building at about 8:00AM, Haynes expressly told Ms. Starks – "just like a boss" - that Haynes was expecting a visitor for JC for a conference, that she will be upstairs in her classroom, and she instructed Starks to send the visitor directly upstairs to Haynes, bypassing the office. (Starks dep. trans. 44:20-45:9; 54:17-57:8; 80:15-18; 103:8-12, <u>Exhibit BB</u>). At Haynes' criminal trial, Starks testified that Haynes told her "JC's dad's aunt" was the visitor. (Id. at 61:14-63:8, 64:9-15)("She said the aunt is coming"). Tilton's Principal Hodge also testified that her understanding is that Haynes told Starks to send Tyler directly upstairs without going to the office. (Hodge dep. trans. I, 73:15-74:10; 76:18-23, <u>Exhibit CC</u>).

- When she instructed her to send Tyler directly upstairs, Haynes did not inform Starks whether the aunt was an authorized guardian or contact for JC; Starks trusted Haynes' judgment that the aunt was an authorized contact for JC and did not question Haynes. (Id. at 76:5-15). Had she known Tyler was not authorized, Starks would have sent her straight to the office. (Id. at 49:15-50:15; 79:8-80:18; 81:13-82; 82:5-16).

- When Tyler arrived shortly after 8:00, Tyler told Starks she was there to see Haynes and that Haynes was expecting her. Starks had Tyler sign in and then, as Haynes instructed her, sent her directly upstairs to Haynes' classroom, not to the office. (Starks dep. at 65:23-66:4; 68:17-69:9; 71:4-9; 84:18-85:2). Tyler was alone when she arrived; neither of JC's parents were with her. (Id. at 77:11-14). Starks, whose desk is across the entryway from the office, watched Tyler go upstairs. (Id. at 83:3-84:7). Tyler did not go to the office first. (Id. 83:4-9, 84:14-16). Tyler did not get a pass. (Hodge dep. trans. I, 197:13-199:9).

- Starks testified that principal Hodge later gave her a warning because Starks breached security protocol by sending Tyler directly upstairs instead of to the office because Tyler was not on Tilton's list of authorized guardians/contacts for JC. (Starks dep. at 82:17-83:2; 99:4-103:5). Given the policy that only authorized adults were allowed to have contact with students, had the office discovered that Tyler was not an authorized guardian or contact for JC, Tyler would have been told to leave. (Hodge dep. trans. I, 165:2-11).

Even though Haynes admits that she told Starks that she was expecting a visitor for JC and would be upstairs in her classroom, defendants argue that "Haynes was not involved in, and had no knowledge of how, Ms. Tyler entered" the building. (Motion at 5). This does not make sense. First, Haynes knew that unauthorized visitors are not allowed to have contact with students, and she admitted she never even checked to see if Tyler was authorized. Second, Haynes had just talked to JC's parents and met twice with JC's mother, so she knew who *was* authorized. Third, Haynes' excuse that JC's family had not yet submitted their paperwork for the 2018-2019 school year, even if true, is contradicted by Principal Hodge's testimony that the school's policy in that situation early in the school year was to regard the prior school year's authorized contacts as the current authorized contact, and that person was JC's mother. (Hodge dep. trans. I, 175:14-176:1).

### Haynes' Violations of Defendant Board's Policies are Relevant and Admissible to Proving JC's State Law Claims

Defendants argue that Haynes' violations of Board policies are irrelevant and inadmissible to proving any of plaintiff's claims, including her state law claims against defendant Haynes. (Motion at 2, 3, 4). They argue that "[h]ow [Tyler] got [into the school on September 20, 2018]" has no relevance at all and that whether Haynes violated any policy in order to get Tyler into the school to beat JC has no relevance. (Motion at 4). They argue that whether JC's parents – who, it is undisputed, were the only authorized contacts for JC in the school's records

and knowledge – consented to Tyler having contact with JC has no relevance. Defendants are whistling into the wind.

The law is clear that Haynes' policy violations are relevant to plaintiff's state law claims and to her claims for punitive damages. Defendants cite a single, dated decision for their argument that policy violations are likely inadmissible to prove state law claims. (Motion at 4). That case, *Delgado v. Mak*, 2008 WL 4367458, *8 (N.D.Ill. Mar. 31, 2008), relies on the Illinois appellate Court's decision in *Morton v. City of Chicago*, 286 Ill. App.3d 444, 454 (1997). State and federal decisions since then stand for the proposition that such evidence may be relevant and admissible to proving *both* a plaintiff's state law claims and a plaintiff's claims for punitive damages under both state and federal claims. *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248, 250-252 (2ⁿᵈ Dist. 2003)(jury was allowed to consider a policy that the defendant officer ignored because it was relevant to proximate causation); *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 405 (1ˢᵗ Dist. 2007) ("a violation of an internal police department rule can constitute some evidence of willful and wanton conduct"); *Rivera v. City of Chicago*, 401 Ill. App.3d 602, 613, 616, note 4 (1ˢᵗ Dist. 2010) (same); *Kolodziej v. Justice Park District*, 2020 IL App. (1st) 191032-U, ¶ 76 (1ˢᵗ Dist. 2020)(jury was allowed to consider violations of internal rules and policies along with other evidence in reaching a determination of willful and wanton conduct); *Rothwell v. City of Chicago*, No. 10 C 1338, 2011 WL 5169419, at *1 (N.D.Ill. Oct. 31, 2011)(evidence of policy violations "may be relevant to the punitive damages if liability is found as to federal or state law claims"); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034188, *1-2 (N.D.Ill. July 27, 2010)(denying defendant's motion in limine to exclude police policies because they "may be considered in determining whether claimed officer misconduct is willful and wanton" and "may be relevant as to the potential imposition of punitive damages as to

federal claims… as well as to state law claims"); *Brooks v. City of Chicago*, No. 13-cv-03090, 2015 WL 354386, *5 (N.D.Ill. June 5, 2015) (denying defendants' motion in limine to exclude use of force guidelines, ruling that they were "relevant at a minimum to plaintiff's claim for punitive damages"); *Jones v. Walters*, 12-cv-5283, 2016 WL 1756908, *8 (N.D.Ill. April 29, 2016)("Such evidence may be relevant for other purposes, however, including to prove state law claims"). Thus, in *Brooks, Scott*, and *Rothwell*, the Court denied defendants' motion in limine to exclude policies, ruling that they were "relevant at a minimum to plaintiff's claim for punitive damages." Id.

Moreover, *Thompson v. City of Chicago*, 472 F. 3d 444, 458 (7th Cir. 2006), a wrongful death case, and the Illinois decision on which it relied to bar evidence of policy violations, *Morton v. City of Chicago*, 286 Ill. App. 3d 444, 454, 676 N.E. 2d 985, 992 (Ill. App. 1997), only considered whether evidence of policies is relevant under a *negligence* or willful and wanton standard. *Delgado v. Mak*, 2008 WL 4367458, at *7-8. In addition, since then, the scope of the holding in *Morton* has been clarified to mean that, "although a violation of an internal rule will not automatically constitute willful and wanton conduct, a jury may consider it along with other evidence in reaching a determination of willful and wanton conduct." *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 405 (1st Dist. 2007); *Rothwell v. City of Chicago*, No. 10 C 1338, 2011 WL 5169419, at *1 (N.D.Ill. Oct. 31, 2011). In fact, in *Morton*, the evidence of CPD policy violations was used at the trial as evidence of willful and wanton conduct. *Morton*, 676 N.E. 2d at 992. Here, plaintiff's claims are not for negligence: they are for intentional conduct.

Punitive damages. Plaintiff expressly seeks punitive damages against Haynes under all state and federal claims. (Dkt. 23, ¶¶ 117, 119-123, 138-139, 148, 154, 160, 164-166, 173-174, 181-182, 190-191, at prayer for relief, at 31). Plaintiff specifically alleges that Haynes harmed JC

intentionally, deliberately, maliciously, and/or in a willful and wanton manner. (Id. at 117, 120, 122, 148, 154, 160, 163-166, 173-174, 181-182, 191-192). Haynes' actions in proactively contacting an adult whom she knew was not authorized, (or in ignoring the critical question of whether or not she was authorized to have contact with JC), consenting to have her come to school, and arranging for her to bypass the school's security check demonstrated a conscious disregard for or utter indifference to the safety of a child, JC. Haynes exposed her student to the risk or danger of harm. As the direct result of Haynes exposing him to Tyler, JC was injured.

The school security policy is relevant to plaintiff's request for punitive damages in two ways. First, the policy indicates the barriers that were erected to prevent an unauthorized adult like Tyler from being able to freely enter the school and a teacher's classroom in order to inflict harm on a student. The school policy should have prevented Tyler from ever having contact in the school with JC and with any of his teachers. The also policy should have prevented Haynes from contacting Tyler to begin with, since she was not authorized in school records. Further, the policy should have prevented Tyler from bypassing the school office for a security check and gong directly to Haynes' classroom. Finally, the policy should have prevented an unauthorized adult like Tyler from getting permission from JC's teacher to seize him in school, remove him from class, and inflict physical punishment on him. Human action was required to defeat the school security policy.

In other words, the school security policy is relevant to Haynes' intent because it was a clear obstacle to her alleged goal of getting Tyler into the school to physically discipline JC. To achieve her goal, Haynes *had* to violate the school security policy in at least three ways. First, she had to proactively find, contact and have an unauthorized person come to Tilton. Alternatively, even if you credit Haynes' testimony that she "did not know" whether Tyler was

authorized, then Haynes had to find, contact and invite someone while ignoring whether the

person was authorized or not (and then making sure that the person successfully bypassed the

office when arriving at the school); this action alone shows disregard or indifference to JC's

safety. Third, Haynes had to somehow get an unauthorized person through school security and

up to her classroom without stopping at the office. To summarize:

- Without Haynes' intentional choice of a person who was not authorized per policy to have contact with JC, Tyler would not have had contact with JC.

- Without Haynes' disregard for whether Tyler was an authorized per policy contact for JC, Tyler would not have had contact with JC.

- Without Haynes' direction to Starks to send Tyler directly upstairs to her classroom when she arrived at the school security desk, Tyler would not have been able to bypass the office's security check because the office would have discovered she was not an authorized contact for JC and asked her to leave.

Second, the school security policy is relevant evidence that Haynes' conduct in having Tyler

come to the school to have access to JC was intentional or reckless. The fact that Haynes was

required to adhere to the school security policy but instead acted to breach it in multiple ways is

probative of her state of mind in the circumstances. The school policy clearly forbade her from

doing certain things, but when it came to JC and Tyler, Haynes did those things anyway, even at

the personal risk of getting caught and incurring discipline; the fact that she broke from school

security policy to do those things is evidence that she acted intentionally and/or in a willful and

wanton manner. *United States v. Proano*, No. 17-3466, 912 F.3d 431, 438-440 (7th Cir. 2019)

(Evidence of officer's departures from his training was relevant and admissible on the issue of

his intent). In other words, the fact that Haynes, despite personal risk, was willing to violate and

did violate school security policy to attain her goal of having Tyler physically discipline JC in

school is highly probative of her intent, whether willful and wanton, deliberate, or malicious.

Without the ability to present evidence of how Haynes circumvented the requirements of the

school security policy to accomplish the beating of JC, it is plaintiff, not defendants, who would suffer severe, unfair prejudice in the form of not being able to prove his claim for punitive damages.

Aiding and Abetting Tyler's assault, battery, and intentional infliction of emotional distress on JC. The school security policy and the specific actions Haynes took in the light of the requirements of that policy are relevant and highly probative in two ways to proving plaintiff's claims against Haynes for aiding and abetting Tyler in assaulting, battering and intentionally inflicting emotional distress on JC. First, Haynes' violation of the policy is highly probative of whether she "substantially assisted" Tyler in providing her the opportunity to beat JC. (Plaintiff's proposed jury instruction 39, FPTO, Exhibit E, at 61). The fact that Haynes, despite incurring the risk of discipline herself, was willing to go so far as to violate school security policy and did violate school security policy in order to grant Tyler access to JC suggests a very high degree of material aid and support to Tyler.  To be more specific:

- Without Haynes taking the initiative to contact an unauthorized person about JC's behavior and asking/agreeing with her to come to school the next day, an unauthorized person would not have been able to have contact with JC at school;

- Alternatively, without Haynes' decision to ignore whether Tyler was authorized, Tyler would not have been able to have any contact with JC.

- Without Haynes' personal direction to Starks to send Tyler directly upstairs to her classroom as soon as she entered the building, Tyler would not have been able to bypass the office's security check because, per policy, the office would have asked her to leave the building.

This shows that Haynes' violations of school security policy were not just "substantial assistance" to Tyler but indispensable assistance, assistance without which Tyler would not have succeeded.

Second, the school security policy is relevant to proving that Haynes "knowingly" assisted Tyler in assaulting, battering and intentionally inflicting emotional distress on JC.

(Plaintiff's proposed jury instruction 39, FPTO, <u>Exhibit E</u>, at 61). The policy is evidence that Haynes understood that unauthorized adults were not supposed to have contact with students in school; the fact that she broke from the policy and did things in a differently when it came to contacting and getting Tyler into the school, shows that Haynes knowingly provided this assistance to Tyler. The contrast between what the security policy required – only authorized persons are allowed to have contact with students in school - and how Haynes maneuvered Tyler around this policy is highly probative of Haynes' intent and purpose.

