IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Asia Gaines, for herself and )
as next best friend of her )
minor child, "JC," )
  )
      Plaintiff, )
  )
  )
  v. )  No. 19 C 775
  )
  )
The Chicago Board of )
Education, Kristen A. Haynes, )
and Juanita Tyler, )
  )
      Defendants. )

<u>Memorandum Opinion and Order</u>

    Before me are the parties' motions *in limine*, which I resolve as set forth below.

**I. Plaintiff's Motions**

**Plaintiff's Motion *in Limine* No. 1**

    Plaintiff Asia Gaines moves to bar any argument, testimony, evidence, reference, or suggestion that defendant Juanita Tyler did not strike JC repeatedly in a washroom at his school on September 20, 2018 with one or more belts which she had obtained from defendant Kristen Haynes. The motion is granted in part and denied in part.

    After a bench trial in Illinois state court, Tyler was found guilty of domestic battery of JC. *See People v. Tyler*, 18 DV 80766

(Ill. Cir. Ct.). That conviction was affirmed by a state appellate court. *People v. Tyler*, 2023 IL App (1st) 210450-U. Plaintiff thus argues that defendants should be barred from relitigating the underlying facts based on the doctrine of collateral estoppel, also known as issue preclusion.

Because the prior decision comes from an Illinois state court, Illinois law of issue preclusion controls. *See Creation Supply, Inc. v. Selective Ins. Co. of the Se.*, 51 F.4th 759, 763 (7th Cir. 2022). Under Illinois law, the "minimum threshold requirements" for application of issue preclusion are: "(1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Gumma v. White*, 833 N.E.2d 834, 843 (Ill. 2005) (citations omitted). Plaintiff bears the burden of demonstrating that these factors are met. *Givens v. City of Chicago*, --- N.E.3d ---, 2023 WL 6886085, at *11 (Ill. Oct. 19, 2023).

Plaintiff's motion sweeps too broadly by seeking to bar "any" argument regarding Tyler striking JC, since that would estop defendant Chicago Board of Education ("the Board") from so arguing, even though the Board was not a party to the underlying criminal case and was not in privity with Tyler. In other words, the third element of issue preclusion is unmet as to the Board. Additionally,

though Haynes was a codefendant in the criminal proceeding, plaintiff makes no suggestion that she actually litigated the issue of Tyler's battering of JC, as required for issue preclusion. *Am. Fam. Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000) (citation omitted). And in any event, Haynes was acquitted. Finally, though true that issue preclusion may apply to inferences drawn from verdicts where such findings are necessarily implied by the verdict, it was not necessarily implied by the verdict that Tyler obtained the belt she used to beat JC from Haynes, even if there was evidence presented during the criminal trial to support that conclusion. Thus, issue preclusion is unavailable as to whether Tyler obtained the belt from Haynes.

That means plaintiff has satisfied the threshold requirements for issue preclusion only as to Tyler, and only as to the facts that Tyler struck JC repeatedly in a washroom at his school on September 20, 2018 with one or more belts. But that is not the end of the inquiry. Even where the basic requirements of issue preclusion are satisfied, as an equitable doctrine its application is inappropriate if it will cause unfairness. *Id.*

Defendants argue that prohibiting Tyler from litigating these facts would prejudice the Board and Haynes, and would confuse the jury. Specifically, they argue that instructing the jury that they must find as to Tyler that she struck JC with a belt in the school bathroom, while permitting the other defendants to argue to the

3

contrary, could result in jury confusion. *See* 4/10/2018 Tr., *Phillips v. City of Chicago*, No. 14 C 9372 (N.D. Ill.), ECF 170 (denying motion *in limine* premised on issue preclusion in part because the judge was "in a fog about how we would instruct the jury. This issue has been decided with respect to Defendants X and Y but not with respect to Defendant Z, and the evidence is the same."); *Taylor v. City of Chicago*, No. 14 C 737, 2021 WL 4401528, at *6 (N.D. Ill. Sept. 27, 2021) (reaching a similar conclusion as that reached in *Phillips*, on a motion for partial summary judgment premised on issue preclusion).

There are, however, features of this case that distinguish it from *Phillips* and *Taylor*. The prior proceedings here consisted of a criminal trial and appeal, in which Tyler was convicted by proof beyond a reasonable doubt, whereas the prior cases in *Phillips* and *Taylor* were civil, where a preponderance of the evidence standard governed. Were I to deny plaintiff's motion on grounds of unfairness and potential juror confusion, it would permit Tyler to argue the facts already decided against her anew and could lead to the anomalous result that, though Tyler was previously found beyond a reasonable doubt to have committed the relevant acts, for purposes of this trial she could be found not to have committed them simply by a preponderance of the evidence. Such a result would stir up significant federalism concerns, since Tyler's criminal

conviction was in Illinois state court. In contrast, the prior proceedings in *Phillips* and *Taylor* took place in federal court.

Nor will holding Tyler to her conviction unduly prejudice her codefendants. For Haynes to be liable for the acts committed by Tyler, plaintiff must prove additional facts to show that she aided and abetted Tyler or conspired with her to commit them. And for the Board to be liable, Haynes must be found liable.

In sum, Tyler has already had her day in court on these issues, and she is not entitled to a do-over simply because her codefendants might want to try their hand at arguing those issues. Given the problems relitigation would pose, I grant the motion in part as to Tyler on the following issues: that Tyler struck JC repeatedly in a bathroom at his school on September 20, 2018 with one or more belts. The motion is otherwise denied.

**Plaintiff's Motion *in Limine* No. 2**

Plaintiff moves to bar any evidence that Haynes was found not guilty of battery and child endangerment. The motion is granted.

Defendants argue that this request is inconsistent with plaintiff's request in her first motion *in limine*, since, in defendants' view, if portions of the criminal proceeding establishing that Tyler committed certain acts control in this litigation, then so too should those aspects of the criminal proceeding in which Haynes was *not* found to have committed certain acts. Defendants are mistaken. Courts have long understood the

peculiar position that acquittal in a prior criminal proceeding inhabits: "Evidence of acquittal in a criminal action is generally irrelevant and inadmissible in a civil case involving the same incident since it constitutes a negative sort of conclusion lodged in a finding of failure of the prosecution to sustain the burden of proof beyond a reasonable doubt." *Est. of Moreland v. Dieter*, 395 F.3d 747, 755 (7th Cir. 2005) (citations and internal quotation marks omitted). While Tyler was found to have committed certain acts beyond a reasonable doubt, Haynes was simply not found to have committed certain acts beyond a reasonable doubt. Haynes was not, as defendants' argument would suggest, affirmatively found *not* to have committed certain acts beyond a reasonable doubt, or even by a preponderance of the evidence.

**Plaintiff's Motion *in Limine* No. 3**

Plaintiff moves to bar all testimony, argument, and innuendo that JC's physical injuries from September 20, 2018 were caused by his mother, father, or any other relative or person (besides Tyler). The motion is granted.

The fate of this motion is tied to my disposition of plaintiff's first motion *in limine*, since defendants claim that their purpose in introducing this evidence would be to argue that Tyler did not beat JC on September 20, 2018, and that his physical injuries from that date are from other incidents unrelated to defendants. Since it will be established that Tyler in fact beat

JC with belts on September 20, 2018, it is difficult to see what permissible purpose this evidence satisfies.

The motion can be granted on other grounds, too. The testimony at issue was given by Tyler at her deposition. Tyler testified that Mona--one of JC's great aunts--had beaten JC in the past, including in Tyler's presence. *See, e.g.*, Tyler Dep. at 58:20–59:11, 108:20–109:1, 187:5–188:15, 273:5–275:22, ECF 323-12. She also testified that Gaines was sometimes present for these beatings, and that Gaines brought JC to Mona specifically so that Mona could beat him. *See, e.g.*, *id.* at 60:1–5, 275:15–276:3. In defendants' view, this testimony, coupled with Tyler's additional testimony that Mona had at least some contact with JC in 2018, *see id.* at 62:16–23 (testifying that Mona sent JC to bible study in the summer of 2018), could suggest an alternative source of JC's physical injuries from September 20, 2018. Furthermore, Tyler testified generally that Gaines herself sometimes beat JC, *id.* at 273:5–20, and specifically that "after court"--presumably following a court appearance in the state criminal proceeding--Gaines followed Tyler to a store where Gaines admitted to Tyler that she "whooped" her own son, and that she was glad she "got [Tyler] on the news." *Id.* at 312:8–314:23.