Furthermore, without knowledge of the school security policy, the jury may well view Haynes' actions - contacting Tyler when she had just been dealing with JC's parents, having Tyler come to school and ignoring whether she authorized, and telling school security to send Tyler directly to her - as insignificant or ordinary rather than as knowing acts providing substantial and material aid and support. Only by knowing and understanding the security policy will the jury be able to see that Haynes' actions constituted "knowing and substantial assistance" to Tyler to harm JC. (Plaintiff's proposed jury instruction 39, FPTO, <u>Exhibit E</u>, at 61). Only by knowing and understanding the security policy will the jury be able to see that, without Haynes' assistance, Tyler would not have been able to seize and batter JC in school. Without the ability to introduce the highly probative evidence of the school security policy, it is plaintiff who would be severely unfairly prejudiced in the form of not being able to prove his aiding and abetting claim.

Defendants argue that plaintiff "cannot claim" that Haynes' violation of the policy is evidence of aiding and abetting Tyler in beating JC because "Haynes was not involved in, and had no knowledge of how, Ms. Tyler entered Tilton Elementary School on September 20, 2018, or whether Tyler was a listed guardian or parent of JC."  (Motion at 5). As shown, this is untrue and does not make sense, so Haynes' testimony is simply not credible. Haynes' testimony

contradicted by other Board witnesses. Haynes' argument that she was "not involved in" Tyler entering the building and going up to her classroom when it is undisputed that Haynes was the one who had her come to the school is not even a serious argument.

Conspiracy. The school policy and the actions Haynes took in the light of that policy are also relevant and highly probative evidence of plaintiff's conspiracy claim against Haynes. First of all, Haynes' violation of school security policy was an indispensable, overt act in furtherance of the conspiracy. Each of her actions that violated the policy – i.e., in contacting an unauthorized individual on 9/19 when she was already communicating with JC's parents or ignoring whether/never checking if Tyler was authorized, agreeing to Tyler her come to Tilton on 9/20, and telling the school security guard on 9/20 to send her directly upstairs (without going to the office for the school's standard security check for visitors) - was an overt act in furtherance of the conspiracy. Together, Haynes acts were a course of conduct in furtherance of the conspiracy. The fact that Haynes violated school security policy to accomplish these acts is crucial evidence because it highlights that her acts were not ordinary, random or a mistake were done expressly and intentionally "in an effort to carry out the agreement or plan."  (Plaintiff's proposed jury instruction #40, FPTO, Exhibit E, at 63).

Second, the school security policy is relevant to showing that Haynes participated in the conspiracy *knowingly* and had a common purpose with Tyler. (Plaintiff's proposed jury instruction #40, FPTO, Exhibit E, at 63). Again, the school security policy shows that Haynes knew she was required to do things one way; the fact that she departed from the policy and did things in another way when it came to JC and Tyler, shows that she did so knowingly and voluntarily. The juxtaposition between what the policy required Haynes to do and what she

95

actually did is highly probative evidence of her intent and purpose to participate in the conspiracy with Tyler.

Without clear knowledge of the school security policy and the ability to see that Haynes' actions violated it, the jury will miss the inference that Haynes' actions were intentional and undertaken "in an effort to carry out the agreement or plan." Without knowledge of the fact that Haynes' actions violated the policy, the jury may even think Haynes' actions were ordinary or an innocent mistake. Only by knowing and understanding Haynes' conduct in the light of the school security policy will the jury be able to see that each of her actions – and the series of actions together, her course of conduct – was undertaken "in an effort to carry out the agreement or plan." For Haynes, violating the school security policy was an indispensable stage and step in the plan to carry out the agreement. Without Haynes reaching out to Tyler and getting Tyler past the office and into her classroom, Tyler would not have been able to assault, batter and inflict emotional distress on JC at school. Without each of Haynes' overt acts done in violation of school security policy, Haynes' and Tyler's agreement and goal would not have succeeded. Therefore, without the ability to introduce the highly probative evidence of the school security policy and how Haynes got around it, it is plaintiff, not defendant, who would suffer severe, unfair prejudice in the form of not being able to prove his conspiracy claim.

Defendants argue that Haynes' violations of policy are not relevant to plaintiff's conspiracy claim because they were not unlawful acts, but of course it is not a requirement for the means or actions Haynes took "in an effort to carry out agreement or plan" to have been unlawful in order to serve the conspiracy. (Response at 5-6; Plaintiff's proposed jury instruction #40, FPTO, Exhibit E, at 63).

Intentional infliction of emotional distress.  The school security policy and the actions
Haynes took in the light of that policy are also relevant and highly probative of all three elements
of plaintiff's intentional infliction of emotional distress claim against Haynes. First, Haynes'
end-run around the school security policy through soliciting an unauthorized adult and then
arranging for that individual to get into the school and up to JC's classroom without a security
check at the office – all for the purpose of beating JC with belts - is relevant evidence of extreme
and outrageous conduct. (Plaintiff's proposed jury instruction #37, FPTO, Exhibit E, at 58).
Tilton's security policy – at bottom, that only authorized adults can have contact with students -
was and is the cornerstone and pillar of students' safety and parents' trust of schools everywhere.
The fact that Haynes personally solicited and engineered an unauthorized adult to come to and
enter the school, bypass the security check, and provide that person with direct access to JC - to
beat him in a school bathroom - is shocking and difficult to comprehend. Her actions in violating
the policy are relevant evidence that her conduct was "extreme" precisely because her actions
were outside the bounds of the policy (i.e., the school security policy as well as the Board's
prohibition against corporal punishment). Further, Haynes' actions in in light of the security
policy are also relevant evidence of their "outrageous" character. Haynes' conduct was "beyond
all possible bounds of decency" and "intolerable in a civilized community" because a civilized
community, by definition, keeps its kids safe in school by ensuring that unauthorized adults
cannot walk into school and harm them. (Defendants' proposed jury instruction #38, FPTO,
Exhibit E, at 59). To be sure, Haynes' conduct was far more than "mere insults, indignities,
threats, annoyances, petty oppressions, or trivialities…."  (Id.). Moreover, the fact that Haynes
was JC's homeroom teacher and thus had a high degree of "authority… over plaintiff" and "the

ability to… exercise that authority," makes Haynes' violations of the school security policy even more relevant and probative. (Id.).

Second, Haynes' violations of the school policy that would have kept JC safe are relevant to Haynes' intent to inflict severe emotional distress on JC. The fact that Haynes gave an unauthorized person access to JC at school when she was prohibited from doing so, thus exposing JC to direct physical and psychological danger, is highly probative evidence that she intended to inflict severe distress on him or at least knew there was a high probability that her conduct would cause him severe distress. (Defendants' proposed jury instruction #38, FPTO, Exhibit E, at 59). Third, Haynes' conduct in soliciting and granting an unauthorized individual access to JC in violation of school security policy actually did inflict severe emotional distress on JC. (Id).

Impeachment. Finally, to the extent Haynes testifies that her actions on 9/19 and 9/20 complied with school policy, then plaintiff is allowed to introduce evidence of the school security policy in order to show that she violated it. As defendants already argue, Haynes claims that, by not checking whether Tyler was authorized, she "had no knowledge of" whether Tyler was authorized or not and, thus, she did not violate policy. (Motion at 5). In fact, Haynes understood the policy, had been communicating with JC's parents, and did not check whether Tyler was authorized or not; she simply turned a blind eye to whether Tyler was authorized. Similarly, to the extent Haynes testifies that JC's father somehow consented to allowing Tyler to go to school to have contact with his son, plaintiff should be allowed to impeach her testimony by introducing evidence of the policy and that she did not follow it when Tyler arrived at school by herself.

The probative value of the evidence of Haynes' policy violations to plaintiff's state law claims and claim for punitive damages far outweighs any unfair prejudice to defendants. The probative value is extremely high. (Motion at 6-7, 7).

Nor is the evidence of the straightforward school security policy confusing, misleading, or cumulative; on the contrary, the concise policy illuminates Haynes' conduct and intent. What *would be* confounding and profoundly misleading and incomplete for the jury is to hear that Haynes solicited the alleged batterer to come to the school without being provided any explanation as to how, including how or why Haynes chose her and how she got into the building and past any security checks. The jury must know about Haynes' end-run around Tilton's security policy.

Finally, any prejudice to defendants can be cured by a clear, limiting instruction. Defendants' suggestion that courts consider evidence of policy violations so prejudicial that a limiting instruction could not eliminate any prejudicial effect is another misstatement of law. In fact, it is common practice for courts in this District to admit evidence of policy violations with a limiting instruction. *Brooks v. City of Chicago*, 2015 WL 354386, *5 (denying motion in limine but ruling that "The Court will give the jury a limiting instruction to make clear that compliance (or non-compliance) with the police department's "Use of Force Guidelines" is immaterial to whether a constitutional violation occurred"); *see also Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034188, *1-2 (N.D.Ill. July 27, 2010)(denying defendant's motion in limine to exclude police policies but ruling that "any such evidence during trial will be subject to an appropriately cautionary jury instruction"); *Wilbon v. Plovanich*, 2016 WL 890671, at *9 ("If plaintiffs seek to introduce a rule, regulation or order at trial, Defendants may object or seek a limiting instruction. Defendants' motion in limine… is denied"), *report and recommendation adopted*, No. 12 C

1132, 2016 WL 3922906 (N.D.Ill. July 21, 2016). Given the high probative value of the evidence, the Court should admit it with a limiting instruction.

### Haynes' Violations of Defendant Board's Policies are Also Relevant and Admissible to Proving JC's Federal § 1983 Claims

Next, Haynes' violations of the Board's policies are relevant to proving plaintiff's 1983 claims against Haynes. Defendants' overly broad argument in their motions in limine 3 and 6 that the Board's policies are inadmissible misstates the law again. "…[E]vidence regarding policies, including expert testimony, is not *per se* inadmissible." *Cazares v. Frugoli*, No. 13-cv-5626, 2017 WL 4150719 (N.D.Ill. Sept. 19, 2019), *citing United States v. Brown*, No. 16-1603, 2017 WL 3947160, at *3 (7th Cir. 2017) ("Despite its strong language, *Thompson* should not be understood as establishing a rule that evidence of police policy or procedure will *never* be relevant to the objective-reasonableness inquiry" (emphasis in original)); see also *United States v. Proano*, No. 17-3466, 912 F. 3d 431, 439 (7th Cir. 2019) ("Since *Thompson*, however, we have clarified that there is no *per se* rule against the admission of police policies or training"). Such evidence may be relevant in three ways.

First, while a state actor's violations of agency policy are not, *ipso facto,* constitutional violations, they are nevertheless *relevant to determining whether the state actor's conduct was objectively reasonable under the Fourth Amendment. Mays v. Jackson*, No. 20 C 2134, 2020 WL 2796082, *3 (N.D.Ill. May 29, 2020) ("…[T]he law in this circuit is that such guidelines are relevant in determining objective reasonableness, but not determinative") (emphasis added); *Lynn v. City of Indianapolis*, 2015 U.S. Dist. LEXIS 4045, at *10 (S. D. Ind. Jan. 14, 2015) (Evidence that officers violated policy is relevant and probative of whether officers acted reasonably). Put differently, "the use of… policies may clarify for the jury what the evidence [of the individual defendant's conduct] means." *Ratliff v. City of Chi.*, No. 10 C 739, 2012 WL

5845551, at *1-3 (N.D. Ill. Nov. 19, 2012). Plaintiff does not intend to admit evidence of Haynes' violations of the school security policy in order to prove or argue that they were, *ipso facto*, violations of JC's Constitutional rights.

Second, as noted, violations of policy can be relevant to a claim for punitive damages under § 1983. *Via v. Lagrand*, No. 03 C 3278, 2007 WL 495287, at *6 (N.D. Ill. Feb. 12, 2007) (*"Thompson* did not address the potential admissibility of evidence showing a violation of internal agency rules and procedures with regard to a claim for punitive damages. The considerations may not be the same; a claim for punitive damages typically requires a showing that the defendant acted maliciously."); *Ratliff v. City of Chi.*, No. 10 C 739, 2012 WL 5845551, at *1-3 (N.D. Ill. Nov. 19, 2012)("…[T]he court reserves its decision as to any such testimony, evidence, or argument in support of a punitive damages claim… not foreclosed by *Thompson* and *Morton*."); *United States v. Proano*, 912 F. 3d at 439 ("*Thompson* did not address whether evidence of police policy or training can be relevant to intent….").

Third, evidence of a state actor's violation of agency policy may be relevant for impeachment. If a defendant testifies that her actions complied with and did not violate policy, then plaintiff may introduce relevant policies to impeach or rebut her testimony. *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 818 (N.D.Ill. Feb. 11, 2010)("However, if developments at trial make evidence about police department rules and regulations relevant to an issue other than plaintiffs' constitutional rights, the court will address at that time whether the proffered evidence is admissible."); see also *United States v. Anifowoshe*, 307 F. 3d 643, 649 (7th Cir. 2002)("The district court is within its discretion in allowing testimony if the objecting party has already opened the door for such testimony.") (internal quotation omitted).