Defendants point to nothing in Tyler's testimony, however, suggesting that Mona, Gaines, or anyone else beat JC on September 20, 2018, or shortly before. Indeed, in Tyler's testimony about

the exchange in which Gaines admitted that she herself beat JC, Tyler states that Gaines did not specify when she beat JC. *Id.* at 314:19-23. To the extent that defendants seek to admit this testimony for the purpose of showing that, because Mona or Gaines may have physically disciplined JC in the past, it is possible they did so around the September 20, 2018 incident, it is inadmissible character evidence intended to establish propensity. Fed. R. Evid. 404(b). Beyond that, the testimony is woefully speculative as to the question of whether Mona or Gaines beat JC on or just before the relevant date; Tyler's testimony is general and does not specify timeframes. Any probative value the testimony might have is substantially outweighed by a danger to unfair prejudice to plaintiff and the possibility of misleading the jury.

**Plaintiff's Motion *in Limine* No. 4**

Plaintiff moves to bar all testimony, argument, and innuendo that JC's mother, father, or any other relative disciplined JC through physical means. The motion is granted.

Defendants respond to this motion by characterizing it as "more of the same" as plaintiff's third motion *in limine*. Def. Resp. at 3, ECF 336. They assert that such evidence would be introduced to show that JC could have been beaten by another person around September 20, 2018. Accordingly, this evidence is excluded for the same reasons given in connection with plaintiff's third motion *in limine*.

**Plaintiff's Motion** *in Limine* **No. 5**

Plaintiff moves to bar all evidence and testimony that Gaines and Joseph Champ failed to intervene or report Mona Tyler's alleged physical abuse of JC in the distant past to Illinois Department of Children & Family Services ("DCFS") and/or the police. The motion is granted for the reasons given in connection with the preceding two motions, and for the additional reason that such evidence would be irrelevant to the claims in this case.

**Plaintiff's Motion** *in Limine* **No. 6**

Plaintiff moves to bar all examination and testimony regarding JC's mother's and/or father's and/or immediate family members' criminal background histories, including but not limited to arrests, charges, and convictions. The motion is granted.

Because I have granted plaintiff's motion to collaterally estop Tyler from relitigating certain facts established in the state criminal proceedings, defendants seek to admit some of Gaines' prior convictions and arrests, including: (1) two October 12, 2011 convictions for domestic battery and (2) four arrests for domestic battery. Defendants do not develop any arguments in response to plaintiff's motion, however, so any such arguments are waived. *See Martin v. City of Chicago*, No. 15-cv-04576, 2017 WL 2908770, at *9 (N.D. Ill. July 7, 2017) (finding waiver where response to motion *in limine* objected "but cite[d] no reason or authority" for the objection (citing *M.G. Skinner & Assocs. Ins.*

*Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017))).

**Plaintiff's Motion *in Limine* No. 7**

Plaintiff moves to bar all testimony, argument, and innuendo regarding JC's mother and/or father having sex, having children at young ages, having children out of wedlock, having children with other spouses, using drugs, being "irresponsible" or "bad parents," and whether they lived together and for how long. The motion is granted in part and denied in part.

Defendants do not oppose excluding evidence about either of JC's parents having sex, so that part of the motion is granted, but defendants oppose the remainder of the motion.

Central to plaintiff's case is the issue of the alleged emotional and psychological harm JC suffered due to the events on September 20, 2018. The causes of psychological harm are undoubtedly complex, and some of the evidence plaintiff wants to exclude may be relevant to determining those causes here. Indeed, consistent with my ruling on plaintiff's fourteenth motion *in limine* below, defendants' expert expects to opine that some of these circumstances of JC's upbringing contributed to his mental health problems. This evidence is not impermissible character evidence because it is not being offered to establish any particular propensity of Gaines or Champ; it is offered to explain defendants' theory of how JC came to have certain mental health

problems. Thus, other than the portion identified above, the motion is denied.

Defendants will only be allowed to introduce this sort of evidence to the extent it is relevant to Dr. McNaught's expert opinions. Otherwise, its probative value is likely outweighed by its potential for unfair prejudice.

**Plaintiff's Motion *in Limine* No. 8**

Plaintiff moves to bar all reference to and testimony regarding Gaines' employment status since 2019, including whether she has been unemployed at any time since then or for how long. The motion is granted.

Defendants argue that this evidence is probative of Gaines' motive in filing this suit and seeking a judgment of over one million dollars. It is permissible for defendants to argue that Gaines' motivation in bringing this suit is pecuniary. *See, e.g.*, *Patterson v. City of Chicago*, No. 15-cv-4139, 2017 WL 770991, at *12 (N.D. Ill. Feb. 28, 2017) ("Defendants may argue that [plaintiff] is lying because there is a pecuniary motivation to do so." (citing orders from other cases)). But defendants can make this argument without bringing in evidence of Gaines' employment status. The probative value of that evidence to support the obvious point that one might bring a lawsuit for money is outweighed by the risk that the evidence will unfairly prejudice Gaines in the eyes of the jury. *See Brooks v. City of Chicago*, No. 13-cv-03090,

2015 WL 3545386, at *5 (N.D. Ill. June 5, 2015) (allowing argument that plaintiff was motivated to bring suit "by financial need and a desire to obtain money," but excluding evidence regarding details of plaintiff's financial condition under Rule 403).

**Plaintiff's Motion *in Limine* No. 9**

Plaintiff moves to bar any evidence that Gaines' and Joseph Champ's children, including JC, slept in the same bed with them. The motion is unopposed and is granted.

**Plaintiff's Motion *in Limine* No. 10**

Plaintiff moves to bar all evidence relating to JC's school behavioral incidents and disciplinary history prior to September 20, 2018, and to bar evidence relating to certain incidents after that date. The motion is granted in part and denied in part.

**A.**

Incidents prior to September 20, 2018 are relevant to the issue of causation and damages.[1] As discussed above, a central component of plaintiff's suit is the claim that JC suffered psychologically and emotionally from the events of September 20,

---

[1] Plaintiff's motion focuses on the inappropriateness of such evidence when it comes to whether Haynes' actions on September 20, 2018 were reasonable. Since defendants offer an entirely different basis for introducing this evidence and do not oppose the motion for purposes of showing whether Haynes' actions were reasonable, the motion is granted on those grounds. Defendants will not be allowed to introduce evidence of JC's pre-September behavior for the purpose of arguing that Haynes' actions were reasonable. An appropriate limiting instruction will be provided to the jury.

2018. If plaintiff wants to present evidence to the jury that JC's behavior, demeanor, and mental health changed based on the beating, then defendants are entitled to present evidence suggesting that these claimed problems existed prior to the incident too, or that there was a smaller change in these aspects of JC's life after the incident than plaintiff claims. Indeed, plaintiff explicitly argues that post-September 20, 2018 incidents "are relevant to proving plaintiff's damages in the form of exacerbated ADHD, PTSD, new Depression and new Anxiety--in other words, that JC's mental health overall was dramatically worse as a result of the incident." Pl. Mot. at 37-38, ECF 323. To determine whether there was a change in JC's mental health, the jury should be allowed to hear about the pre-incident "status quo." In short, this evidence is probative of the cause and extent of JC's claimed psychological harm, and it is not unfairly prejudicial. Additionally, in light of this non-propensity purpose, and the fact that this evidence is not proposed to prove JC's truthfulness or untruthfulness, Rules 404(b)(1) and 608 pose no bar to its introduction.

Plaintiff alternatively argues, in the event defendants are allowed to introduce some pre-September 20, 2018 evidence of JC's behavior in school, then plaintiff should be allowed to introduce additional pre-September 20, 2018 incidents in order to "(1) explain the ADHD-basis for [JC's] misbehaviors and (2) to show that Haynes and other school personnel failed to intervene and

13

provide the educational accommodations and supports JC desperately needed, which led to his behavior in September, 2018." Pl. Mot. at 29, ECF 323. To the extent plaintiff wants to introduce additional pre-September 2018 incidents to paint a fuller picture for the jury to compare pre- and post-incident behavior--or for another appropriate purpose--they may do so subject to specific objections at trial. But since plaintiff voluntarily dismissed her *Monell* claim, there is no longer any claim in this case that any defendant failed to intervene to address JC's behavioral issues, or that doing so could have prevented the events of September 20, 2018, so no evidence may be introduced for that purpose.

**B.**

The parties agree that at least some post-September 20, 2018 incident reports about JC's behavior should be allowed in, but plaintiff seeks to bar the introduction of several incidents as unfairly prejudicial pursuant to Rule 403. These incidents are as follows:

> 1. 10/4/2018 - JC "was not following directions refusing to listen to staff running around messing with other students."
>
> 2. 10/4/2018 - JC "was given directions and told staff 'he didn't have to listen to what anyone said and he could do what he wanted.'"
>
> 3. 10/4/2018 - JC "was throwing rocks at other students on the playground."
>
> 4. 10/4/2018 - JC "came into the building and was trying to throw rocks at another student in the hallway."

5. 10/4/2018 - JC "walked away from staff and went upstairs without permission and got into a fight with another student."