In this case, Haynes' violations of Tilton's school security policy are relevant in all three ways identified above.

Punitive damages.  For the reasons argued above, Tilton's school security policy and the actions Haynes took in violation of that policy are relevant and probative to her claim for punitive damages under both § 1983 counts. Tilton's policy and Haynes' actions *vis-à-vis* the policy show her getting around that policy to get Tyler into the building and give her direct access to JC, whether maliciously or in reckless disregard of his safety. That her steps violated a policy of which she was well-aware is evidence that her steps were deliberate or reckless.

Unreasonable seizure/excessive force. Evidence that Haynes violated the school security policy is relevant to plaintiff's excessive force claim against Haynes. Under the Fourth Amendment, a teacher may use only such force as is "objectively reasonable" under the totality of facts and circumstances she faced. (Plaintiff's proposed jury instructions ##25-26, FPTO, Exhibit E, at 30, 34). The reasonableness of the particular use of force must be judged from the perspective of a reasonable teacher in Haynes' position.  (Id.). Reasonableness includes considerations such as whether the force was necessary to maintain the safety of other students or for the purpose of self-defense, and the age and size of the student. (Id.). Here, Haynes' actions fell outside of a school security policy that was intended to keep students safe from harm by unauthorized adults. Here, while plaintiff does not argue that her violation of policy violated JC's Fourth Amendment rights *per se*, nevertheless Haynes' actions constitute some evidence that Haynes acted unreasonably under the circumstances. That is to say, since her actions fell outside of Board and Tilton policies, rules and procedures, it is more likely that Haynes knew her actions would deprive a student of a federal right.  *United States v. Sheffler*, No. 19-30067, 2021

WL 2742742, *3 (C.D.Ill. July 1, 2021) (denying motion in limine to bar evidence of corrections officer's violations of Illinois Department of Corrections regulations).

Substantive due process – state created danger. The evidence that Haynes violated Tilton's school security policy is also relevant to plaintiff's shock the conscience/state-created danger claim against Haynes in multiple ways. (Plaintiff's proposed jury instructions #28, FPTO, Exhibit E, at 39). For example, by violating policy to grant an unauthorized adult direct access to and, thus, the opportunity to harm JC, Haynes' actions created JC's exposure to danger at the hands of Tyler and/or increased the likelihood that he would be seriously harmed. (Id.). As another example, it was foreseeable to Haynes, who understood the building security policy, that, by violating the policy to grant an unauthorized adult direct access to and, thus, the opportunity to harm JC, her acts would expose KC to danger and/or lead to injury. (Id.). Further, without knowing the policy, the jury simply will not understand the shocking nature of Haynes' exposure of JC to mental and physical danger.

Impeachment. Finally, for reasons argued above, Tilton's school security policy and Haynes' actions in violation thereof are relevant for impeachment and/or rebuttal of any testimony or argument by Haynes that her actions complied with or did not violate that policy.

The probative value for plaintiff's claims, including her claim for punitive damages, of the evidence of Haynes' policy violations is far greater than any unfair prejudice that could result to Haynes. The Court can address any potential for unfair prejudice through limiting instructions. *Smith v. Garcia*, 2018 WL 461230, at *4, n. 1.; *Wilbon v. Plovanich*, No. 12 C 1132, 2016 WL 890671, at *9 (N.D.Ill. March 9, 2016)("…Defendants' request to bar any reference to all police department rules, policies, and general orders is overly broad… If plaintiffs seek to introduce a rule, regulation or order at trial, Defendants may object or seek a limiting instruction.

Defendants' motion in limine… is denied without prejudice."), *report and recommendation adopted*, No. 12 C 1132, 2016 WL 3922906 (N.D.Ill. July 21, 2016). Finally, the court may simply decline to foreclose the admissibility of evidence of policy violations on defendants' motion in *limine* #6, instead deferring a ruling until trial. *Smith v. Garcia*, No. 15-CV-10105, 2018 WL 461230, at *4 (N.D. Ill. Jan. 18, 2018); *Gonzalez v. Olson*, No. 11 C 8356, 2015 WL 3671641, at *12–13 (N.D. Ill. June 12, 2015); *Ratliff v. City of Chi.*, 2012 WL 5845551, at *1-3.

For all of the above reasons, defendants' motion in limine #6 should be denied.


## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 7

### Introduction

Defendants ask this Court for a sweeping order barring "all evidence pertaining to the dismissal charges, pre-suspension hearing, suspension, and dismissal hearing against Defendant Kirsten Haynes (except for impeachment purposes)." Dkt. 320 at 1. Defendants contend, without even identifying the specific evidence sought to be barred, that "this evidence" is inadmissible under FRE 407 (as one giant "subsequent remedial measure"), is inadmissible hearsay, is not relevant under FRE 401, and is substantially outweighed by a danger of unfair prejudice and confusing the jury. *Id.* at 1-9. Defendants' motion is frivolous. Defendants come nowhere close to meeting their burden at this stage of showing that the evidence in dispute has no path to admission at trial. For all of the reasons set forth below, the motion should be denied in its entirety.

### Factual and Procedural Background

Because Defendants omit key facts, Plaintiff begins there, with the facts. On September 20, 2018, the day of the incident in the case, Defendant Kristen Haynes was a tenured Chicago Public School ("CPS") teacher assigned to George W. Tilton Elementary School ("Tilton").

*Temporary Reassignment.* On September 25, 2018, CPS Director of Employee Engagement, Mary Ernesti, notified Haynes in writing that she was being temporarily reassigned effective immediately from Tilton to the CPS Network 5 Office, where her duties and responsibilities were to be supervised by the Chief of Schools, Shontae Higginbottom, and she was prohibited from attending any events at Tilton. Ex. DD at BOE 517.

*Dismissal Charges.* On March 1, 2019, the Chief Executive Officer ("CEO") of Defendant Chicago Board of Education, Janice K. Jackson, notified Defendant Haynes in writing that the CEO had approved dismissal charges and specifications against Haynes. Ex. DD, Board's Dismissal Charges Against Haynes, at BOE 469. In the formal charging document dated March 1, 2019, the CEO approved 8 dismissal charges and 20 specifications against Haynes. *Id.* at BOE 471-73. Specifically, the CEO charged Haynes, *inter alia*, with numerous violations of CPS corrective action categories, Illinois State Board of Education ("ISBE") rules and regulations, Board rules, and the Tilton Staff Handbook. *Id.*; Ex. X, Board's Post-Hearing Brief, at BOE 8098-99, 8102-05 (detailing the specific policies and rules which Defendant Board alleges Haynes violated). The "specifications" approved by Defendant Board against Haynes included:

- That during the 2018-2019 school year, Haynes was assigned to Tilton and had J.C.—a nine-year-old, male student in her fourth-grade class (Ex. DD at BOE 472);
- That Haynes kept two leather belts hanging in the storage closet of her classroom (*id.*);
- That Haynes told multiple students that year that if they misbehaved she would contact their parents so that their parents could come to school and "whip" them with the belts (*id.*);
- That on September 19, 20218, Haynes reached out to Ray Champ, a relative of J.C.'s, to ask for J.C.'s grandmother's phone number to have her come to school to "scare" J.C., obtained Defendant Juanita Tyler's telephone number from Ray Champ, and then had a telephone conversation with Tyler in

which they agreed Tyler would come to Tilton the following day, September 20, 2018, to scare J.C. into behaving in her class (*id.*);

- That on the morning of September 20, 2018, Haynes arrived at Tilton and informed the security officer that Tyler would be arriving at the school and should be sent up to Haynes' classroom (*id.*);
- That Tyler then arrived at Tilton and proceeded to Haynes' classroom, whereupon Haynes and Tyler waited in the classroom doorway for J.C. (*id.*);
- That while waiting in the classroom doorway for J.C., Haynes asked Tyler if she needed a belt in reference to disciplining J.C (*id.*);
- That upon J.C.'s arrival, Haynes, leaving her classroom unattended, and Tyler, carrying both belts from Haynes' classroom, escorted J.C. down the hallway to an out-of-order boys' bathroom (*id.* at BOE 473);
- That Haynes then unlocked the out-of-order bathroom and permitted Tyler to enter with J.C. and the belts before returning to her classroom and leaving J.C. with Tyler alone in the out-of-order bathroom (*id.*);
- That Tyler then proceeded to slap J.C. in the face and repeatedly whip J.C. with the belts in the out-of-order bathroom causing bruising, abrasions, and lacerations to multiple parts of J.C.'s body, including, but not limited to, his back and legs ((*id.*);
- That J.C. returned to class approximately ten minutes after Haynes left him unattended with Tyler in the out-of-order bathroom and was visibly distraught (*id.*);
- That despite J.C.'s clear distress, Haynes made no effort to discern what had happened to him and failed to contact Tilton administration regarding the same (*id.*); and
- That on October 4, 2018, Haynes gave the following false, misleading, or deliberately incomplete statements to a CPS investigator when she (a) denied asking Tyler "Do you need a belt?" on September 20, 2018; (b) denied providing Tyler with a belt for the purposes of disciplining J.C.; (c) stated that J.C. had a smirk on his face after returning from the out-of-order bathroom with Tyler; and (d) stated that, after Tyler took the belt from her classroom to the out-of-order bathroom, she "did not see the belts until the end of the class on the floor in the closet" (*id.*).

*Suspension.* The Board's CEO's March 1, 2019 written notification also informed Haynes that the CEO was requesting that Haynes be suspended, without pay, pending a pre-suspension hearing on the charges against her. Ex. DD at BOE 469. On March 11, 2019, pursuant to CPS "Guidelines Governing Pre-Suspension Hearings for Tenured Teachers," and at the CEO's request, a "pre-suspension" hearing was held in the CPS OEE before an OEE hearing officer to determine whether Haynes would be suspended without pay. *Id.* BOE 460, 463, 468. Haynes, a Chicago Teachers Union ("CTU") attorney, a CTU field representative, and an attorney for Defendant Board attended. *Id.* BOE 463-64. Counsel for Defendant Board reviewed the dismissal charges and specifications against Haynes and asked the OEE hearing officer to recommend Haynes be suspended without pay pending resolution of the dismissal charges, while

106

the CTU confirmed receipt of the Board's investigative report and indicated Haynes' intent to request a dismissal hearing. *Id.* BOE 463. Following the hearing, the OEE hearing officer recommended in writing that Haynes be suspended without pay pending resolution of the dismissal charges against her. *Id.* BOE 462-63. The OEE Director, in turn, sent the CEO a written memorandum agreeing with that recommendation. *Id.* BOE 461.

On March 12, 2019, Haynes was suspended without pay pending resolution of the dismissal charges against her. *Id.* BOE 460.

*Administrative Dismissal Proceeding.* By operation of section 34-85 of the Illinois School Code ("School Code"), 105 ILCS 5/34-85, Defendant Board's CEO's March 1, 2021 approval of the dismissal charges and specifications against Haynes initiated an administrative proceeding to dismiss tenured teacher Defendant Haynes.[23]

The parties held a dismissal hearing *via* Zoom on June 22, 2021; August 31, 2021; October 25, 2021; November 29, 2021; December 21, 2021; and April 25, 2022 before a mutually-selected ISBE hearing officer, Danielle Carne.[24] *Id.* at BOE 8101. Over the course of the six-day hearing, both parties—Defendant Board's CEO and Defendant Haynes—had a full and fair opportunity to make opening statements, present and cross-examine witnesses, and offer

---

[23] The School Code provides that no tenured teacher can be removed except for "cause." 105 ILCS 5/34-85(a); *see Huddleston v. Illinois State Bd. of Ed.*, 2019 IL App (1st) 18-1907-U, ¶¶ 41-44 (outlining the statutory framework governing termination of tenured teachers like Haynes in Illinois). To dismiss a tenured teacher for "cause," the local superintendent—here, the CEO of the Chicago Board of Education—must approve written charges and specifications against the tenured teacher. 105 ILCS 5/34-85(a)(1). Within 10 days thereof, the teacher must be served with written notice of the charges and specifications against her. 105 ILCS 5/34-85(a)(1).

[24] Under the School Code, the tenured teacher may request (though is not required to request) a hearing before a mutually selected hearing officer. 105 ILCS 5/34-85(a)(2)-(3). In consultation with the CTU, Defendant Board must maintain a list of at least nine qualified hearing officers possessing certain minimum training and experience requirements. 105 ILCS 5/34-85(a)(3). The teacher and Defendant Board's CEO then rotate striking hearing officers until one remains. 105 ILCS 5/34-85(a)(3). The remaining hearing officer then presides over the teacher's dismissal hearing, and is tasked with determining whether Defendant Board proved by a preponderance of the evidence the charges and specifications supporting dismissal.

documents into evidence. Ex. W. Defendant Board presented thirteen witnesses: (1) Michael

Mahone, (2) student R.J., (3) Defendant Tyler, (4) Deisy Anaya, a DCFS investigator, (5) student

K.B., (6) student S.C., (7) student K.K.B., (8) student J.L., (9) Tiara Taylor, J.C.'s aunt, (10)

J.C., (11) N.C., J.C.'s sister, (12) Plaintiff Asia Gaines, and (13) CPD detective Alice Casanova.