6. 9/23/2019 - JC "told another student that he would shoot him and his friend because of something that had occurred during lunch" and that "he was able to get a gun from his brother."

7. 1/22/2020 - JC "ran up to a student (girl) and brushed cheek to cheek and made kissing sounds. The student felt threatened and uncomfortable."[2]

8. 2/5/2020 - JC "inappropriately touched 2 girl students in private part areas. Most notably, in the gluteus maximus region."[3]

9. 2/26/2020 - JC "was using inappropriate loud, vulgar language to various students," and said "'I want you to suck my dick and fuck me.'"

10. 3/15/2021 - JC showed up to a Zoom class he was not a part of.

Incident Reports at 24–33, 62, 76, 87, 95, 101–02, ECF 324-4.

Defendants argue generally that these incidents are relevant to evaluating any change in JC's behavior from before September 20, 2018 to after, and that defendant's expert relied on these incidents to form her opinion. True as that may be, an

---

[2] Plaintiff identifies this incident as occurring on 1/23/2020, but the "incident date" is listed as 1/22/2020 (it was delivered to JC's mother on 1/23/2020, *see* ECF 324-4 at 77).

[3] Plaintiff identifies an incident from 1/21/2020 in which JC "inappropriately touched two female students on their backside areas." This appears to actually have been an incident on 2/5/2020 --and presumably the same incident quoted above--which states that JC "inappropriately touched two female students on their backside areas." ECF 324-4 at 85.

individualized inquiry into each of these incidents is necessary to determine admissibility.

Defendants argue that the five incidents from October 5, 2018 are especially probative because of their proximity to the incident on September 20, 2018. I agree that the date on which these incidents occurred makes them more probative. The only potential unfair prejudice I can glean from plaintiff's arguments and an assessment of the October 5, 2018 incidents is that the incidents that involve throwing rocks and fighting another student could paint JC as physically violent. It is a close call, but I conclude that these specific incidents--the third, fourth, and fifth--have minimal probative value in light of the other two incidents from that day, and that their probative value is outweighed by the potential for unfair prejudice. Defendants make no argument as to why these three specific incidents should be presented, particularly given that other incidents close in time to September 20, 2018 are available. The first and second incidents will be admitted, and the third, fourth, and fifth excluded.

The incident involving JC's comment to another student that he would shoot him and that JC had access to a gun is also properly excluded under Rule 403. It is a particularly serious comment and could portray JC as dangerous or arouse prejudice in jurors. Nor is it necessary, in light of the voluminous other evidence of behavioral incidents, to illustrate for the jury how or whether

16

JC's psychological wellbeing differed before and after September 2018. Defendants argue that this particular incident should be admitted because their expert witness "expects to testify on JC's reference to obtaining a gun from his brother in connection with his brother's death--an event that undoubtedly had a significant emotional impact on JC." Def. Resp. at 11, ECF 348. But excluding evidence of this incident does not prevent defendants' expert from opining about the effects of JC's brother's death on JC's mental wellbeing, so I reject that argument.

The seventh, eighth, and ninth incidents are sexual in nature. Again, given the plethora of post-September 20, 2018 incidents that the parties agree are admissible, I see no reason to admit these more salacious ones, which could unfairly prejudice JC without adding much to the overall picture of his relevant behavior before and after the September 2018 incident. Defendants may still argue, even without pointing to these incidents, that JC's behavior is simply the product of adolescence.

Finally, like defendants I do not perceive the possibility of unfair prejudice from admitting the final incident involving showing up uninvited to a Zoom class. Plaintiff does not explain what makes this incident "extreme," so that incident may be introduced.

**Plaintiff's Motion *in Limine* No. 11**

Plaintiff moves to bar all general reference to and testimony about JC as an "aggressive," "violent," "angry," or "bad" kid or student. The motion is denied.

Describing JC's behavior will be necessary for defendants to refute that his behavior worsened after the incident, so these terms might be admissible in certain contexts. On the other hand, gratuitous use of these descriptors that serve no purpose other than to inflame the jury's feelings about JC will not be allowed. Accordingly, it is better to leave individual objections for trial. *See United States v. Lillie*, 669 F. Supp. 2d 903, 905-06 (N.D. Ill. 2009) ("[D]enial [of a motion *in limine*] simply means the court cannot determine whether the evidence in question should be excluded outside of the trial context." (citations omitted)).

**Plaintiff's Motion *in Limine* No. 12**

Plaintiff moves to bar all evidence relating to JC's grades and attendance both before and after September 2018. The motion is denied.

Plaintiff claims evidence of JC's grades is irrelevant because she does not endeavor to show that his grades suffered following the September 2018 incident. She also contends that his grades were no different before or after the incident, so they do not bear on the effects of that incident. But as defendants argue, the fact that JC's grades did not get worse following the incident

18

could suggest that its effect on JC was smaller than claimed. I will therefore allow defendants to introduce evidence of JC's grades, but only to the extent they can establish through admissible expert testimony that the absence of a decline in grades could suggest something about the severity of the September 2018 incident on JC's psychological wellbeing.

Furthermore, though the title of plaintiff's motion indicates she aims to bar evidence of JC's school attendance "both before and after September 2018," in her motion she concedes that attendance *after* the incident is relevant to his damages for psychological harm. If so, then evidence of JC's attendance from before the incident is necessary as a comparator, just as with the behavioral incidents discussed in connection with plaintiff's tenth motion *in limine*.

**Plaintiff's Motion *in Limine* No. 13**

Plaintiff moves to bar the conclusions of the Illinois DCFS investigations into Haynes' and Tyler's conduct. The motion is unopposed and is granted.

**Plaintiff's Motion *in Limine* No. 14**

Plaintiff moves to bar the opinions and testimony of defense expert witness Dr. Jane McNaught. The motion is granted in part and denied in part.

Expert testimony is admissible if it satisfies Federal Rule of Evidence 702 and the standards set out in *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The burden of establishing the admissibility of expert testimony lies with the expert's proponent. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). The admissibility analysis has three parts: (1) whether the witness is qualified; (2) whether her methodology is reliable; and (3) whether her testimony will help the factfinder understand the evidence or determine a fact in issue. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *see Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017) ("In other words, the district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." (emphases in original)).

### A.

Dr. McNaught received her Ph.D. in Counseling and Student Personnel Psychology, with an emphasis in Counseling Psychology, from the University of Minnesota in December 1982. McNaught CV at 80, ECF 324-5. She has worked full time since 1980 as a psychologist, including at her own practice as a Clinical and Forensic Licensed Psychologist since 1991. *Id.* at 77-78. The forensic side of her practice focuses on the diagnosis and treatment of both children and adults with PTSD in the context of civil, criminal, and family law cases. *Id.* On the clinical side, she provides treatment for various populations, including victims

20

of abuse, clients involved in high conflict divorce, and clients experiencing depression and anxiety. Prior to starting her own practice, she performed similar work at the Center for Child and Behavior Therapy from 1984 to 1991, and at a different practice from 1980 to 1983. *Id.* at 78. Before 1980, she held various part-time and full-time psychology-related positions and internships, including some consulting work. *Id.* at 78-79.

In connection with this case, Dr. McNaught reviewed various records and depositions. She also conducted interviews and various psychological tests with JC and Gaines.

**B.**

Plaintiff first attacks Dr. McNaught's diagnostic opinion that JC suffers from Complex Posttraumatic Stress Disorder ("CPTSD"), while not currently suffering from Posttraumatic Stress Disorder ("PTSD"). Plaintiff argues primarily that Dr. McNaught's opinion is unreliable, but also hints that she is not qualified to give this opinion. *See* Pl. Mot. at 49, ECF 323 ("It is clear even to a layperson that McNaught does not understand the CPTSD diagnosis . . . ."); *id.* at 46 ("McNaught is not a psychiatrist and has a mere two publications to her name, and she has no peer-reviewed publications of any kind, including in the subspecialty of child PTSD."). A psychologist need not have published in order to be qualified to testify as to psychological disorders. Nor must one be a psychiatrist to render a mental health diagnosis. Dr.

21

McNaught has years of experience working with both children and adults in a forensic capacity in civil and other legal proceedings. Her experience focuses on traumatic events and traumatized individuals, and it sufficiently qualifies her to render an opinion on diagnoses of psychological trauma. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." (citations omitted)).