For her case-in-chief, Defendant Haynes presented three witnesses: (1) herself, (2) Lavita

Buckner, and (3) Charlene Haynes. In all, the hearing officer heard testimony from sixteen

witnesses and received about sixteen exhibits into evidence.[25]

As relevant here, witness Michael Mahone, owner of Arc Light Investigative Services

(retained by Defendant Board to investigate the underlying incident), testified to the foundation

necessary for the admission of Arc Light's final report summarizing the interviews/statements of

key witnesses (including Haynes and Tyler) as well as Arc Light's investigative findings. *Id.* at

18:1-51:8.

In addition, though Haynes testified in the proceeding that she kept the two belts for kids

whose pants were sagging, *id.* 417:4-418:3, that the belts were adult-sized so they would fit

larger students, *id.* 418:7-17, and that the belts were used only to assist students with dress code

violations, *id.* 417:4-418:3, that testimony was directly refuted by the testimony of R.J., K.B.,

S.C., K.K.B., and J.L.—five of J.C.'s classmates. Specifically, each child testified to knowing

that Haynes kept two belts in a small closet in the front of her classroom. *Id.* at 226:21-23; 230:4-

5; 255:3-10; 417:4-418:3; 208:2-14; 240:2-9; 241:18-20; 255:3-10; 295:2-10. One belt was

brown and one was black. *Id.* at 418:7-17. They had names: Mr./Mrs. Brown and Mr./Mrs.

Black. *Id.* at 256:1-7; 274:23-275:2; 418:18-24; 500:7-12. The belts were adult-sized, not child-

sized. *Id.* at 207:12-20; 418:7-17. Nearly all of these students recall Haynes telling them that she

---

[25] Most of the exhibits introduced at the dismissal hearing are identified on Plaintiff's Proposed Exhibit List in this case.

could get permission from their parents to discipline them with the belts if they misbehaved. *Id.* at 203:16-20; 204:11-14 (K.B.); 227:5-11 (S.C.); 240:10-18 (K.K.B.); 256:1-7 (J.L.).

Today, Defendant Board and Defendant Haynes await the hearing officer's report in which she will make findings as to each of the dismissal charges and specifications and make a recommendation to the superintendent as to whether or not Haynes should be dismissed. 105 ILCS 5/34-85(a)(6). After the hearing officer makes her recommendation, Defendant Board will have 45 days to decide whether to dismiss Haynes. 105 ILCS 5/34-85(a)(7).

*Plaintiff's Motion to Compel.* In this case, Plaintiff moved to compel Defendants to identify the ten (or more) students who provided case-critical statements to CPS investigator Finley and CPD detective Casanova (Exs. C and D), some of whom later testified in the Board's dismissal proceeding against Haynes. Judge Lee ordered Defendants to provide Plaintiff with the parent/guardian names and contacts for two of the ten (or more) students. Dkt. 111. To be clear, this was before any of the students testified at Defendant Board's dismissal proceeding against Defendant Haynes.

*Defendant Board's Failure to Timely Disclose the Transcript of Haynes' Dismissal Hearing.* Though day five of Haynes' dismissal hearing was held on December 21, 2021 (two years ago) (see BOE 8089); though Defendant Board submitted its post-hearing brief in support of the dismissal charges against Haynes on September 1, 2022 (over a year ago), *see* Ex. X at BOE 8141, and though both of these records fell squarely within the scope of Plaintiff's discovery requests to Defendant Board, *see* Ex. GG at RFPs ¶¶ 2, 4, 8-11, 13, 44, it was not until the evening of November 15, 2023—three weeks ago—that the Board produced these records to Plaintiff. Ex. HH, Emails from Shariaye Wilson to Al and Zach Hofeld, at 1.[26]

---

[26] Of note, the Board's post-hearing brief is a 44-page legal memorandum.

Worse, though day four of Haynes' dismissal hearing was held on November 29, 2021 (two years ago) (*see* Ex. X at BOE 8101), it was not until the evening of Friday, December 1, 2023—one week ago—that Defendant Board produced the hearing transcript to Plaintiff. Ex. HH at 2. Notably, this transcript was 222 pages long and predominantly contained the testimony of Defendant Kristen Haynes herself.[27] Plaintiff's review of these newly produced records is not yet complete.

Worse still, though Defendant Board explicitly noted in its post-hearing brief that the final day of Haynes' dismissal hearing was held on April 25, 2022 (over a year and a half ago) (*see* Ex. X at BOE 8101), Defendant Board produced the transcript to Plaintiff just *two days ago*. Ex. HH at 3. And Defendants still have not produced Defendant Haynes post-hearing brief, which may contain valuable impeachment material for Plaintiff. Needless to say, Plaintiff would gladly obtain copies of these records herself if she could, but unfortunately these records are not public.

What's more, the statute governing Haynes' dismissal proceeding suggests Haynes and the Board had the entire hearing transcript (all six days) by August 11, 2022 at latest—sixteen months ago. *Compare* 105 ILCS 5/34-85 (requiring hearing officer to "direct the parties to submit post-hearing briefs no later than 21 calendar days *after receipt of the transcript*"), *with* Ex. X at BOE 8141 (showing Defendant Board submitted its post-hearing brief September 1, 2022). Defendants now seek to bar all this evidence, including the 222-page transcript they produced just seven days ago and the final transcript just two days ago.

**Argument**

---

[27] Haynes' testimony comprises 173 pages of the 222-page transcript. *See* Ex. W at 405-627.

Based solely on the fact that Defendants' eleventh-hour production of much of the evidence they now seek to bar, combined with the fact that they still have not produced Haynes' post-hearing brief, Plaintiff has not yet had a basic, fair opportunity to review all of the new evidence Defendants now seek to bar. For this reason alone, the Court should deny Defendants' MIL at the outset as an "appropriate sanction[]" pursuant to Federal Rule of Civil Procedure 37(c)(1)(C).[28] Turning to the substance of the motion, it should be barred for six independent reasons.

## I.  DEFENDANTS' MOTION IS OVERLY BROAD, FAILING TO SPECIFY THE EVIDENCE SOUGHT TO BE BARRED

The scope of Defendants' MIL is staggering: they seek a sweeping order "precluding and prohibiting plaintiff, plaintiff's attorney and plaintiff's witnesses from eliciting any testimony concerning, introducing any evidence, alluding to, instructing the jury on, and/or making any argument regarding the dismissal charges, pre-suspension hearing, suspension, and dismissal hearing against Defendant Kristen Haynes." Dkt. 320 at 1. But, upon closer inspection, Defendants do not even specify the evidence they seek to bar. Notably, Defendants offer no indication whether they seek to bar all evidence introduced at the dismissal hearing; all verbal statements made by witnesses or counsel at the dismissal hearing; written statements made by the parties to the dismissal hearing, such as their admission in post-hearing briefs; or anything else.

Moreover, most of Defendants' assertion as to Plaintiff's intentions at trial are not only wrong as a factual matter, but also fail to point to any basis for their contention, such that Plaintiff cannot meaningfully comprehend Defendants' argument—let alone respond to it. A prime example is the following: in describing the evidence sought to be barred, Defendants

---

[28] Plaintiff is also reviewing the newly produced transcripts to determine whether she has suffered any further prejudice as a result of Defendants' untimely production and whether any additional sanction may be warranted.

111

assert that Plaintiff "seeks to introduce at trial *voir dire* . . . pertaining to Haynes' dismissal charges, pre-suspension hearing, suspension without pay, and dismissal hearing." Dkt. 320 at 3. Plaintiff has no idea what Defendants are referring to. And Defendants nowhere cite a single one of Plaintiff's proposed jury questions in support. Because this argument is not developed in a way that permits a response, it is forfeited. *See Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (holding that an undeveloped argument is forfeited); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments).

Likewise, Defendants assert that Plaintiff seeks to introduce "instruction to the jury" "pertaining to Haynes' dismissal charges, pre-suspension hearing, suspension without pay, and dismissal hearing." Dkt. 320 at 3, 5. Again, Plaintiff is unsure what Defendants refer to, and Defendants notably fail to cite a single jury instruction in support. This argument, too, is not developed in a manner that allows a response and is therefore forfeited. *Smith*, 388 F.3d at 569; *Otto*, 134 F.3d at 854. In short, the Court should dismiss Defendants' motion as overly broad and lacking in specificity as to the evidence sought to be barred. *See Native Am. Arts v. Earthdweller, Ltd.*, No. 01 C 2370, 2002 WL 1173513, at *5 (N.D. Ill. May 31, 2002) (summarily denying defendant's MILs in part as "vague" and "overbroad" "because [defendant]" among other things "fails to sufficiently explain the evidence it seeks to exclude"); *Christmas v. City of Chi.*, 691 F. Supp. 2d 811, 821 (N.D. Ill. 2010) (summarily denying MIL as over broad); *In re Depakote*, No. 14-CV-1052-MJR-SCW, 2018 WL 9732116, at *1 (S.D. Ill. Jan. 22, 2018) (denying vague MIL to "exclude evidence and testimony about legal standards, duties, and obligations" as overbroad); *Dahlstrand v. FCA US, LLC*, No. 15 CV 7603, 2021 WL 4318322, at *6-7 (N.D. Ill. Jan. 14, 2021) (summarily denying several of defendants' MILs as "overly broad"); *Hillard v. City of*

112

*Chi.*, No. CIVA 09C2017, 2010 WL 1664941, at *3 (N.D. Ill. Apr. 23, 2010) (same); *Saunders v. City of Chi.*, 320 F. Supp. 2d 735. 740 (N.D. Ill. 2004) (Bucklo, J.) (same); *Garcia v. City of Chi.*, No. 08 C 5354, 2010 WL 11713400, at *2 (N.D. Ill. Apr. 15, 2010) (same); *Rosenberg v. Cottrell, Inc.*, No. 05-545-MJR, 2007 WL 2028789, at *4 (S.D. Ill. July 12, 2007) (denying numerous MILs as "over broad" and "lacking the specificity required of a motion in limine"): *see also Luce v. United States,* 469 U.S. 38, 41 n.4 (1984) (Court may exclude evidence in advance of trial only when clearly inadmissible).

## II.    RULE 407 DOES NOT APPLY HERE

Defendants contend without authority that "all evidence" "pertaining to" the dismissal charges, pre-suspension hearing, suspension, and dismissal proceeding against Haynes is a "subsequent remedial measure" within the meaning of FRE 407, such that *all* evidence logically related to Haynes' suspension or dismissal proceeding is barred. Dkt. 320 at 3-5. The fatal flaw in Defendants' argument is that it assumes—without explanation or citation to *any* authority— that "this evidence" (again, without specifying what evidence they are referring to) qualifies as a "subsequent remedial measure." The argument is without merit for two independent reasons.

First, Defendants fail to explain how the evidence sought to be barred is a "remedial measure." Indeed, it is not. To the extent that the advisory committee notes explicitly reference "employee discharge" as an example of a remedial measure, no "discharge" has occurred here. The Board simply approved dismissal charges and Haynes' employment has been suspended *pending resolution of the dismissal charges.* Because Haynes' dismissal is still being adjudicated, it is unknown what the hearing officer's recommendation will be, whether the Board will adopt that recommendation, and, if adverse to Haynes, whether Haynes will seek review of the Board's decision in the Illinois Appellate Court and, if so, whether that Court will affirm or reverse the Board's decision, and ultimately whether Haynes will keep her job or not. Put simply,

the suspension and dismissal charges are not remedial measures because Haynes has not yet been terminated. *See Herschel v. Watts*, No. 117CV02828JMSMJD, 2018 WL 5044682, at *2 (S.D. Ind. Oct. 17, 2018) (rejecting argument that police captain's investigative report, which specifically evaluated defendant's conduct against police department policies, was not barred by FRE 407 because a discharge recommendation for a police officer was not a remedial measure since the officer had not yet been terminated); *J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 931 (E.D. Wis. 2017) (holding that a discharge recommendation for a police officer was "not itself a remedial measure; the remedial measure was [an officer's] termination"); *see also Aranda v. City of McMinnville*, 942 F.Supp.2d 1096 (D. Or. 2013) ("By it terms, this rule is limited to measures that would have made the harm less likely to occur; it does not extend to post-incident investigations into what did occur. The reason [for finding Rule 407 inapplicable] is that such reports or inspections are not themselves remedial measures, and do not themselves even reflect decisions to take or implement such measures. Although such reports or inspections might represent the first or most preliminary steps that might eventually lead to decisions to make or implement changes, they are not themselves excluded under Rule 407." (quotations and internal citations omitted)).