Turning to reliability, which is the focus of plaintiff's argument for excluding this opinion, plaintiff contends that CPTSD is not a valid diagnosis in the United States because it is not in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") and not otherwise recognized in this country's mental health community. Plaintiff's evidence for this assertion includes a citation to a publication by an Australian nonprofit specializing in posttraumatic mental health. That publication explains that "[t]he DSM-5 workgroup on PTSD critically evaluated the then existing literature on CPTSD and, largely on the basis of a lack of current evidence and validity, decided not to include CPTSD as a separate diagnosis."[4] But

---

[4] Phoenix Australia, Australian Guidelines for the Prevention and Treatment of Acute Stress Disorder, Posttraumatic Stress Disorder and Complex PTSD at 2, https://www.phoenixaustralia.org/wp-content/uploads/2022/08/Chapter-7.-CPTSD.pdf (last accessed January 28, 2024).

plaintiff does not explain why a particular diagnosis must be included in the DSM-5 to be valid. Dr. McNaught did not materialize the idea of CPTSD from thin air; it is recognized in the eleventh edition of the International Statistical Classification of Diseases and Related Health Problems ("ICD-11"), published by the World Health Organization ("WHO"). To be reliable, an opinion "must be grounded in the scientific process and may not be merely a subjective belief or unsupported conjecture." *Lewis*, 561 F.3d at 705 (citations omitted). Dr. McNaught has not offered her CPTSD diagnosis based on subjective belief or speculation. Rather, she has used a tool--the ICD-11--published by a well-recognized international health organization. Plaintiff is free to cross-examine Dr. McNaught about CPTSD's absence from the DSM-5, and may examine its own witness, Dr. Berkowitz, about his views on the matter.

Nor is Dr. McNaught's CPTSD diagnosis rendered unreliable by her opinion that JC does not currently have PTSD. Plaintiff argues that you cannot have one without the other, and her position finds some support in the ICD-11's description of CPTSD, which states in relevant part that "[a]ll diagnostic requirements for PTSD are met."[5] But Dr. McNaught explained at her deposition the basis for

---

[5] 6B41 Complex Post Traumatic Stress Disorder, Diagnostic Requirements, ICD-11, https://icd.who.int/browse11/l-m/en#/http://id.who.int/icd/entity/585833559 (last visited January 28, 2024) (hereinafter "ICD-11 CPTSD Page").

her view that a current PTSD diagnosis is not required for a current CPTSD diagnosis. *See* McNaught Dep. Tr. at 155:24–160:9, ECF 323-7. And her position also finds support in the ICD-11's listed "Essential (Required) Features" of CPTSD, which instruct that the three core features of PTSD--re-experiencing the traumatic event after the traumatic event has occurred, deliberate avoidance of reminders likely to produce re-experiencing of the traumatic event(s), and persistent perceptions of heightened current threat--must "[f]ollow[] the traumatic event" and must "last[] for at least several weeks." ICD-11 CPTSD Page. In other words, it does not appear that those three core aspects of PTSD must be present for a current CPTSD diagnosis, but only that they must have been present at one point "following" the traumatic event, which is what Dr. McNaught opines was the case here.[6]

Plaintiff also argues that Dr. McNaught's findings do not satisfy other criteria for a CPTSD diagnosis under the ICD-11. For instance, one of the diagnostic requirements for CPTSD is exposure to "extremely threatening or horrific" events, which "include, but are not limited to, torture, concentration camps, slavery,

---

[6] Additionally, though plaintiff's expert opines in his rebuttal report that JC "cannot be diagnosed with CPTSD if he is not symptomatic with PTSD symptoms," Berkowitz Rebuttal Report at 5, ECF 324-6, his annotated version of the ICD-11's CPTSD page notes that, because PTSD is listed as an "[e]xclusion" on that page, in Dr. Berkowitz's view, "[o]ne cannot be diagnosed with both PTSD and CPTSD," *id*. at 5. That appears consistent with Dr. McNaught's understanding.

genocide campaigns and other forms of organized violence, prolonged domestic violence, and repeated childhood sexual or physical abuse." ICD-11 CPTSD Page. Though none of the events cited by Dr. McNaught as contributing to JC's CPTSD rise anywhere near the level of these examples, the diagnostic requirement is explicit that qualifying events are not limited to these examples. Thus, while questioning Dr. McNaught about how the events in JC's life[7] measure up to the horrific examples given in the ICD-11 may provide fertile ground for cross-examination, it is not a reason to find her opinion unreliable.

Other essential features of CPTSD that plaintiff argues are missing from Dr. McNaught's findings include hypervigilance, experiencing persistent beliefs that one is "diminished," and impairment with relationships. As above, "hypervigilance" is only given as an example of a behavior indicating persistent perceptions of heightened current threat, so its absence does not appear to rule out a CPTSD diagnosis. Additionally, Dr. McNaught recounts in her report that JC does feel shame about the incident, including that he is afraid students at his new school might learn of the incident. McNaught Rep. at 12, ECF 358. And though impairment in relationships apparently can indicate CPTSD, the ICD-11 notes that

---

[7] Dr. McNaught's discussion of JC's upbringing must comport with my rulings on other motions in this order--in particular, my ruling on plaintiff's seventh motion *in limine*.

functioning--i.e., non-impairment--may be maintained through significant additional effort, so even assuming Dr. McNaught did not specifically find that JC's relationships were impaired, that would not appear to preclude a CPTSD diagnosis. Nor is it clear that Dr. McNaught's opinions that JC is generally happy now and that his symptoms are relatively minor are necessarily inconsistent with a CPTSD diagnosis. Plaintiff's motion to exclude Dr. McNaught's CPTSD opinions is denied.

### c.

Plaintiff next argues that Dr. McNaught's opinions on the cause of JC's mental health problems are invalid because they are contaminated by inaccurate assumptions and a lack of cultural knowledge. This includes Dr. McNaught's opinion that JC's history of growing up without a single caretaker has contributed to his CPTSD. In plaintiff's view, this ignores the fact that "it is normative in urban, African American culture for child rearing to be communal and for grandparents and godparents to play central and positive roles." Pl. Mot. at 52, ECF 323.

Plaintiff's argument goes to whether Dr. McNaught is qualified to give her opinions. As explained above, Dr. McNaught is clearly qualified in the diagnosis and treatment of trauma-related disorders, including in children. Accordingly, she is qualified to opine on the effects that the circumstances of JC's upbringing may have had on his mental health. To the extent that

26

plaintiff's expert disagrees, he can testify on this point, and plaintiff may explore the issue with Dr. McNaught on cross-examination. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." (citations omitted)).

Plaintiff also seeks to bar Dr. McNaught from opining that JC was "aggressive," which plaintiff argues is unduly prejudicial because it depicts JC as having "an immutable, individual character trait for aggression or violence" and plays into racial stereotypes rather than speaking to relevant aspects of his mental health. Pl. Mot. at 56, ECF 323. I have largely addressed this issue in connection with plaintiff's eleventh motion *in limine*. To the extent that Dr. McNaught's use of terms like "aggressive" and description of "aggressive" acts are necessary to convey her admissible opinions, then any objection will be overruled. However, to the extent less inflammatory language can be used, it should be. This aspect of the motion is denied but, as always, plaintiff may object to specific evidence or testimony at trial.

**D.**

Next, plaintiff seeks exclusion of Dr. McNaught's opinions that are critical of Dr. Berkowitz because they were not properly or timely disclosed. It is true that an expert report must contain

27

"a complete statement of all opinions the witness will express and the basis and reasons for them," Fed. R. Civ. P. 26(a)(2)(B)(i), and that parties may not "cure deficient expert reports by supplementing them with later deposition testimony," *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). But the purpose of expert reports is to eliminate unfair surprise, *see Baethke v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 97 C 7882, 1999 WL 1144917, at *4 (N.D. Ill. Dec. 8, 1999), and here, where many of Dr. McNaught's opinions fundamentally conflict with Dr. Berkowitz's--coupled with the fact that plaintiff had ample opportunity to question Dr. McNaught about Dr. Berkowitz's opinions at her deposition, *see* McNaught Dep. Tr. at 58:20-24 (Dr. McNaught testifying that she had read Dr. Berkowitz's report and deposition transcript)--there is no danger of unfair surprise in allowing Dr. McNaught to testify about Dr. Berkowitz's opinions at trial. Accordingly, the motion is denied on this point.

**E.**

Plaintiff also seeks to bar Dr. McNaught's opinions based on psychological scales--essentially diagnostic tools--that were not timely disclosed to plaintiff. But when presented with the opportunity to re-depose Dr. McNaught on these scales, plaintiff's counsel declined, requesting only that the documents be provided to Dr. Berkowitz to review. *See* ECF 349-1. Plaintiff therefore

suffered no prejudice from this oversight and this aspect of plaintiff's motion is denied.

**F.**

Finally, plaintiff requests that Dr. McNaught be barred from testifying that (1) JC is her "client" and (2) her evaluation and report were "independent." Defendants agree that Dr. McNaught will not testify that JC was her "client," so the motion is granted to that extent. The motion is denied as to allowing Dr. McNaught to testify that she "independently" conducted her evaluation and report, since that could simply convey that she arrived at her opinions without influence from the defendants or defense counsel. As is common practice, plaintiff may inquire as to who retained Dr. McNaught and how much she has been paid.