What's more, any meaningful consideration of the evidence Defendants vaguely reference reveals it has little "remedial" value at all, particularly when viewed against the backdrop of other actions that had *already* been taken by March 1, 2019. Specifically, on September 25, 2018—five days after the incident—CPS temporarily reassigned Haynes effective immediately away from Tilton to the CPS Network 5 Office, where her duties and responsibilities were to be supervised by the Chief of Schools, and she was to be prohibited any events at Tilton. Ex. DD at BOE 517. The Board's approval of dismissal charges (and thus a

114

dismissal proceeding) against Haynes merely perpetuated the status quo: suspension, not termination. Defendants fail to show that this evidence is a remedial measure necessarily barred by FRE 407. *See Herschel v. Watts*, No. 117CV02828JMSMJD, 2018 WL 5044682, at *2 (S.D. Ind. Oct. 17, 2018) (rejecting argument that police captain's investigative report, which specifically evaluated defendant's conduct against police department policies, was not barred by FRE 407 because a discharge recommendation for a police officer was not a remedial measure since the officer had not yet been terminated); *J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 931 (E.D. Wis. 2017) (holding that a discharge recommendation for a police officer was "not itself a remedial measure; the remedial measure was [an officer's] termination"); *see also Aranda v. City of McMinnville*, 942 F.Supp.2d 1096 (D. Or. 2013) ("By it terms, this rule is limited to measures that would have made the harm less likely to occur; it does not extend to post-incident investigations into what did occur. The reason [for finding Rule 407 inapplicable] is that such reports or inspections are not themselves remedial measures, and do not themselves even reflect decisions to take or implement such measures. Although such reports or inspections might represent the first or most preliminary steps that might eventually lead to decisions to make or implement changes, they are not themselves excluded under Rule 407." (quotations and internal citations omitted)).

Second, even assuming for argument's sake that "this evidence" were barred by FRE 407, the rule nevertheless permits evidence of remedial measures for purposes other than to show culpable conduct. Here, significant evidence pertaining to Haynes' dismissal charges, suspension, and dismissal proceeding may become admissible for impeachment purposes (examples discussed *infra*), which 407 permits. *See Traylor v. Husqvarna Motor*, 988 F.2d 729, 733-34 (7th Cir. 1993) (finding that even if judge properly excluded evidence under FRE 407,

115

"he had no basis for excluding its use to impeach testimony by defendants' expert witnesses" because "Rule 407 expressly permits the use of evidence of subsequent repairs for purposes of impeachment"); *Westmoreland v. CBS Inc.*, 601 F. Supp. 66, 67 (S.D.N.Y. 1984) ("The fact that subsequent remedial measures are excluded as admissions of fault does not mean that competent evidence resulting from an internal investigation of a mishap must also be excluded."); *Kenny v. Se. Pennsylvania Transp. Auth.*, 581 F.2d 351, 356 (3d Cir. 1978) (explaining that despite the "general rule" that "evidence of remedial measures taken after the event is not admissible to prove culpable conduct," that rule does not apply "when the defendant opens up the issue by claiming that all reasonable care was being exercised at the time," in which case " the plaintiff may attack that contention by showing later repairs which are inconsistent with it" (citing See 2 J. Weinstein & N. Berger, Weinstein's Evidence PP 407(03), (04) (1977))); *Huckaba v. CSX Transportation, Inc.*, No. 3:13-CV-0586-SMY-PMF, 2015 WL 672334, at *5 (S.D. Ill. Feb. 17, 2015) (admitting subsequent remedial measure for purpose of impeachment).

In sum, to the extent Defendants even identify the specific evidence they contend is a "remedial measure," it is not one here, where Haynes has not yet been terminated, and even if it were a remedial measure, there are still numerous ways this evidence may come into evidence at trial. *See infra.*

## III.    TESTIMONY FROM HAYNES' DISMISSAL HEARING MAY BE ADMITTED AT TRIAL FOR PURPOSES OTHER THAN IMPEACHMENT

In a curt, two-sentence argument, Defendants argue—without explication or citation to any authority other than the general rule against hearsay, FRE 801(c)—that "[if] Plaintiff offers the [] transcripts of witness testimony . . . from Haynes' dismissal hearing," that testimony should be excluded as "inadmissible hearsay with no applicable exception." Dkt. 320 at 5. But

this argument is not developed in a way that allows a response, and is therefore forfeited. *Smith*,

388 F.3d at 569; *Otto*, 134 F.3d at 854.

It also lacks merit. Indeed, for example, at trial Plaintiff may seek to admit the Arc

Light/CPS investigative report, which memorializes statements made by Defendant Haynes,

Defendant Tyler, and other key witnesses during the course of Arc Light's/CPS's investigation

following the incident. The report was prepared by Latasha Finley and supervised, reviewed, and

ultimately approved by Arc Light founder and owner Michael Mahone. But Plaintiff has reason

to believe that Finley and Mahone may be "unavailable" to testify at trial within the meaning of

FRE 804(a)(5)(A) in order to lay proper foundation for admission of the Arc Light investigative

report: Finley resigned from Arc Light in or around 2019 (and though she was served with

subpoena and deposed, was difficult to reach during discovery), and Mahone now lives in

Arkansas. *See* FED. R. EVID. 804(a)(5)(A) ("A declarant is considered to be unavailable as a

witness if the declarant is absent from the trial or hearing and the statement's proponent [(i.e.,

Plaintiff)] has not been able, by process or other reasonable means, to procure the declarant's

attendance[.]").[29] Nevertheless, Mahone testified at the dismissal hearing to the foundation

necessary for admission of the Arc Light investigative report. *See* Ex. W at 18:1-51:8. That

means that if both Finley and Mahone are "unavailable" to testify at trial under FRE

804(a)(5)(A), Plaintiff may properly introduce Mahone's sworn testimony from the dismissal

hearing under FRE 804(b)(1), which provides that the "former testimony" of an unavailable

witness is "not excluded by the rule against hearsay" so long as the testimony "(A) was given as

a witness at a trial, hearing, or lawful deposition . . . ; and (B) is now offered against a party who

---

[29] Plaintiff is currently working to secure Finley's and/or Mahone's attendance at trial. Consequently, it is not yet clear to Plaintiff whether one or both will be available to testify at trial.

had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination." FED. R. EVID. 804(b)(1).

Here, no question exists that Mahone's dismissal hearing testimony would satisfy both requirements under FRE 804(b)(1). First, the testimony "was given as a witness at a . . . hearing." Second, as to Defendants Haynes and the Board, Plaintiff would be offering the testimony against a party that indeed had the opportunity to develop it by direct or cross-examination at that hearing, and, as to Defendant Tyler, a party whose predecessor in interest (i.e., Defendants Haynes and/or the Board, as the case may be) had an opportunity and similar motive to develop it on direct or cross examination (indeed, Haynes' counsel strenuously contested the admissibility of the Arc Light investigative report upon cross-examination of Mahone. Ex. W at 18:1-51:8. Because Mahone's dismissal hearing testimony is "former testimony" under FRE 804(b)(2), it may be admitted at trial if Mahone and Finley are both unavailable.

The same is true for "R.J.," "K.B.," "S.C.," "K.K.B.," and "J.L."—five children, identified only by their initials, who also were in Ms. Haynes' 4th-grade class in September 2018. Each child gave crucial testimony at Haynes' dismissal hearing.[30] During discovery, Plaintiff received the name and contact information of two of these five students after Plaintiff

---

[30] Indeed, a key issue in this case is the purpose for which Defendant Haynes kept two leather belts in her classroom closet. Haynes does not deny that she kept two leather belts in her classroom closet. Rather, Haynes maintains that the belts were for kids whose pants were sagging, were adult-sized so as to fit larger students, and were used solely to assist students with dress code violations—but not for any disciplinary purpose. But "R.J.," "K.B.," "S.C.," "K.K.B.," and "J.L. directly refuted Haynes' self-serving account at the dismissal hearing, testifying (separately) that they were well aware that Haynes kept two belts in a small closet in the front of her classroom (*id.* at 226:21-23; 230:4-5; 255:3-10; 417:4-418:3; 208:2-14; 240:2-9; 241:18-20; 255:3-10; 295:2-10); that the belts had names, Mr./Mrs. Brown and Mr./Mrs. Black (*id.* at 256:1-7; 274:23-275:2; 418:18-24; 500:7-12); that the belts were adult-sized (for discipline), not child-sized (for sagging pants) (*id.* at 207:12-20; 418:7-17); and that they vividly recall Haynes threatening them with the belts, telling them she could get permission from their parents to use the belts to discipline them if they misbehaved (*id.* at 203:16-20; 204:11-14 (K.B.); 227:5-11 (S.C.); 240:10-18 (K.K.B.); 256:1-7 (J.L.)).

118

moved to compel Defendant Board, among other things, to identify and disclose all student witnesses identified in Finley's CPS investigate report and Casanova's CPD investigative report. Ex. C; Ex. D. Now, after Defendant Board again recently refused Plaintiff's request to identify three other students for purposes of trial, Plaintiff is now working with a private investigator to do the same. Accordingly, it remains possible that Plaintiff may be able to procure the attendance of each student at trial in order to testify. However, the possibility remains that if one or more of these students refuse to comply with Plaintiff's subpoena to testify at trial or if Plaintiff is unable to identify the remaining three students without the Board's assistance, one or more of these students may be deemed "unavailable" under FRE 804(a)(5)(A). In that event, any such student's testimony from Haynes' dismissal proceeding would be admissible under FRE 804(b)(1) for the same reasons that Mahone's testimony would be admissible. *See supra.* Defendants request to bar all testimony from Haynes' dismissal hearing at trial here—when the availability of numerous witnesses is as of yet undetermined and a trial date has not even been set—is severely premature and should be denied.

## IV. ANY STATEMENT MADE BY DEFENDANT BOARD IN HAYNES' DISMISSAL PROCEEDING MAY PROPERLY BE ADMITTED AT TRIAL

In addition to witness testimony given at Haynes' dismissal hearing, virtually any statement made by Defendant Board—which is a party to both Haynes' pending dismissal proceeding and the instant action—may properly be admitted at trial in this case under FRE 801(d)(2). From counsel's written statements (i.e., opening at dismissal hearing) to their written statements (i.e., Defendant Board's post-hearing brief submitted to presiding ISBE hearing officer), Defendant Board has made countless statements to date in Haynes' administrative proceeding—many of great relevance to Plaintiff's claims, as discussed below. Numerous ways exist in which these statements may be admissible at trial here based on how trial unfolds. To

illustrate the point, if Defendant Board takes a position at trial at odds with its position in the dismissal proceeding, Plaintiff may impeach the Board using those statements from the dismissal proceeding. This might occur, for example, if the Board were to introduce testimony or argument that Haynes did not violate certain CPS corrective action categories, ISBE rules or regulations, Board polices, or the Tilton Staff Handbook. In such a scenario, Plaintiff certainly would have the right to introduce rebuttal evidence, including, but not limited to, the Board's statements in the dismissal proceeding asserting the exact opposite. *See, e.g.*, Ex. X, Board's Post-Hearing Brief, at 5-8, 27-38.[31]

More fundamentally, virtually any statement made by the Board in Haynes' dismissal proceeding may properly be admitted at trial under FRE 801(d)(2). Fed. R. Evid. 801(d)(2) (providing that out-of-court statements made by a party-opponent are not hearsay if (i) "the statement is offered against an opposing party" and (ii) "(A) was made by the party in a representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; *or* (E) was made by the party's coconspirator during and in furtherance of the conspiracy." (emphasis added)). Defendants would be hard pressed to argue that, in Haynes' dismissal proceeding, its general counsel was not acting in a representative capacity on behalf of

---

[31] *See, e.g.*, Ex. X at 36 ( "[Haynes'] conduct discussed above violated several of the Corrective Action Categories contained in the Matrix as well as Board and school-based Policies. [Haynes] threatening to call students' parents to whoop them with belts she kept in her classroom runs afoul of Categories: Physical Integrity: Verbal Abuse-Students, Performance: Negligence/Incompetence and Policy Compliance: Policy Non-Compliance Students. [Haynes'] threats also run afoul of the Student Code of Conduct, as this is not an approved method or tactic for student discipline. [Haynes] also violated Board Rule 4-4(i) (reinforced by the Tilton Staff Handbook) requiring [Haynes] to maintain a violence free and respectful learning environment as well as ISBE's standards requiring [Haynes] to engage with her students in a similar manner. (Charges 1-2, 4-8).").

the Board or was not authorized by the Board to make statements about the issues involved in the dismissal proceeding, or was not acting as the Board's agent or employee. Put simply, any one of the Board's statements from the dismissal proceeding potentially may be admitted as an admission in this proceeding.

In fact, the admissibility of several of the Board's statements is already clear. Consider that for Plaintiff to prevail on her *respondeat superior* claim against the Board, she must show by a preponderance of the evidence that Haynes' conduct occurred within the scope of her employment with the Board—a question which, in turn, turns on (1) whether the conduct was of the kind Haynes was employed to perform; (2) whether the conduct occurred substantially within the authorized time and space limits of Haynes' employment; and (3) whether the conduct was actuated, at least in part, by a purpose to serve her employer. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163 (2007); RESTATEMENT (SECOND) OF AGENCY [hereinafter "Restatement"] § 228 (1958); *Adames v. Sheahan*, 233 Ill. 2d 276, 298 (2009) (Illinois courts "look to the Second Restatement of Agency for guidance" in determining whether an employee's acts were within the scope of employment).[32] Plaintiff must prove all three elements to prevail. *Bagent*, 224 Ill. 2d at 165; *Adames*, 233 Ill. 2d at 298; *Reeze*, 2013 IL App (3d) 120981 ¶¶ 28-32.