**Plaintiff's Motion *in Limine* No. 15**

Plaintiff moves to bar all evidence and argument that JC's parents or other family members would benefit from any verdict award for JC. The motion is granted for the reasons given in connection with plaintiff's eighth motion *in limine*.

**Plaintiff's Motion *in Limine* No. 16**

Plaintiff moves to bar any argument Haynes was not acting "under color of law" because her conduct was not within the scope of her employment. The motion is unopposed and is granted.

**Plaintiff's Motion *in Limine* No. 17**

Plaintiff moves to bar all factual and/or legal defenses not disclosed in defendants' answers to the complaint, defendants' mandatory initial discovery pilot ("MIDP") disclosures, and/or defendants' answers to discovery. The motion is granted in part and denied in part.

Plaintiff gives three examples of evidence that should be excluded: (1) evidence of Joseph Champ's 1994 and 2001 probate estates; (2) DCFS mandatory reporter statutes and manuals; and (3) argument that JC's family caused the injuries on his body on September 20, 2018. I dealt with the third item in discussing plaintiff's third motion *in limine*, so I offer no additional comment on that category of evidence here. I will grant the motion as to the second item because defendants represent that they will not introduce this evidence unless plaintiff opens the door.

That leaves the first category of evidence, which defendants argue was alluded to in Tyler's deposition. The cited exchange was as follows:

Q. Why was [Gaines] at your house? Do you know?

A. Because Chubby-Chub [Joseph Champ] and his sister got awarded a million dollars for they mother death and she wanted some of the money.

Q. How do you know she wanted some of the money?

A. Because she told him that she wanted some of the money, and she said, I'm going to bust your windows out

30

if you don't come out of there, and she scratched up his
car and bust the windows.

Tyler Dep. at 76:8-19, ECF 323-12. This excerpt is not enough to
have put plaintiff on notice that evidence regarding Joseph Champ's
probate estate would be relevant to this litigation, and defendants
do not explain its relevance in their response. Accordingly, the
motion is granted as to this evidence.

Insofar as plaintiff's motion relates to other unspecified
evidence, it is denied as too broad and too vague. Should evidence
arise at trial that plaintiff objects to on this basis, I will
assess those challenges then.

**Plaintiff's Motion *in Limine* No. 18**

Plaintiff moves to bar appeals to jurors as taxpayers. The
motion is unopposed and is granted.

**Plaintiff's Motion *in Limine* No. 19**

Plaintiff moves to bar any argument that Haynes is unable to
pay a judgment because the City of Chicago or the Board will
indemnify any compensatory or punitive damages awarded to
plaintiff. The motion is granted.

I need not delve into the parties' disagreement over the legal
underpinnings of plaintiff's argument, because defendants
represent that Haynes might not testify as to her financial
condition or ability to pay anyway. I may of course revisit this
ruling should defendants seek to introduce this evidence.

**Plaintiff's Motion *in Limine* No. 20**

Plaintiff moves to exclude non-party witnesses from the courtroom. The motion is granted in part and denied in part.

Defendants agree that non-party witnesses should be excluded from the courtroom during trial, except for expert witnesses. It is indeed generally--though not always--appropriate to allow expert witnesses in the courtroom since, per Rule 703, such witnesses "may base an opinion on facts or data in the case that the expert has . . . personally observed." Fed. R. Evid. 703. Accordingly, the motion is granted as to lay witnesses and denied as to expert witnesses.

## II. Defendants' Motions

**Defendants' Motion *in Limine* No. 1**

Defendants move to exclude evidence of Tyler's criminal record. The motion is granted in part and denied in part.

As it relates to the specific issues decided in Tyler's prior criminal proceeding, discussed in connection with plaintiff's first motion *in limine*, the motion is denied.

As for other aspects of Tyler's criminal history, given the disposition of plaintiff's first motion *in limine*, plaintiff represents that she will "not have to introduce evidence of past instances in which Tyler physically assaulted and battered family and friends in order to prove her battery, assault, and IIED claims

against Tyler here." Pl. Resp. at 8, ECF 353. Accordingly, this motion is granted as to the remainder of Tyler's criminal history.

**Defendants' Motion *in Limine* No. 2**

Defendants move to exclude plaintiff's deposition designations and testimony from the administrative hearing against Haynes. The motion is granted in part and denied in part.

**A.**

Plaintiff seeks to introduce testimony given at Haynes' administrative hearing by several of JC's classmates--KB, SC, KKB, JL, and RJ--and an investigator involved in creating a report about Haynes for Chicago Public Schools--Michael Mahone. Defendants object that this testimony constitutes hearsay and that plaintiff has not shown, as required by Federal Rule of Evidence 804, that these witnesses are unavailable, Fed. R. Evid. 804(a), or that the testimony "was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one" and "is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination," Fed. R. Evid. 804(b)(1).[8]

---

[8] Defendants argue that the testimony also does not satisfy Federal Rule of Civil Procedure 32(a)(4), which addresses use of depositions in court proceedings when a witness is unavailable. Plaintiff does not discuss or cite this rule, so I limit my analysis to the Federal Rules of Evidence.

Plaintiff's proposed use of the administrative hearing testimony is tentative at this point, so I agree with her that she need not yet establish the witness' unavailability. A witness may be unavailable now but would be available during trial, for which no dates have been set, or vice versa. It would require speculation and would otherwise be a waste of resources to settle the issue now.

Whether the administrative hearing testimony satisfies the requirements of Federal Rule of Evidence 804(b)(1), however, can be decided now. The Rule 804(b)(1)(A) requirement that the proffered testimony "was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one" is met here, and defendants do not argue otherwise.

As for the Rule 804(b)(1)(B) requirement, plaintiff has the better argument. That rule requires the proffered testimony to be "now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1)(B). Plaintiff represents that the administrative hearing testimony would only be "offered against" Haynes, who had a virtually identical opportunity and motive to develop the testimony at her hearing. Given that the testimony would only be offered against Haynes at trial, it makes no difference whether

34

Tyler, the Board, or a predecessor in interest had an opportunity or similar motive to develop the testimony at the administrative hearing. The testimony will not be offered against them. Thus, the motion is denied as to the administrative hearing testimony of KB, SC, KKB, JL, RJ, and Michael Mahone. Should plaintiff seek to introduce this testimony at trial, she may only do so against Haynes, and only after a showing of unavailability as to each witness.[9]

### B.

Defendants also seek to bar JC's and NC's deposition testimony, asserting that the requirements of Rule 804 are not met and that they should testify live. As to unavailability, defendants emphasize that JC and NC have been available to testify about the events underlying this case, including at their deposition and at the state criminal trial. Plaintiff lists and discusses several reasons why I should deem them unavailable:

> Given that JC and NC are minors, that they are in fragile mental health and highly suggestible, given the number of times that JC and NC have already been thoroughly examined and/or interviewed by the defense, the number of times they have been re-traumatized through

---

[9] Defendants also argue that the administrative hearing testimony should be excluded because these witnesses were not disclosed in plaintiff's mandatory initial discovery pilot ("MIDP") disclosures. However, the individuals who testified at the administrative hearing were long known to at least the Board (and likely Haynes, who was the subject of that hearing). At a minimum, their identities were "made known to the other parties during the discovery process." Fed. R. Civ. P. 26(e)(1)(A). So the motion is denied insofar as it is premised on failure to disclose.

> recounting the events, the fact that defendants already
> had the opportunity to cross-examine both of them at
> their depositions in this case, and the fact that, after
> so many examinations and interviews, JC and NC have no
> new information and nothing new to say, the Court should
> find that JC and NC are unavailable [to] testify at trial
> . . . .

Pl. Resp. at 40-41, ECF 353. Plaintiff does not explain which criteria for unavailability under Rule 804(a) these considerations satisfy. And given how frequently JC and NC have already testified regarding the events of September 20, 2018, I conclude that they are available to testify at this trial. Accordingly, the motion is granted as to JC's and NC's deposition testimony.

Plaintiff proposes several safeguards that should be imposed should JC testify at trial, but since defendants' motion is aimed only at the use of his deposition testimony, they understandably do not weigh in on that issue. The parties should strive to come to a consensus about what precautions would be appropriate for trial. A good starting point might be the strictures that were put in place for JC's deposition, but the parties should keep in mind that certain facts about the events of September 20, 2018 will be considered already established by collateral estoppel. To the extent they cannot agree, I will resolve the dispute before trial.