Here, without disclosing too much of Plaintiff's trial strategy, it is sufficient at this juncture to observe that Defendant Board has already made certain statements/admissions in its post-hearing brief in Haynes' dismissal proceeding that Plaintiff may properly admit in support of her *respondeat superior* claim. For instance, as to the third element of the claim—that Haynes

---

[32] The Restatement elaborates on section 228's three criteria in ensuing sections, *see, e.g.*, RESTATEMENT § 229 (kind of conduct), § 230 (forbidden acts), § 233 (time), § 234 (space), § 235 (purpose not master's), § 236 (dual purpose), § 237 (reentry to scope), and the Illinois Supreme Court and Illinois Appellate Court have repeatedly turned to these other sections "for guidance" in evaluating whether the three elements are met, *see, e.g.*, *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 166 (2007) (examining section 229 in evaluating the first element).

was actuated, at least in part, by a desire to serve her employer—the Board's dismissal charges and specifications (specifically specification no. 11) against Haynes expressly averred that Haynes "asked Tyler if she needed a belt in reference to disciplining J.C.," and the Board's post-hearing brief goes on to contend that Haynes kept the belts for purposes of discipline and acknowledges that maintaining discipline was one of her duties as a CPS teacher. *Id.* at 8, 27, 35. Defendants' motion comes nowhere close to demonstrating that this evidence could never come in at trial and should be denied.

## V. EVIDENCE INTRODUCED AT HAYNES' DISMISSAL HEARING IS NO LESS ADMISSIBLE HERE

To the extent Defendants intend for MIL 7 to encompass evidence introduced at Haynes' six-day dismissal hearing (i.e., CPD investigative report, DCFS investigative report, etc.), the motion is without merit, unsupported by citation to any authority, and must be denied. The admissibility of any such evidence does not turn on whether it was admitted in the dismissal proceeding.

## VI. DEFENDANTS' RULE 401 AND RULE 403 ARGUMENTS FAIL

As detailed above, to the extent Defendants sufficiently specify the evidence sought to be barred, there are numerous way in which that evidence may properly be admitted at trial in this case—to name just a few, as relevant to Plaintiff's *respondeat superior* claim against the Board, for purposes of impeachment, as the admission of a party opponent under, or as the former testimony of an unavailable witness. *Supra.*

In a last-ditch effort, Defendants invoke Rule 403, reciting in boilerplate fashion the language of the Rule. Dkt. 320 at 8. Citing strictly to caselaw concerning the admissibility of *policies* to prove *constitutional* violation, Defendants contend that the jury will conflict evidence of one with the other. *Id.* But the evidence at issue are not "policies," and Plaintiff does not

122

contend that it is admissible to prove a constitutional violation. As detailed above, myriad ways exist in which this evidence comes in. Any exclusion of this evidence now would be wholly premature. Defendants' motion must be denied.

## Conclusion

For all of the foregoing reasons, this Court should deny Defendants' MIL 7.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 8

### Introduction

On its face, Defendants' MIL 8 seeks judgment on the pleadings as to several of Plaintiff's claims and to bar any evidence related to supposed "unpled claims." Dkt. 321. In reality, the motion hurls a series of unfounded attacks against Plaintiff's complaint and claims at the eleventh hour. At bottom, Defendants' motion is procedurally flawed and substantively without merit. Due to the separate nature of these attacks, Plaintiff separately addresses each in turn.

### Argument

**I.    Defendants' MIL 8 Should Be Denied as Improper and Untimely**

Plaintiff objects to Defendants' MIL 8 to the extent that it is not a motion *in limine* but rather a Fed. R. Civ. Pro. Rule 12(c) and/or Rule 12(b)(6) motion dressed in the guise of a motion *in limine*. Further, Defendants' MIL 6 is untimely because it comes on the eve of trial in a case that has been pending for nearly five years, and Defendants' timeliness arguments cite no case that has granted the relief they now seek. On this basis alone, the Court should deny Defendants' motion.[33]

**II.   Defendants Are Not Entitled to Judgment on the Pleadings as to Plaintiff's Aiding and Abetting Claim Against Defendant Haynes**

---

[33] Plaintiff hereby expressly reserves the right to expound on these objections further if necessary or if helpful to the Court.

In Count VII of the amended complaint, Plaintiff alleges that Defendant Haynes aided and abetted Defendant Tyler's state-law IIED, assault, and battery torts against J.C. Dkt. 23 ¶¶ 1-105, 110-23, 155-74, 175-82. In their MIL 8, Defendants ask this Court for judgment on the pleadings as to Plaintiff's "aiding and abetting" count against Haynes, arguing in cursory fashion that "Plaintiff never properly pleaded theories of aiding and abetting liability relevant to each of the individual tort claims alleged in this action." Dkt. 321 at 5. But this argument is not developed in a way that permits a response and is therefore forfeited.[34] *See Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (holding that an undeveloped argument is forfeited); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments).

The argument also lacks merit. "To state a claim for aiding and abetting [under Illinois law], one must allege that: i) the party whom the defendant aids performed a wrongful act causing an injury, ii) the defendant was aware of his role when he provided the assistance, and iii) the defendant knowingly and substantially assisted the violation." *In re Rest. Dev. Grp., Inc.*, 397 B.R. 891, 897 (Bankr. N.D. Ill. 2008) (citing *Hefferman v. Bass,* 467 F.3d 596, 601 (7th Cir. 2006)). Here, there can be no question that Plaintiff has stated a claim for aiding and abetting because Plaintiff expressly pled each of these elements years ago. Dkt. 23 at ¶¶ 175-76, 178-80.

Defendants one-paragraph argument to the contrary is nonsensical. If Defendants actually are arguing that *Eastern Trading Co. v. Refco, Inc*., 229 F.3d 617, 623 (7th Cir. 2000), *Renovitch v. Kaufman*, 905 F.2d 1040, 1049 (7th Cir. 1990), and *Cenco, Inc. v. Seidman & Seidman*, 686

---

[34] Indeed, Defendants fail to offer any explanation as to what, in Defendants' view, renders Plaintiff's aiding and abetting count deficient. Nor do Defendants ever define a properly pleaded aiding and abetting claim. With no parameters, both Plaintiff and the Court are left to guess what Defendants are arguing.

F.2d 449, 452 (7th Cir. 1982), support judgment on the pleadings, that argument was

convincingly rejected by the Seventh Circuit in *Hefferman v. Bass*, 467 F.3d 596 (7th Cir. 2006):

> Hefferman alleges that Bass aided and abetted St. Pierre in both St. Pierre's breach of fiduciary duties and in St. Pierre's fraud. In the first place, Bass argues that as a matter of law this circuit does not recognize aiding and abetting as a tort, citing *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir.2000), and *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 452–53 (7th Cir.1982). Bass is technically correct but misses the point.
>
> What these opinions say is that aiding and abetting is a theory for holding the person who aids and abets liable for the tort itself; the rejection of aiding and abetting as an independent tort is not the same thing as saying that there is never liability for aiding and abetting. *See Refco*, 229 F.3d at 624 ("Law should be kept as simple as possible. One who aids and abets a fraud is guilty of the tort of fraud (sometimes called deceit); nothing is added by saying that he is guilty of the tort of aiding and abetting as well or instead."); *Cenco*, 686 F.2d at 453 ("Anyone who would be guilty in a criminal proceeding of aiding and abetting a fraud would be liable under tort law as a participant in the fraud, since aider-abettor liability requires participation in the criminal venture."). Furthermore, this is a diversity case, governed by the law of Illinois. *See generally Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). Recent Illinois decisions recognize aiding and abetting liability. Under Illinois law, to state a claim for aiding and abetting, one must allege (1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation. *See Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 799 N.E.2d 756, 767 (2003). To the extent that the question is whether Hefferman adequately alleged that Bass aided and abetted St. Pierre's breach of his fiduciary duty, we look again to Rule 8. Once again, we conclude that the complaint provided sufficient notice to Bass.

*Id.* at 600-01 (finding plaintiff adequately pled defendant aided and abetted another defendant's

breach of fiduciary duty); *see also In re Rest. Dev. Grp., Inc.*, 397 B.R. 891, 898 (Bankr. N.D.

Ill. 2008) (finding trustee adequately pled defendants aided and abetted fraudulent transfers).[35]

---

[35] *In re Glick*, 568 B.R. 634, 676 (Bankr. N.D. Ill. 2017), presents a good counterexample. There, the court found that "[c]ounts XI-XVI" did "not state claims for aiding and abetting fraudulent transfers" "because Counts VII-X do not state fraudulent transfer claims." The equivalent here would be a finding that Plaintiff has not stated claims against Haynes for aiding and abetting Tyler's assault, battery, and IIED torts against J.C. because Plaintiff has not stated assault, battery, and IIED games. *See id.* ("For an 'aiding and abetting' claim to proceed, the underlying conduct aided and abetted must itself be actionable." (citinig *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006); *Eastern Trading Co. v. Refco,*

125

To the extent Defendants are arguing that Count VII is inadequate because it does not identify the state-law torts that Haynes aided and abetted, that argument is patently false. The amended complaint alleges that Tyler committed state-law assault, battery, and IIED against J.C at paragraphs 155 through 160, 161 through 167, and 168 through 174, respectively, and the very first allegation in Count VII *expressly* "re-allege[s] and incorporate[s]" each of those paragraphs into the count. Dkt. 23 ¶¶ 155-60, 161-67, 168-74, 175. The count then proceeds to allege each element of state-law aiding and abetting, as just discussed. *Id.* ¶¶ 176-82.

Finally, to the extent Defendants are arguing that Plaintiff should have divided her state-law aiding and abetting count into three separate counts—one for aiding and abetting Tyler's assault, one for aiding and abetting Tyler's battery, and another for aiding and abetting Tyler's IIED—that would needlessly elevate form over substance and has no basis in law—tellingly, Defendants cite no authority whatsoever in support). Moreover, the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint. *Streckenbach v. Vandensen*, 868 F.3d 594, 596 (7th Cir. 2017) (citing *Johnson v. Shelby*, 574 U.S. 10 (2014)); *see also Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1002 (N.D. Ill. 2017) ("Pleading in counts, although often helpful and permitted by Rule 10(b), is not required; as noted already, it is axiomatic that a plaintiff is not required to plead legal theories at all."). A trial is necessary on the aiding and abetting theories.

III. **A Trial Is Necessary on Plaintiff's Fourteenth Amendment Claim Against Defendant Haynes for Violation of J.C.'s Substantive Due Process Rights**

Defendants spill much ink attacking Plaintiff's Fourteenth Amendment claim against Defendant Haynes for violation of J.C.'s substantive due process rights. Dkt. 321 at 5-12.

---

*Inc.*, 229 F.3d 617, 623 (7th Cir. 2000))). Needless to say, this is not *Glick*; Defendants have never challenged the sufficiency of Plaintiff's assault, battery, and IIED claims against Tyler.

Plaintiff's substantive due process claim, set forth in Count III, alleges among other things that

Haynes, a public schoolteacher acting under color of state law, did as follows:

- Invited Defendant Tyler, a private citizen with no authority to act as J.C.'s parent/guardian, to the school for the express purpose of corporally punishing and abusing J.C., Dkt. 23, Am. Compl. ¶¶ 1, 17-19, 31, 117;
- Helped Tyler get passed school security, given that Tyler was not authorized to act as J.C.'s parent or guardian, and up to Haynes' second-floor classroom, *id.* ¶ 33, 37; *see also* Ex. K, Tyler Dep at 119:10-13;
- Provided Tyler with two leather belts, which Haynes kept in her classroom closet for the purpose of corporally punishing misbehaving students, *id.* ¶ 5, 27, 53;
- Allowed Tyler to take custody of J.C. when J.C. arrived for class, *id.* ¶ 39-41;
- (*After* observing Tyler punch J.C. hard in the mouth multiple times,) led Tyler (with the belts) and J.C. down the hallway to a bathroom that was out-of-order, locked, and empty, *id.* ¶¶ 43, 45-47, 49, 53; Ex. B, J.C.'s Dep at 29:4-32:18 (bathroom locked, empty); Ex. N, Haynes Dep at 169:14-16 (bathroom not in use in Sep. 2018);[36]
- Used a key to unlock and open the bathroom door and let Tyler (with the belts) and J.C. inside, *id.* ¶ 48, 53; Ex. B, J.C. Dep at 29:4-31:17 (Haynes used key to unlock bathroom door, held door open); Ex. N, Haynes Dep at 169:14-16 (admitting unlocked bathroom door); and
- Left Tyler (with the belts) and J.C. alone in the out-of-order bathroom for an extended period of time, during which Tyler struck J.C. some 20-30 times all about the body, causing severe, lasting physical, emotional, and psychological injuries, *id.* ¶ 49, 51, 53-58, 60-61, 83-106.

In short, Plaintiff alleges that Haynes, a state actor, created the conditions necessary for Tyler, a

private actor, to beat J.C. with belts viciously and without interruption. Defendants did not

challenge the adequacy of this claim in their motion to dismiss. *See* Dkt. 26; 2020 WL 1182767

(N.D. Ill. Mar. 12, 2020) (summarizing Board's 12(b)(6) motion). And notably, Defendants

expressly concede in their motion (as they must) that they are "*not* disput[ng] that Count III

pleads a *substantive due process . . . claim*." Dkt. 321 at 8 (emphasis added).[37] What Defendants

now argue rather is that they thought Count III was a "substantive due process '*shocks the

conscience' claim*"—as they call it—and did not know it was a "substantive due process *state-

created danger claim*"—as they call it. Dkt. 321 at 8 (emphasis added). On the basis of this

---

[36] Plaintiff's citations to deposition testimony, in addition to the allegations in the amended complaint, is appropriate here, where the amended complaint was filed in April 2019 (five-and-a-half years ago) and the facts going to Plaintiff's substantive due process claim have evolved during discovery. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery.").