**Defendants' Motion** *in Limine* **No. 3**

Defendants move to exclude all evidence relevant only to plaintiff's voluntarily dismissed *Monell* claim. The motion is denied.[10]

As part of this motion, defendants request that the Board be removed from the case caption and stricken from plaintiff's proposed jury instructions, since the only remaining claims against the Board are based on *respondeat superior* and indemnification. In support, defendants cite *Martin v. City of Chicago*, in which the City was removed from the case caption and verdict form where there were no substantive claims against it. No. 15-cv-04576, 2017 WL 2908770, at *9 (N.D. Ill. July 7, 2017). In *Martin*, however, while the plaintiff objected to that motion *in limine*, he did not cite case law or develop an argument, so the court found his objection waived. *Id.* And in any event, the court observed that the plaintiff had already agreed to a jury instruction that the defendants were being sued as individuals and that "the City is not a party to the lawsuit." *Id.* That is not the case here. Indeed, in deciding a similar motion in a different case, the same judge denied the City's motion to remove it from

---

[10] Of course, any evidence relevant only to plaintiff's *Monell* claim is inadmissible, since that claim was voluntarily dismissed. Denial is nonetheless appropriate because, as explained below, defendants' motion reveals itself to aim at more than just that evidence.

the case caption and the verdict form, concluding that "[t]he City is still a Defendant in this case under a respondeat superior theory for malicious prosecution as well as for [plaintiff's] indemnification claim." *Jones v. City of Chicago*, No. 14-cv-4023, 2017 WL 413613, at *6 (N.D. Ill. Jan. 31, 2017). I find this to be the better course, as have other courts. *See Bruce v. City of Chicago*, No. 09 C 4837, 2011 WL 3471074, at *4 (N.D. Ill. July 29, 2011); *Wilbon v. Plovanich*, No. 12 C 1132, 2016 WL 890671, at *3 (N.D. Ill. Mar. 9, 2016).

Relatedly, defendants seek to bar plaintiff from referring to the Board as a defendant or referencing the Board's potential liability under Counts IX and X in any way. Because the Board is a party and faces potential liability under Counts IX and X, I decline to issue the blanket ban defendants ask for. Any references to the Board or its potential liability must, of course, be relevant and otherwise comply with the Federal Rules of Evidence, but that is a matter for individual objections at trial.

Defendants also argue that plaintiff should be barred from introducing evidence or calling witnesses related solely to the claims that have been dismissed against the Board, evidence they say is irrelevant and/or unfairly prejudicial, confusing, and misleading. They point to various proposed exhibits and witnesses related to: "(1) the Board's policies and practices; (2) the Board's underlying internal investigation and subsequent dismissal

38

proceedings related to Defendant Haynes; and (3) the Board's answers and responses to Plaintiffs' written discovery." Def. Mot. at 3, ECF 317.

In the broadest sense, and as observed above, the propriety of defendant's request is obvious: plaintiff may not introduce evidence or call witnesses related *solely* to dismissed claims. But I decline at this juncture to delineate what that evidence or who those witnesses might be. Defendants identify three broad categories of evidence and witnesses without explaining why each category is irrelevant to any claim. They simply cite two Seventh Circuit cases that found that police department policies had no bearing on the reasonableness of officers' actions for purposes of excessive force claims. *See Est. of Biegert v. Molitor*, 968 F.3d 693, 698–99 (7th Cir. 2020); *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). This request is too broad and vague. *See Wilbon*, 2016 WL 890671, at *8 (denying motion *in limine* as overly broad, making it too difficult to know whether introduction of the evidence at issue for any purpose would be permissible or not).

In briefing on this motion *in limine*, the parties also discuss a special interrogatory recommended by defendants regarding whether Haynes was acting within the scope of her employment at the time of her alleged wrongdoing. In their view, it is impossible that the jury could find that Haynes acted in the scope of her employment as to one alleged tort, but not as to the others.

39

Plaintiff argues that the special interrogatory would be confusing to the jury, and that instead, the verdict form should pose the scope-of-employment question to the jury as to each claim it applies to. I agree that plaintiff's proposal is less confusing, and decline defendants' proposed special interrogatory.

**Defendants' Motion *in Limine* No. 4**

Defendants move to exclude video evidence of Tyler's CBS interview, which took place after she left a court hearing and in which she discusses the events of September 20, 2018. The motion is granted.

Defendants argue, among other things, that the footage should be excluded because any probative value it has is substantially outweighed by the risk of unfair prejudice. Given the disposition of plaintiff's first motion *in limine*--which bars Tyler from relitigating the facts that she beat JC with one or more belts in the Tilton school bathroom--plaintiff concedes that the probative value of the footage is greatly diminished.

**Defendants' Motion *in Limine* No. 5**

Defendants move to limit the scope of Dr. Steven Berkowitz's expert testimony. The motion is granted in part and denied in part.

The same standards as those discussed in connection with plaintiff's fourteenth motion *in limine* apply here.

**A.**

Dr. Berkowitz is a psychiatrist who received his M.D. in 1989 from the Hahnemann University School of Medicine before residency and a fellowship at Yale. Berkowitz Report & CV at 29, ECF 324-3. He has worked in a number of roles, most of which focus on issues related to youth mental and behavioral health, and he is currently a Professor in Psychiatry and Director of the Stress, Trauma, and Adversity Research and Treatment ("START") Center at the University of Colorado. *Id.* He has published extensively on childhood trauma and behavioral health. *Id.* at 26–28.

As part of his retention in this case, he reviewed various reports, records, documents, and deposition transcripts. He also met with JC and Gaines, and conducted various psychological tests.

**B.**

Defendants first seek to bar Dr. Berkowitz's opinions about the duties, obligations, and standards of schools, including his opinions about the school's failure to identify and accommodate JC's ADHD and that, had the school addressed JC's ADHD, the events of September 20, 2018 would not have occurred. I agree that these opinions are irrelevant to the issues in the case and so would not be helpful to the jury. Whether the school should have or did address JC's ADHD or other mental health needs would only possibly have been relevant to plaintiff's *Monell* claim, which has been voluntarily dismissed. Even if plaintiff could show that the school

41

should have, but did not, address certain of JC's needs, that would not help the jury determine liability or damages for any of the remaining claims.

Plaintiff argues that barring this evidence will severely prejudice her because she will be unable to respond to defendant's argument that JC's pre-September 20, 2018 behavior justified Haynes' actions on September 20, 2018. But as discussed in connection with plaintiff's tenth motion *in limine*, defendants will not introduce evidence of JC's pre-September 2018 behavior to argue that Haynes' actions were reasonable; they will only be allowed to introduce this evidence as to the cause and extent of JC's alleged psychological harms. So the only purpose for which plaintiff argues she should be allowed to introduce this evidence --to rebut the argument that "JC's behavior in kindergarten through third grade is relevant to Haynes' conduct on 9/20/18," Pl. Resp. at 79, ECF 353--is unnecessary because defendants will not so argue.

### c.

Defendants next take aim at Dr. Berkowitz's "opinions about access to mental health treatment services in Chicago." Def. Mot. at 7, ECF 18. The opinions at issue are, more specifically, that: the available resources to treat PTSD in children are extremely limited in the public sector and hard to obtain in Chicago; it is difficult to find a therapy provider that will accept Medicaid;

42

and it is unlikely that JC will get effective treatment for his PTSD because of this lack of resources.

Defendants first argue that these opinions are irrelevant, since they do not relate directly to what occurred on September 20, 2018, and whether JC was injured as a result. But these opinions are relevant to why, in Dr. Berkowitz's opinion, JC will need to seek treatment at private, rather than public, facilities. Since private sector services are more expensive than public sector services, this will help explain how Dr. Berkowitz arrived at his treatment cost estimates, which assume treatment in the private sector. In other words, this information is relevant to damages.

Defendants also argue that Dr. Berkowitz is not qualified to opine on access to mental health treatment services in Chicago, since he is not licensed in Illinois and does not practice in Chicago. But there is no requirement that Dr. Berkowitz have direct experience practicing in Chicago to opine on that topic. Here, Dr. Berkowitz has based his opinion on his experience as a professional psychiatrist with knowledge of accessing mental health treatment, conversations with Chicago colleagues who treat trauma disorders in the private sector, and review of the deposition of Sue Patton --someone who treated JC. Berkowitz Dep. I at 175:7-12, 217:13-21, ECF 333. It is reasonable that a psychiatrist would rely on the reports of his colleagues practicing in a certain location, as well as his own years of experience, to form an opinion on the

43

availability or cost of psychiatric services in that location. Defendants are of course free explore Dr. Berkowitz's bases for these opinions on cross-examination, should he testify to them at trial.