[37] The point is not that they

supposed distinction, Defendants ask the Court to "confirm" that Count III is the former and exclude any evidence relevant to the latter. *Id.* at 5.[38]

But Defendants' entire argument is woefully misguided. For starters, it rests on a made-up legal premise: that the law recognizes a "substantive due process '*shocks the conscience' claim*" as <u>separate and distinct</u> from a "substantive due process *state-created danger claim*."[39] It does not. Any fair reading of relevant Supreme Court and Seventh Circuit jurisprudence paints a clear framework for analyzing substantive due process claims that seek to hold *state actors* liable for harms suffered by a plaintiff at the hands of *private actors*. The general rule, announced by the Supreme Court more than three decades ago in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), is that the Due Process Clause of the Fourteenth Amendment does *not* impose upon the state a duty to protect individuals from harm by private actors. *Id.* at 194-96; *cf. King v. East St. Louis School Dist.*, 496 F.3d 812, 817 (7th Cir. 2007). However, there are two well-established exceptions to the *Deshaney* rule: (1) the "special relationship" exception and (2) the "state-created danger" exception. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chi.*, 988 F.3d 978, 988 (7th Cir. 2021) [hereinafter *Laporta*]; *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009); *King*, 496 F.3d at 817. Under the "special relationship" exception, the state "has an affirmative duty to provide for the safety of a person it has taken into its custody involuntarily." *LaPorta*, 988 F.3d at 988 (citing *Deshaney*, 489 U.S. at 199-200); *Buchanan-Moore*, 570 F.3d at 827; *King*, 496 F.3d at 817. The "state-created danger" exception "applies when the state 'affirmatively places a

---

[38] Notably, Defendants do not identify any evidence they seek to bar in connection with this motion in limine, instead broadly asking the Court to bar "any evidence" related to the claim. Of course, substantial evidence—indeed, nearly all of the evidence in this case—is relevant to more than one of Plaintiff's claims. On this ground alone, Defendants' motion should be denied.

[39] Tellingly, Defendants cite no authority whatsoever in support of their distinction.

particular individual in a position of danger the individual would not otherwise have faced.'" *LaPorta*, 988 F.3d at 988 (quoting *Doe v. Village of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015)); *cf. Buchanan-Moore*, 570 F.3d at 827; *King*, 496 F.3d at 817.

But the Seventh Circuit has long held that no "special relationship" exists between schoolchildren and the state because "the government, acting through local school administrators, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises." *J.O. v. Alton Community Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990) (decided one year after *Deshaney*). For this reason, courts in the Seventh Circuit generally analyze substantive due process claims in which a plaintiff seeks to hold state actors liable for injuries inflicted by private actors under the state-created danger exception to *Deshaney*. *E.g.*, *King*, 496 F.3d at 817-19 (7th Cir. 2007); *Medina as next friend for N.M. v. Izquierdo*, 594 F. Supp. 3d 1045, 1056-57 (N.D. Ill. 2022); *Doe v. Sch. Dist. U-46*, 557 F. Supp. 3d 860, 871-73 (N.D. Ill. 2021); *Black as next friend of J.D. v. Littlejohn*, No. 19 C 2585, 2020 WL 469303, at *4-5 (N.D. Ill. Jan. 28, 2020).

Against this backdrop, any plaintiff who, like Plaintiff here, brings a substantive due process claim seeking to hold a public school administrator or teacher liable for harm inflicted upon a student by a *private* citizen *necessarily* brings a substantive due process claim that is predicated on a state-created danger theory. *See, e.g.*, *Black as next friend of J.D. v. Littlejohn*, No. 19 C 2585, 2020 WL 469303, at *4-5 (N.D. Ill. Jan. 28, 2020) (analyzing substantive due process claim against school administrators and teachers "under the State-created danger theory," appropriately recognizing that the "special relationship" theory did not apply given *A.O.*'s holding that "schools do not have a special relationship with students"). The Supreme Court and Seventh Circuit precedents just discussed dictate that conclusion. Here, therefore, Plaintiff's

substantive due process claim in Count III (which, as noted, Defendants concede was pled) was, as a matter of law, necessarily based on a state-created danger theory.

In other words, Defendants' suggestion (without authority) that Plaintiff's pled a "substantive due process 'shocks the conscience'" theory (because the count references "conduct that shocks the conscience") and *not* a state-created danger theory, Dkt. 321 at 8, 11, is nothing more than an outlandish attempt to suggest that the *third* element of a substantive due process claim predicated on a state-created danger theory constitutes a separate and distinct "claim." Indeed, as Defendants concede, to prevail on a substantive due process claim based on a state-created danger theory, the Seventh Circuit holds that a plaintiff must establish that (1) the state, by its affirmative acts, created or increased a danger to plaintiff; (2) defendants' failure to protect the plaintiff proximately caused the injuries; and (3) defendants' failure to protect the plaintiff "shock[s] the conscience." *King*, 496 F.3d at 818; *cf. LaPorta*, 988 F.3d at 988; *Buchanan-Moore*, 570 F.3d at 827.[40] But *there is no* separate and distinct "shocks the conscience" theory— not to mention separate claim. Tellingly, while Defendants' motion recites the three elements of the state-created danger theory, *they identify no separate elements of their contrived, so-called "shocks the conscience" theory*. Dkt. 321 at 6-10. Defendants' argument fails.

Third, Plaintiff's factual allegations in this case indisputably support each element of a substantive due process claim based on a state-created danger theory. Indeed, Plaintiff adequately pled the first element—that the state (i.e., Haynes), by its affirmative acts, created or

---

[40] While true that many cases involving substantive due process claims discuss the "shocks the conscience" element at length, that is because it is often the element upon which liability turns. *See, e.g.*, *King*, 496 F.3d at 818-19; *Black as next friend of J.D. v. Littlejohn*, No. 19 C 2585, 2020 WL 469303, at *4-5 (N.D. Ill. Jan. 28, 2020) (denying 12(b)(6) dismissal of substantive due process claim brought on behalf of student, finding claim necessarily proceeded on state-created danger theory rather than special relationship theory in light of *A.O.*, that plaintiff alleged sufficient facts, and further rejecting defendants' argument that the alleged misconduct did not "shock the conscience"); *see also Lewis v. County of Sacramento*, 118 S.Ct. 1708 (1998) (defining the "shocks the conscience" standard).

increased a danger to J.C.—when she alleged that Haynes, acting under color of state law, invited Tyler, a known convicted batterer, to school to corporally punish J.C., helped Tyler gain entry to the school, provided Tyler with two leather belts used to discipline misbehaving students, placed J.C. in Tyler's custody, led Tyler and J.C. to a school bathroom that was empty, used a school key to open the bathroom door and let Tyler (with the belts) and J.C. in, and left Tyler (with the belts) and J.C. alone in the bathroom for an extended period of time during which Tyler struck J.C. repeatedly, some 20-30 times, all about the body, causing severe, lasting physical, psychological, and emotional injuries. Dkt. 23 ¶¶ 1, 5, 17-19, 27, 31, 33, 37, 39-41, 43, 45-49, 51, 53-58, 60-61, 83-106, 117, 119; Ex. K, Tyler Dep at 119:10-13; Ex. B, J.C.'s Dep at 29:4-32:18; Ex. N, Haynes Dep at 169:14-16. Plaintiff pled the second element—that Haynes' failure to protect J.C. proximately caused J.C.'s injuries—when she alleged that "[t]he beating that Ms. Haynes solicited, invited, arranged, facilitated and actively assisted in caused J.C. immediate, severe, and lasting emotional and psychological distress and injury," Dkt. 23 ¶ 83, in addition to all of the allegations cited immediately above. Finally, Plaintiff explicitly pled the third element—that Haynes' failure to protect J.C. "shocks the conscience." Dkt. 23 ¶ 151 ("Haynes' abuse and neglect of JC was so malfeasant that it shocks the conscience and violates his constitutional rights."). In sum, the amended complaint not only pleads a substantive due process claim generally, but it pleads a state-created danger theory specifically.

In a last-ditch effort to escape this conclusion, Defendants contend that Plaintiff did not plead a state-created danger theory because "[t]here is no mention of the words 'state-created' or 'danger'" in the amended complaint. Dkt. 321 at 8-9. But the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint. *Streckenbach v. Vandensen*, 868 F.3d 594, 596 (7th Cir. 2017) (citing *Johnson v. Shelby*, 574 U.S. 10 (2014)); *Jajeh v. Cty. of*

131

*Cook*, 678 F.3d 560, 567 (7th Cir. 2012) (finding hostile work environment claim pleaded where complaint never used that term); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery."); *see also Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1002 (N.D. Ill. 2017) ("Pleading in counts, although often helpful and permitted by Rule 10(b), is not required; as noted already, it is axiomatic that a plaintiff is not required to plead legal theories at all."). A trial is necessary on the state-created danger theory.[41]

Seemingly recognizing the folly of their position, Defendants ask this Court in the alternative for a grant of judgment on the pleadings as to Plaintiff's "theory of state-created danger." Dkt. 321 at 10-11. Relying entirely on *J.O. v. Alton Community Unit School Dist.* 11, 909 F.2d 267, 272 (7th Cir. 1990),[42] Defendants argue that "[t]he Seventh Circuit recognizes that a state-created danger claim is not an appropriate cause of action for conduct within the school walls." Dkt. 321 at 11. Defendants are mistaken. *J.O.* says no such thing. Indeed, plaintiff in *J.O.* proceeded under the "special relationship" exception to *Deshaney*—not the "state-created danger" exception. *See J.O.*, 909 F.2d at 272. As already discussed above, the Seventh Circuit held that no special relationship exists between schoolchildren and the state because "the government, acting through local school administrators, has not rendered its schoolchildren so

---

[41] Defendants further argue in a paragraph that they "never provided any express or implied consent to proceed to trial on any unpled claim" under Federal Rule of Civil Procedure 15(b)(2). Dkt. 321 at 10. But Plaintiff does not require Defendants' consent to proceed to trial under Rule 15(b)(2) because Plaintiff adequately pled her substantive due process claim generally—and state-created danger theory specifically—in the amended complaint, for all of the reasons already discussed. *See supra*. Indeed, it is the claim the parties have been litigating throughout this case.

[42] Plaintiff has already discussed this case above in defining the two exceptions to the *Deshaney* rule—the "special relationship" exception and the "state-created danger" exception. *Supra*. As noted, *J.O.* concerned the former exception, not the latter. *Id.*

helpless that an affirmative constitutional duty to protect arises." *Id.* Defendants' argument fails. Their motion should be denied.

### IV.     Defendants' Conclusory Arguments Are Forfeited

Defendants state in two sentences of their motion that "Plaintiff claims through the parties [sic] joint pretrial order that she . . . . pled . . . an excessive force claim against Defendant Juanita Tyler." Dkt. 321 at 10. But Plaintiff did no such thing, and Defendants fail to identify the purported language. Because their argument is not developed in a way that permits a response, it is forfeited. *See Smith*, 388 F.3d at 569; *Otto*, 134 F.3d at 854.

Similarly, in a cryptic sentence, Defendants observe that "while Plaintiff's amended complaint alleges an excessive force claim against Kristen Haynes, nowhere in the complaint do the words 'seizure' or 'seized' appear in relation to the allegations against Haynes." It is unclear what relevant this observation has to do with Defendants' motion, but to the extent Defendants are attacking Plaintiff's excessive force claim against Haynes, that argument, too, is not developed in a way that allows a response and is therefore forfeited. *See Smith*, 388 F.3d at 569; *Otto*, 134 F.3d at 854.

### V.     Plaintiff's Failure to Intervene Claim

Plaintiff is currently evaluating whether she has a basis in case law for seeking leave to amend at this stage to cure any defect in her failure to intervene claim.

For all of the foregoing reasons, the Court should deny Defendants' MIL 8.

### <u>PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE #9</u>

#### Introduction

Defendants' motion in limine 9 seeks purely arbitrary time limits based only on the length of defendants' criminal trial in which there were only 2 charges, far fewer legal issues, a

far narrower scope of evidence, and no damages case. Upon closer inspection of the parties' proposed witnesses and exhibits, defendants' argument does not hold up and is a veiled attempt to prevent plaintiff from being able to present the evidence necessary to prove her case. Plaintiff has already streamlined her proof and would be severely unfairly prejudiced by the imposition of time limits, a chess clock, and/or equal time. No such limits are appropriate at this time in this case.

Trial management decisions are of course within the trial judge's discretion. "But that discretion can be abused." *U.S. v. Warner*, 506 F. 3d 517, 521 (7th Cir. 2007). The Seventh Circuit has repeatedly warned against "rigid hour limits" that engender an unhealthy preoccupation with the clock and prevent "a particularized judgment" about the appropriate length of civil trials. *United States v. Vest*, 116 F.3d 1179, 1187 (7th Cir. 1997). Plaintiff's witnesses should not be excluded on the basis of mere numbers, whether days or hours. *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1171 (7th Cir. 1983).