### D.

Defendants also challenge Dr. Berkowitz's opinions: (1) that JC's statement that "the devil takes over" when he has to talk about the September 20, 2018 incident is a phrase commonly used by religious individuals who want to express something bad happening, and (2) that the drop in JC's church attendance following the incident is a trauma response. As to the first opinion, plaintiff has not carried her burden to establish that Dr. Berkowitz has specialized knowledge, skill, experience, or education to opine on the meaning of JC's use of the phrase "when the devil takes over." The meaning of a phrase to religious people is not a matter of psychiatry. Additionally, it is not a phrase that a layperson on the jury would need an expert's help to understand; surely most English speakers would know that the devil taking over is a bad thing. *See United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2012) ("[A] witness should not be allowed to put an 'expert gloss' on a conclusion that the jurors should draw themselves." (citation omitted)). The motion is granted as to this opinion.

It is squarely in Dr. Berkowitz's wheelhouse, however, to opine on whether observed behavioral changes may be in response to

a traumatic event. And it will inform the jury about the effects of the September 20, 2018 incident to hear evidence about the decline in JC's church attendance following the incident. Accordingly, the motion is denied as to this opinion.

**E.**

In the final section of their motion, defendants list additional statements in Dr. Berkowitz's report and depositions that, in their view, are unreliable, speculative, and irrelevant. First, they seek to exclude Dr. Berkowitz's opinions about JC's PTSD because, at his second deposition, Dr. Berkowitz testified that he did not know what PTSD symptoms JC currently exhibited, when his symptoms would resolve, or the likelihood of recovery. *See* Berkowitz Dep. II Tr. at 15:22–16:1, 24:5–8, 25:7–27:7, ECF 335. Uncertainty on these specific questions is not disqualifying, however. The second deposition took place months after his first deposition and his report, and was primarily intended to discuss his rebuttal report, so it is unsurprising that he did not testify about JC's current symptoms. Dr. Berkowitz relayed in both his report and his first deposition his opinion on the PTSD symptoms JC experienced. *See, e.g.*, Berkowitz Rep. at 11–12, 23, ECF 324-3; Berkowitz Dep. I Tr. at 56:4–23, 72:5–22, 111:4–113:1, ECF 333. Similarly, while Dr. Berkowitz expressed some uncertainty at the second deposition as to the probability that JC will recover from his PTSD, he has opined as to his best estimates. *See* Berkowitz

45

Rep. at 24, ECF 324-3; *see also* Berkowitz Dep. II Tr. at 25:15-17, ECF 335 ("I will say that since he has not been treated it's unlikely that they will resolve any time soon.").

Defendants also attack Dr. Berkowitz's diagnostic opinions on the grounds that he failed to consider other potentially traumatic events in JC's life, specifically mentioning the death of JC's brother and a housefire for which JC was present. But Dr. Berkowitz actually did ask JC about both of these events. Berkowitz Dep. II Tr. at 16:2–17:8, ECF 335 (testifying that JC's brother's death may have been a traumatic event and that he spoke with JC about it); *id.* at 18:9–20:16 (testifying that, in his opinion, the housefire was not a traumatic event for JC because JC was not afraid for his life). The motion is therefore denied as to this opinion.[11]

Defendants also seek to bar Dr. Berkowitz's opinion that JC's ADHD was exacerbated by the incident because, they argue, (1) ADHD is something that you are born with and (2) Dr. Berkowitz did not perform DSM-5 testing for exacerbation of ADHD. The parties dispute whether there is even such a thing as DSM-5 testing for ADHD exacerbation. But in any event, Dr. Berkowitz's opinion is not speculative because he based it on review of JC's medical and

---

[11] For the same reasons, defendant's request to exclude Dr. Berkowitz's opinion that JC's depression and anxiety are linked to his PTSD on the basis that Dr. Berkowitz failed to examine other traumatic events in JC's life is denied.

school records, as well as the deposition taken in this case of Tilton school psychologist Brian Apollo, who testified that JC's post-incident behavior was worse than his pre-incident behavior. *See* Berkowitz Report at 3–4, ECF 324-3 (identifying materials Dr. Berkowitz reviewed in coming to his opinions); *id.* at 8–9 (discussing Apollo's deposition and explaining that Apollo "reported that [JC]'s behavioral difficulties escalated after the beating, which was no doubt due to his PTSD interacting with his pre-existing ADHD"). That renders this opinion sufficiently reliable.

Defendants next request that I exclude Dr. Berkowitz's opinion that medication would have been helpful in treating JC's ADHD and that, had JC been treated, the incident would not have occurred. The motion is granted as to this opinion for the same reasons given in connection with excluding Dr. Berkowitz's opinion that the school could have addressed JC's needs to avoid the incident.

I also grant the motion with respect to Dr. Berkowitz's opinions about cultural norms within the African American community, but only to the extent he seeks to offer opinions unmoored from his diagnoses. Though Dr. Berkowitz has worked extensively with African American patients, it has been in the realm of psychiatry, not sociology. Nor do I understand general opinions about cultural norms to be relevant to deciding the facts

47

in issue here. That said, as I found in connection with Dr. McNaught's proposed testimony about the effects--or lack thereof --of how JC was raised, Dr. Berkowitz is qualified to testify on the effects of multiple caregivers on JC's psychiatric conditions, and such testimony would be relevant.

Defendants also seek to bar Dr. Berkowitz's opinions about JC's potential for future suicide, substance use disorder, major depressive disorder, and major anxiety disorder as purely speculative or irrelevant. The opinion that PTSD and ADHD diagnoses increase the risk of future suicide or substance abuse is relevant to the issue of damages. If the jury finds that defendants caused or exacerbated JC's mental health problems, then they may consider the possible effects of those problems when considering how to compensate him. Furthermore, the opinions are not speculative because an understanding of a correlation between PTSD and suicidality is well within the realm of a child psychiatrist based on his professional education, training, and experience, and he backs the opinions up with published research. The motion is denied as to these opinions.

Finally, defendants move to exclude Dr. Berkowitz's opinions that JC suffers from mild depression and anxiety because he testified at his first deposition that no other practitioner had made those diagnoses. But the mere fact that no other practitioner diagnosed JC with these conditions does not mean that Dr.

48

Berkowitz's diagnosis is "purely speculative." Dr. Berkowitz based these diagnoses on his expert psychological evaluation, so they are sufficiently reliable. The motion is denied as to these opinions.

**Defendants' Motion** *in Limine* **No. 6**

Defendants move to bar all evidence pertaining to any alleged violation of Tilton Elementary School policy related to Tyler being an "unauthorized" individual or obtaining a visitor pass. The motion is denied.

The parties dispute some of the underlying facts, such as whether Tyler ever obtained a visitor pass or whether Haynes instructed the school security guard to send Tyler to her classroom without a visitor pass, but I cannot resolve those factual disputes here.

Policies like this are presumptively irrelevant in determining whether a federal constitutional violation has occurred. *See Thompson*, 472 F.3d at 454–55. But there are instances in which such evidence may be introduced for these purposes. For example, the Seventh Circuit has emphasized that the evidence is more likely admissible in a criminal case to comply with the constitutional demands of those cases. *See United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017). Policy evidence might also be admissible even in the civil context in factually complex cases where explanation regarding policies or procedures can help

49

jurors' understanding of key issues. *See id.* Those circumstances are not present here, however, so this evidence may not be introduced in connection with the merits of plaintiff's § 1983 claims.

Nonetheless, even in cases dealing with federal constitutional claims, "such materials are not barred for all purposes and may be admissible if relevant to other issues, including state law claims and claims for punitive damages." *Brooks*, 2015 WL 3545386, at *5 (citing *Scott v. City of Chicago*, No. 07 C 3684, 2010 WL 3034188, at *1-2 (N.D. Ill. July 27, 2010)). Here, the evidence is relevant at least as to Haynes' intent on several state law claims--including the aiding and abetting and conspiracy claims--as well as the issue of punitive damages. *See United States v. Proano*, 912 F.3d 431, 438-40 (7th Cir. 2019) (concluding that policies can be relevant to intent); *Hudson v. City of Chicago*, 881 N.E.2d 430, 456 (Ill. App. Ct. 2007) (holding that violation of internal policy or rule "can constitute some evidence of willful and wanton conduct"). Policies regarding who counts as an "authorized" individual and requiring such individuals to obtain visitor passes could act as barriers to unauthorized individuals entering the school. Efforts undertaken by Haynes to circumvent those policies are relevant to her state of mind.

I am not persuaded that allowing the introduction of this evidence as to plaintiff's state law claims and for the issue of punitive damages, but not as to the merits of her § 1983 claims, will lead to jury confusion or unfair prejudice. As decided by the courts in *Brooks* and *Scott*, an appropriate limiting instruction may be given to mitigate those concerns.

**Defendants' Motion *in Limine* No. 7**

Defendants move to bar all evidence pertaining to the dismissal charges, pre-suspension hearing, suspension, and dismissal hearing against Haynes, other than for purposes of impeachment. The motion is denied.