In this case, the imposition of time limits, especially defendants' proposed time limits, would result in severe prejudice to the substantial rights of plaintiff. *Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1172 (7th Cir. 1983). Moreover, at least in the Northern District of Illinois, given its rigidity the imposition of a chess clock is an extreme measure that is only rarely appropriate or necessary. *McDaniel v. Loyola University Medical Center*, 2019 WL 1281969, *24, note 1 (N.D.Ill. March 20, 2019) (court threatened to impose chess clock for trial because the parties, in a simple employment discrimination case, abused the summary judgment process by the size of their filings).[43] No comparable abuse of any kind has occurred in this case and, thus, a chess clock is completely unwarranted.

---

[43] Plaintiff's search yielded only one case from this District in which the Court threatened to impose a chess clock for trial and no cases in which the Court actually did so. In *McDaniel*, plaintiff's LR 56.1

**The Scope of Evidence Necessary to Prove Defendants' Criminal Charges was Far Narrower**

In their motion, defendants argue that the measure of reasonable length for plaintiff's civil trial is the length of 1) the incident and 2) defendants' criminal trial. (Motion at 2, 4). Defendants' first argument is a *non-sequitur*: the duration of the event that produced the injury is never a measure of how long a trial takes. For example, the trial in an unjustified, police shooting case may take days or weeks although it took mere seconds for the officer to injure or kill the plaintiff. To state the obvious, there are many surrounding facts and circumstances, both preceding and following the event, that shed light on what occurred in those few seconds.

Defendants' second argument misrepresents the evidence in this case by assuming that plaintiff has the same case to prove here as the State's Attorney's Office did in the criminal trial. This is a vast oversimplification and a false equivalency. There are multiple reasons why defendants' argument is inaccurate.

First, plaintiff has far more claims than the mere two charges against defendants that were tried in the criminal case. Plaintiff goes to trial with 7-13 counts (depending on whether the aiding and abetting and conspiracy claims are each regarded as one or three claims (i.e., three each if viewed as corresponding to the three underlying torts (i.e., assault, battery, and intentional infliction of emotional distress))). Here, plaintiff has very different and more complex claims than simple battery and child endangerment.

This means, second, that several of plaintiff's claims have elements that require the presentation of evidence that the criminal charges did not. For example, plaintiff's substantive due process claim requires plaintiff to present evidence either that Haynes's overall course of

---

statement was 141 pages long with 692 paragraphs of fact while defendants' response was 290 pages and contained objections to nearly every paragraph. (Id.).

conduct either created the danger (exposure to Tyler) that led to JC's beating or shocks the conscience. This requires much more evidence than simply proving that Haynes touched JC and/or left him alone with Tyler. As other examples, plaintiff's aiding and abetting and civil conspiracy claims also require plaintiff to present evidence of 1) Haynes's overall course of conduct in "substantially assisting" Tyler and 2) both women's common purpose and overt acts. Both claims require more circumstantial evidence than a simple battery, and, certainly, they require different and more nuanced evidence of assistance and/or the unfolding of a plan through time. Moreover, each aiding and abetting and conspiracy count against each defendant also requires plaintiff to present evidence of the underlying tort as well as the elements of aiding and abetting and civil conspiracy. Furthermore, in this case defendant Board contests plaintiff's *respondeat superior* claim, so plaintiff must also present evidence that Haynes was acting within the scope of her employment when she arranged and participated in JC's beating at school.

Third, totally unlike in the criminal case, both plaintiff and defendants have a complex damages case to present. JC, who was twice hospitalized following the incident and underwent numerous assessments and some counseling, has had multiple medical and/or psychiatric treaters. In an effort to be efficient, plaintiff listed only two of them on her will-call list, deferring three others to her may-call list. (FPTO, 11-12, 13-14, 17). JC also had counseling at school with Brian Apollo and others, which may become relevant as rebuttal evidence. Both plaintiff and defendants have mental health expert witnesses who will likely present opinions about JC's diagnoses or lack thereof, causation, treatment, and prognosis. (See plaintiff's response to defendants' MIL 5 and plaintiff's MIL 14). Additionally, each of plaintiff's family members listed on plaintiff's witness lists (i.e., JC's mother Asia Gaines, JC's sister NC, JC's aunt Tiara Taylor, and JC's father Joseph Champ) has some knowledge of how JC has been affected, as

136

well as of the incident itself, the aftermath events, and statements that the parties have made about the incident. (FPTO at 8-9, 12).

Fourth, defendants do not mention that numerous key witnesses did not even testify at their criminal trial, including the defendants Haynes and Tyler themselves. Moreover, not only does Tyler plan to testify at the civil trial, but, if the Court allows her to wholly relitigate the factual/liability issue of whether she beat JC with belts in the boys bathroom (instead of barring such evidence based on the collateral estoppel effect of her battery conviction and instructing the jury that the conviction is dispositive on that factual issue), then plaintiff's cross examination, impeachment and rebuttal evidence relative to Tyler will necessarily be significantly greater. Moreover, as Tyler's deposition transcripts show, getting her to cooperate to answer basic questions in a concise manner rather than talking about subjects that have nothing to do with the examination is difficult and time-consuming. (Exhibit K). Her own attorneys had difficulty managing her and her temper. (Id.).

Fifth, several highly relevant witnesses were not called to testify at defendants' criminal trial. This includes other students who heard and/or saw some of the events of 9/20/18 and who heard Haynes threaten to discipline her students with her two belts on prior dates. (FPTO, 10-11, 18-19). None of these witnesses were called at defendants' criminal trial. In addition, as elaborated below no witnesses were called regarding the findings of CPS' internal investigation or the Board's dismissal changes against Haynes. Little to no evidence of Board policies was presented or elicited. At the criminal trial, the testimony of medical witnesses was largely limited to statements that JC made.

Sixth, the practical reality that defendants leave unspoken is that defendants' criminal and civil defense was/is based on a very small number of witnesses, such that *only plaintiff* would

suffer prejudice from time restrictions and/or the equal apportionment of trial time. (FTPO, at 28-31). Even so, defendants will present defenses in this case that they did not present at the criminal trial. For example, in light of the criminal trial judge's comment in her verdict that JC's testimony about being beaten by Tyler in the bathroom was "unimpeached," defendants now plan to argue that plaintiff's mother fabricated JC's allegations for money and/or that JC's mother and/or other family members caused the injuries visible on JC's body on 9/20/18. (FPTO, at 5). Accordingly, if plaintiff's request for proposed jury instruction #48 is not approved or if defendants continue to refuse a stipulation, then plaintiff must be able to rebut defendants' charge with testimony regarding how JC's verdict proceeds are required by law to be handled, including that they are for JC alone and that his mother or other family members would not have access to them. (FPTO, Exhibit E, at 77; FPTO, at 22).

Seventh, defendants simply ignore relevant evidence that has only become available since the criminal trial ended and that all parties, including defendants, want to use for impeachment. For example, the depositions in this case were not even commenced until after the criminal trial ended (due to a stay on discovery imposed by Judge Lee in 2019). Similarly, no testimony was taken in the Board's dismissal proceeding against Haynes until after the criminal trial ended. The parties also now have the criminal trial testimony of the principal witnesses; during the criminal trial, no transcript of any prior testimony was available to the attorneys for potential impeachment. Defendants do plan to impeach JC with his prior statements from these and other proceedings in which he has testified or been interviewed. In short, a mass of impeachment evidence is available now while almost none was available at the criminal trial in 2020.

In sum, in the civil case plaintiff is required to prove everything that was proven in the civil trial and much, much more. This case is far more complex than cases in which the Court

limited the parties to 15 hours each of argument and testimony. *Enright v. Auto-owners Insurance Company*, 2 F. Supp. 2d 1072, *1073 (N.D. Ind. March 12, 1998) ("The entire case stems from a house fire" at plaintiff's residence and from the insurer's denial of coverage based on suspected arson by plaintiff). Unlike this case, the only triable issue in *Enright* was the cause of the fire. (Id. at 1076).

### Plaintiff Has Indeed Streamlined Her Selection and Presentation of Evidence

Defendants' motion also falsely suggest plaintiff seeks a long trial or is unwilling or unable manage the evidence efficiently. (Motion at 3). That is untrue. On the contrary, plaintiff has streamlined and continues to seek to streamline the evidence for trial, even in the face of defendants' resistance. In May, 2023, plaintiff voluntarily dismissed her *Monell* claim and, despite defendants' misrepresentations to the contrary, will not be seeking to present any evidence that is relevant only to that claim. (See plaintiff's response to MIL 3). Additionally, during the FPTO process, plaintiff sought, to no avail to date, to withdraw witnesses in exchange for stipulations with defendants regarding the substance of Board policies. (FPTO, at 16, notes 15 and 16).

To be specific, plaintiff actually has a limited amount of witness testimony to present to the jury, and defendants' arguments about the number of plaintiff's witnesses and exhibits are highly misleading and inaccurate. (Motion at 3). First, the fact is that many of plaintiff's will-call and may-call witnesses (if called at all) will be relatively brief compared with the few, principal witnesses because their knowledge is relatively limited; this includes principal Hodge, officer Warda, security guard Starks, PNP Young, Dr. Richter, and Kelly Tarrant. (FTPO, at 8-22). This also includes the minor witnesses KB, SC, KKB, JL, and RL. (Id. at 10-11). Indeed, all of the minor witnesses, including those on plaintiff's may-call list (i.e., Jai Pierre Little, Kristen

139

Atkins, Koby Bryant, and Keishaunna Brown), have a comparatively brief or concise knowledge of events and statements, and plaintiff will only call a small number of them; more than are necessary are listed only in the event that some are unavailable (- see plaintiff's response to defendants' MIL 2). (FPTO, 10-11, 17-19).

Furthermore, many of plaintiff's may-call witnesses, including police officers, are listed as "backup" witnesses that plaintiff would likely only call in the event that plaintiff's "first choice" officer is unavailable. (FPTO, at 9, 12-14). Similarly, Gutierrez is listed primarily as a backup to Richter. (Id. at 13). As another example, plaintiff would strive to call one witness regarding CPS's investigative report of the incident (either Mahone or Finley); only in the event he/she proves unavailable (as one resides in AR and the other evaded service during discovery) or plaintiff needs both witnesses to establish the foundation to admit the report and elicit testimony about its findings and statements it contains would plaintiff call the second witness. (FPTO, 9-10). As another time-saving measure, plaintiff seeks to designate the testimony of Mahone, who resides in AR, in the event he is unable to testify in person or *via* video conference. Finally, plaintiff listed and would likely only call certain witnesses, including Appollo, Holiday, Dockery and Lang, to rebut specific testimony or evidence that is raised by defendants. (FPTO, 15-17).

While both parties' exhibit lists are long, the vast majority of plaintiff's proposed exhibits would be used to refresh recollection, impeach witnesses and/or rebut defense testimony or argument. (FPTO, Exhibits A and B). Many of plaintiff's proposed exhibits are transcripts listed for impeachment purposes. (Exhibit A, Plaintiffs' proposed exhibits 94-156). Many others are concise demonstrative exhibits. (Exhibit A, 172-197).

Plaintiff will continue to make every effort to be efficient and concise in the choices and presentation of evidence and argument. Plaintiff's estimate of 10-15 trial days includes *voir dire* as well as opening, closing, defense motions for directed verdict, attorney conferences, and sidebars. Plaintiff notes that defendants estimate eight (8) business days for trial and, at the same time, request a chess clock of four (4) business days. (FPTO, at 33). Defendants' eight-day estimate undermines their argument that the case can be tried in four days. (FPTO, at 33).

Finally, however, in the event that the Court sets limits on the number trial days and apportions them among the parties, then plaintiff respectfully submits that the guiding star for the Court's decision on apportionment should be the facts that it is plaintiff who 1) based on the evidence in this case, has more witnesses to present to prove his claims than the defendants have in order to establish their defenses and 2) bears the burden of proof. *James v. Milwaukee Board of School Directors*, 2006 WL 839161, *2 (E.D.Wis., March 28, 2006)("Because the plaintiffs bear the burden of proof, they will have nine trial days to present their case-in-chief, and the [three] defendants will have six days to present their defense"); (FPTO at 32).

Accordingly, the Court should deny defendants' motion in limine #9.

Respectfully submitted,


s/Al Hofeld, Jr.
Al Hofeld, Jr.

141

Al Hofeld, Jr.
Zachary J. Hofeld
LAW OFFICES OF AL HOFELD, JR., LLC
53 West Jackson Boulevard, Suite #432
Chicago, Illinois 60604
(773) 241-5844
Fax - 312-988-0057
al@alhofeldlaw.com
zach@alhofeldlaw.com

### <u>NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS</u>

I, Al Hofeld Jr., attorney for plaintiffs, hereby certify that on December 8, 2023, filing and service of the foregoing ***Plaintiff's Responses to Defendants' Motions in <u>Limine</u>*** was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

<u>/s/ Al Hofeld, Jr.</u>
Al Hofeld, Jr.

Al Hofeld, Jr.
Zachary J. Hofeld
LAW OFFICES OF AL HOFELD, JR., LLC
53 West Jackson Boulevard, Suite #432
Chicago, Illinois 60604
(773) 241-5844
Fax - 312-988-0057
al@alhofeldlaw.com

142