Defendants argue that this evidence is categorically barred by Rule 407; cannot be considered to prove any constitutional violation against Haynes; is irrelevant; and is unfairly prejudicial, confusing, and misleading.

Rule 407 bars evidence of subsequent remedial measures to prove, as relevant here, negligence or culpable conduct. Fed. R. Evid. 407. By the terms of this rule, plaintiff will not be allowed to introduce evidence about disciplinary actions taken against Haynes solely for the purpose of showing culpability. But because defendants have not sufficiently identified the specific evidence for which this is the only purpose, the motion is denied. *See Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1023 (N.D. Ill. 2011) (appropriate to exclude evidence *in limine* "only when the movant

51

shows that the evidence is inadmissible on all potential grounds" (citation and internal quotation marks omitted)). Without identifying the evidence, plaintiff cannot explain for what other purposes the targeted evidence might be relevant. Defendants may object on Rule 407 grounds upon introduction of evidence of remedial measures they believe go only to prohibited purposes.

Similarly, defendants paint only in broad brush strokes in asserting that "*[a]ny* evidence *related to* the dismissal charges, pre-suspension hearing, suspension, or dismissal hearing involving Haynes" is irrelevant and should therefore be excluded. Def. Mot. at 7, ECF 320. So too in their argument to exclude this evidence under Rule 403. *Id.* at 9. Such evidence could range from the charging document itself to evidence introduced at the hearing. Because defendants' Rule 402 and Rule 403 arguments are simply too broad and vague, the motion is denied as to this evidence.

Defendants get more specific in arguing that testimony from the dismissal hearing should be excluded as inadmissible hearsay. But they fail to develop their argument that no exceptions apply. Indeed, some of the testimony given at the hearing could conceivably be introduced as a prior inconsistent statement, Fed. R. Evid. 801(d)(1)(A), or as an opposing party's statement, Fed. R. Evid. 801(d)(2). Thus, the motion is denied as to this evidence.

52

**Defendants' Motion** *in Limine* **No. 8**

Defendants move for judgment on the pleadings as to plaintiff's failure to intervene and aiding and abetting claims, and to bar any evidence related to unpled claims. The motion is granted in part and denied in part.

Plaintiff argues that, to the extent this motion is brought under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings, it is improper and untimely. Generally, a Rule 12(c) motion "may be brought after the dispositive motions deadline if the moving party complies with the requirements of Rule 16(b) *and* if it will not delay trial." *Riggins v. Walter*, 279 F.3d 422, 427–28 (7th Cir. 1995) (emphasis in original) (citation omitted).[12] Here, no trial has been set and this motion can be resolved along with the motions *in limine*, so allowing the motion will not delay trial. Furthermore, defendants premise their motion, at least in part, on recently filed pretrial materials, including plaintiff's proposed jury instructions. In view of this, and because addressing

---

[12] Defendants argue that no dispositive motion deadline was ever set. However, Judge Feinerman stated in a minute entry on December 13, 2022 that "[g]iven the doctor's suggestion that Defendant Tyler will be able to sit for a deposition by early January, the deposition motion deadline is 2/17/2023." ECF 236. In light of the joint status report to which that minute entry responds, *see* ECF 235, it is clear that "deposition motion deadline" was a typo, and what was meant was "dispositive motion deadline." Nonetheless, whether a dispositive motion deadline was set is immaterial because defendants meet the standard for filing a Rule 12(c) motion after that deadline.

the motion may streamline trial, there is good cause under Rule 16(b) for allowing the motion even after the dispositive motion deadline.

Defendants request judgment on the pleadings as to plaintiff's "failure to intervene" claim against Haynes. This "claim" is characterized in the amended complaint as a claim "[i]n addition or in the alternative," under Count II, which more broadly pleads an excessive force claim against Haynes under 42 U.S.C. § 1983. A "failure to intervene" claim requires that one person fails to intervene while another person is committing a constitutional violation. *See Gil v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). Here, since there is no plausible allegation that Tyler committed a constitutional violation--only that she committed state law torts--at no point did Haynes fail to intervene to prevent the commission of a constitutional violation by another. Plaintiff does not respond to this argument, stating simply that she is evaluating whether she should seek leave to amend to cure any defect in her failure to intervene claim. Accordingly, I grant the motion for judgment on the pleadings as to the failure to intervene claim in Count II, though the remainder of Count II stands.

Defendants next argue that judgment should be granted on plaintiff's "aiding and abetting" claim. Defendants are right that "aiding and abetting" is not a standalone tort, *see E. Trading Co.*

54

*v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000) ("[T]here is no tort of aiding and abetting." (citations omitted)), but aiding and abetting "is a theory for holding the person who aids and abets liable for the tort itself," *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006). Here, though aiding and abetting is pled as a separate count, that count incorporates the allegations in the counts for the state-law tort claims against Haynes and Tyler in Counts IV through VI. *See* Am. Compl. ¶ 175, ECF 23 (incorporating the paragraphs for the assault, battery, and IIED counts). The amended complaint thus provides adequate notice under Rule 8 of plaintiff's claim that Haynes aided and abetted Tyler in the commission of the alleged torts. The motion is denied as to plaintiff's aiding and abetting claim.

Next, defendants request that I "bar any evidence related to unpled claims." Def. Mot. at 5, ECF 321. Specifically, defendants identify a "substantive due process state-created danger claim" against Haynes and an excessive force claim against Tyler that are not pled in the amended complaint, but are asserted by plaintiff in the joint pretrial order. *Id.* at 7. As for the excessive force claim against Tyler, defendants do not identify where in the pretrial order plaintiff makes this claim. And in any event, plaintiff represents that she is not pursuing such a claim, so I will deny the motion as to that purported claim. Defendants also state that "while Plaintiff's amended complaint alleges an

excessive force claim against Kristen Haynes, nowhere in the complaint do the words 'seizure' or 'seized' appear in relation to the allegations against Haynes." *Id.* at 7–8. Because defendants do not develop this argument or cite any authority, it is waived. *See Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (undeveloped arguments are waived). Thus, the motion is denied as to the excessive force claim against Haynes.

As for the "substantive due process state-created danger claim," plaintiff did, in fact, plead that claim: it is her § 1983 substantive due process claim found at Count III. A "state-created danger" claim is a type of substantive due process claim, and defendants do not dispute that Count III pleads a substantive due process claim. Def. Mot. at 8, ECF 321. That the count does not bear the more specific label "state-created danger" is not itself fatal since "a complaint need not plead legal theories." *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (citations omitted).

A state-created danger claim requires that a plaintiff plead (1) the state, by its affirmative acts, created or increased a danger to plaintiff; (2) defendant's failure to protect the plaintiff proximately caused the injuries; and (3) defendant's failure to protect the plaintiff shocks the conscience. *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007). The amended complaint sufficiently states this claim because it

alleges or allows me to reasonably infer that Haynes, acting under color of state law, created a danger by inviting Tyler to the school to inflict physical harm on JC; that Haynes' failure to protect JC from this danger proximately caused his injuries because it was foreseeable that JC would be injured by Haynes' acts in inviting Tyler to the school to physically punish JC; and that Haynes' conduct "shocks the conscience."[13] As to proximate cause specifically, the danger of sending JC into the school bathroom alone with Tyler after Haynes gave her instruction to corporally punish JC, as alleged, is "familiar and specific." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009). And under these circumstances, JC was certainly within a definable group of people to which Haynes' conduct created a foreseeable risk. *Id.*

Defendants also contend that state-created danger claims are categorically inappropriate "for conduct within the school walls." Def. Mot. at 11, ECF 321. But defendants' cited case, *J.O. v. Alton Community Unit School District 11*, 909 F.2d 267, 272 (7th Cir. 1990), considered only the "special relationship" exception to the general rule announced in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), that the state has no

---

[13] Defendants do not argue specifically that the "shocks the conscience" element is not sufficiently alleged, nor do they describe what is required to adequately allege this element.

duty to protect individuals from harm by private actors. But plaintiff does not invoke the "special relationship" exception-- indeed, she acknowledges that theory is unavailable to her in light of *Alton Community*--and instead pursues the "state-created danger" exception to *DeShaney*. Accordingly, defendants' motion is denied as to plaintiff's substantive due process state-created danger claim.

**Defendants' Motion *in Limine* No. 9**

Defendants finally move for a 15-hour time limit to present each party's evidence. The motion is denied.

Defendants argue that this time limit is appropriate because the criminal trial of Haynes and Tyler took only four days, and the incident precipitating this suit took no more than 20 minutes. True as that may be, the criminal trial did not comprise as many legal issues as this case and, of critical importance, did not have a damages component. And the length of time it took for the beating to occur is not dispositive, or even necessarily indicative, of how long trial should take. To the extent any party attempts to introduce cumulative evidence that will unnecessarily lengthen the trial, other parties may object.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: February 15, 2024